IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RAYMOND ORTIZ,

     Plaintiff,

vs.                                             No. CIV 18-0028 JB/LF

STATE OF NEW MEXICO,

     Intervenor,

vs.

JOHN BEARDEN,

     Defendant.[1]

## MEMORANDUM OPINION AND AMENDED ORDER[2]

**THIS MATTER** comes before the Court on: (i) the State of New Mexico Risk Management Division's Opposed Motion to Intervene, filed November 6, 2018 (Doc. 36)("Motion to Intervene"); (ii) the Defendants' Motion for Summary Judgment as to Second Amended Complaint Based on Qualified Immunity, filed December 7, 2018 (Doc. 49)("MSJ"); and (iii) Defendant John Bearden's Notice of Joinder in the Motion for Summary Judgment as to

---

[1]This case caption reflects the Court's stipulated order amending the case caption. See Stipulated Order Amending Case Caption, filed September 20, 2019 (Doc. 79).  The Order was issued in response to then-Defendants' request that the case caption be modified in light of the Court's order granting their motion for summary judgment.  See Order, filed September 13, 2019 (Doc. 75).

[2]This Opinion supplements and amends the Court's order granting both The State of New Mexico Risk Management Division's Opposed Motion to Intervene, filed November 6, 2018 (Doc. 36) and Defendants Roberta Lucero-Ortega, Pete Perez, Jason Baca, Gary Trujillo, Damien Nunez, and Carlos Gonzales's Motion for Summary Judgment as to Second Amended Complaint Based on Qualified Immunity, filed December 7, 2018 (Doc. 49).  See Order, filed September 13, 2019 (Doc. 75).

Second Amended Complaint, filed December 18, 2018 (Doc. 53)("Bearden Joinder"). The Court held hearings on January 16, 2019, and September 13, 2019. Clerk's Minutes Before the Court at 1, (taken January 16, 2019), filed January 16, 2019 (Doc. 58); Clerk's Minutes Before the Court at 1 (taken September 13, 2019), filed September 13, 2019 (Doc. 76). The primary issues are: (i) whether the Court should permit the State of New Mexico Risk Management Division ("Risk Management") to intervene in this suit under Rule 24 of the Federal Rules of Civil Procedure because, under state law, Risk Management is tasked with covering liability for torts and civil-rights violations committed by state employees; (ii) whether the Court should permit Bearden's to join the Defendants' MSJ in seeking the dismissal of Counts 1-4 of Ortiz' Second Amended Complaint to Remedy Civil Rights, filed October 31, 2018 (Doc. 30), pursuant to Fed. R. Civ. 10(c); (iii) whether Ortiz' complaint states valid claims for relief under the Fourth Amendment to the Constitution of the United States of America, the Cruel and Unusual Punishment Clause of the Eighth Amendment to the Constitution, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution; (iv) if the sexual contact between Ortiz and Bearden was not consensual, whether a reasonable jury could conclude that, by drawing an inference that Bearden was raping Ortiz and doing nothing about it, Perez, Baca, Trujillo, Nunez, and Gonzales acted with deliberate indifference, in violation of the Fourth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment; and (v) whether Perez, Baca, Trujillo, Nunez, and Gonzales are entitled to qualified immunity with respect to Ortiz' constitutional claims.

The Court concludes that: (i) Risk Management may intervene because it meets its burden of satisfying rule 24(a)'s requirements, in that its obligation to pay damages as required by New Mexico law depends on whether Bearden was acting within the scope of duty; (ii) Bearden is

entitled to adopt by reference the Defendants' MSJ under Rule 7.1(a) of the District of New Mexico Local Rules of Civil Procedure; (iii) although Ortiz' complaint does not violate rule 8's notice-pleading requirement, the claims under the Due Process Clause, Equal Protection Clause, and Fourth Amendment should be dismissed because claims of rape and sexual assault in prison are properly analyzed under the Eighth Amendment; (iv) no reasonable jury could conclude that Perez, Baca, and Trujillo acted with deliberate indifference, but a reasonable jury could conclude that Nunez, Gonzales, and Bearden acted with deliberate indifference; (v) Perez, Baca, and Trujillo are entitled to qualified immunity because no reasonable jury could conclude that they acted with deliberate indifference, but Nunez, Gonzales, and Bearden are not entitled to qualified immunity for the Eighth Amendment cruel-and-unusual punishment claim, because Ortiz has met his burden of demonstrating that right to be free from sexual assault in prison was clearly established at the time of the alleged incident, and because prison rape -- or deliberate indifference to it -- is particularly egregious such that no reasonable officer could conclude it does not offend the Constitution. Accordingly, the Court will grant the Motion to Intervene and the MSJ with respect to Perez, Baca, Trujillo, but deny the MSJ with respect to Nunez, Gonzales, and Bearden.

## **FACTUAL BACKGROUND**

The MSJ states that "Defendants have chosen to file a single motion asserting and combining all of the grounds for dismissal and/or summary judgment." MSJ at 2. Rule 12(b)(6) and rule 56(a) use different factual standards, however. See Fed. R. Civ. P. 12(b)(6); Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Because the Court must separately address arguments under rule 12(b)(6) and rule 56(a), the Court includes two separate factual sections, one for rule 12(b)(6) purposes, the other for rule 56(a) purposes.

1.       <u>**Facts for the Purpose of Rule 12(b)(6).**</u>

Beginning in late-September, 2015, Ortiz was an inmate housed at Western New Mexico Correctional Facility in Grants, New Mexico ("Western NM"). Ortiz' Second Amended Complaint to Remedy Civil Rights ¶ 9, at 3, filed October 31, 2018 (Doc. 30)("Second Amended Complaint"); <u>id.</u> ¶ 3, at 2. Ortiz was housed in Housing Unit #2, Upper Level ("H-Unit"). <u>See</u> Second Amended Complaint ¶ 9, at 3. Bearden was a forty-eight year-old male corrections officer who worked at Western NM. <u>See</u> Second Amended Complaint ¶ 10, at 3. Bearden was assigned to the H-Unit. <u>See</u> Second Amended Complaint ¶ 10, at 3. Bearden became "intensely interested" in Ortiz "shortly after Mr. Ortiz began his detention" at Western NM near the end of September, 2015. Second Amended Complaint ¶ 14, at 4. Bearden's interest began with "an intense and inappropriate physical attraction to Mr. Ortiz" that "would have been very difficult to conceal from" other inmates and guards at the prison, including Jason Baca, Gary Trujillo, Warden Lucero-Ortega, and Deputy Warden Pete Perez. Second Amended Complaint ¶ 14, at 4. Bearden's conversations with Ortiz began to revolve "mostly around Bearden's homosexuality and his intense and inappropriate sexual interest toward" Ortiz. Second Amended Complaint ¶ 15, at 4-5. As the interaction between Ortiz and Bearden increased, Bearden "emphasized his authority and control over" Ortiz, and made known his "intent and inappropriate interest in having a sexual relationship with" Ortiz. Second Amended Complaint ¶ 16, at 5. In view of Baca, Trujillo, Lucero-Ortega, Perez, and others, Ortiz protested that he was not interested in a sexual relationship with Bearden. Second Amended Complaint ¶ 16, at 5. Baca, Trujillo, Lucero-Ortega, Perez, and other employees and officers at Western NM knew that Bearden's actions violated Ortiz' rights, including those the Prison Rape Elimination Act, 34 U.S.C. §§ 30301-30309, protects. <u>See</u> Second Amended Complaint ¶ 17, at 5; <u>id.</u> ¶ 11, at 4.

During the next "approximately two weeks,"[3] Bearden's advances towards Ortiz "increased in frequency." Second Amended Complaint ¶ 17, at 5. Bearden's advances included "flirting and unwanted kissing," and then "unwanted touching and groping Mr. Ortiz' body, including his buttocks and genitalia." Second Amended Complaint ¶ 18, at 5. The advances were so frequent that "it would have been impossible to conceal" them from "anyone who was observant." Second Amended Complaint ¶ 19, at 5-6. Bearden's behavior drew enough attention from the other inmates for the other inmates to label Ortiz "Officer Bearden's favorite." Second Amended Complaint ¶ 19, at 6. Other inmates saw Bearden's sexual interest in Ortiz as an opportunity to acquire "contraband items such as drugs and cigarettes." Second Amended Complaint ¶ 20, at 6. Other inmates tried to manipulate Ortiz by threatening, intimidating, harassing, and coercing him into reciprocating Bearden's advances. See Second Amended Complaint ¶ 20, at 6. Bearden's behavior created an opportunity for other inmates to demand that Ortiz "'take one for the team'" and submit to Bearden's sexual advances, or else risk harm. Second Amended Complaint ¶ 20, at 6 (no citation for quotation).

Ortiz was terrified of Bearden's power as a corrections officer and of the other inmates' threats. See Second Amended Complaint ¶ 21, at 6. As a result, even though Ortiz was "a heterosexual male" and had no interest in reciprocating Bearden's advances, he "had no choice but to concede," "hoping and praying the behavior would at least be limited to the flirting and touching he was already subjected to," but would eventually stop. Second Amended Complaint ¶ 21, at 6.

---

[3]The Second Amended Complaint does not state when this two-week period begins or ends. See Second Amended Complaint. Because Ortiz arrived in "mid to late September 2015," Second Amended Complaint ¶ 9, at 3, and Bearden's interest in Ortiz began "toward the end of September 2015," Second Amended Complaint ¶ 14, at 4, this two-week period appears to run until sometime in mid-October, 2015.

Bearden's advances did not stop, but became more severe.  See Second Amended Complaint ¶ 22, at 6.  Bearden wrote letters do Ortiz, "which he did not conceal."  Second Amended Complaint ¶ 22, at 6.  Bearden continued to sexually harass and sexually assault Ortiz.  See Second Amended Complaint ¶ 22, at 6.

Bearden "violently raped" Ortiz "at least" twice during this two-week period.  Second Amended Complaint ¶ 23, at 7.  During one rape, Bearden abandoned the assault after becoming angry that Ortiz was not responding.  Second Amended Complaint ¶ 23, at 7.[4]  On another occasion, Bearden "violently raped" Ortiz by "forcibly coercing him to comply with Bearden's desire for criminal sexual penetration."  Second Amended Complaint ¶ 23, at 7.  Ortiz responded by resorting to "desperate actions to stop the rape, but only after Bearden had completed the rape and digital penetration."  Second Amended Complaint ¶ 23, at 7.[5]  Ortiz "desperately" tried to avoid Bearden during this time.  Second Amended Complaint ¶ 27, at 8.  The H-Unit's confinement, as well as the "constant threats and harassment from the other inmates" who were trying to exploit Ortiz and Bearden's relationship for contraband, made Ortiz' attempts to avoid

---

[4]The Second Amended Complaint states that this incident is "described in detail" in the "WNMCF and New Mexico State Police . . . investigative reports."  Second Amended Complaint ¶ 23, at 7.  These reports are not attached to the Second Amended Complaint, the First Amended Complaint to Remedy Civil Rights and New Mexico Tort Claims Act Violations, filed February 5, 2018 (Doc. 11), or the original complaint filed in State court and attached to the Notice of Removal, filed January 10, 2018 (Doc. 1).  The Court, therefore, is unable to consider any allegations in these reports for rule 12(b)(6) purposes.

[5]The Second Amended Complaint states that this incident is "described in detail" in the "WNMCF and New Mexico State Police . . . investigative reports."  Second Amended Complaint ¶ 23, at 7.  These reports are not attached to the Second Amended Complaint, the First Amended Complaint to Remedy Civil Rights and New Mexico Tort Claims Act Violations, filed February 5, 2018 (Doc. 11), or the original complaint filed in State court and attached to the Notice of Removal, filed January 10, 2018 (Doc. 1).  The Court, therefore, is unable to consider any allegations in these reports for rule 12(b)(6) purposes.

Bearden in vain.  See Second Amended Complaint ¶ 27, at 8.  Bearden began to smuggle "additional kind of contraband" into Western NM, including methamphetamines, marijuana, and suboxone.  Second Amended Complaint ¶ 27, at 8.  Other inmates used the drugs Bearden supplied. See Second Amended Complaint ¶ 27, at 8.

Bearden raped Ortiz again on October 18, 2015, between 2:00 a.m. and 3:30 a.m.[6]  See Second Amended Complaint ¶ 28, at 8.  Early in the morning of October 18, 2015, Bearden turned off the H-Unit's lights, opened Ortiz' cell to awake him, and "forcefully removed him to the H-Unit stairway," which was "known by all employees of the facility to be a dangerous location" because it was "not monitored by any audio or video."  Second Amended Complaint ¶ 28, at 8-9. Ortiz knew that he had "no choices in resisting Bearden," because, in addition to Bearden having authority over him, Ortiz would "face reprisals from the other inmates" if Bearden stopped supplying drugs and other contraband.  Second Amended Complaint ¶ 29, at 9.  Once Ortiz and Bearden were in the H-Unit stairwell, Bearden confined Ortiz "to a corner of the stairwell in order to viciously rape him."  Second Amended Complaint ¶ 30, at 9.  Bearden kept mace in his pocket, "placed his radio and keys on the stairs, and ordered Mr. Ortiz to remove his shirt, pants, and underwear as he handcuffed" Ortiz.  Second Amended Complaint ¶ 30, at 9.  Ortiz resisted, but Bearden "viciously raped" Ortiz by "digitally penetrating him with his penis and other body parts."

---

[6]It is not clear from the Second Amended Complaint whether this is the second or third time Bearden allegedly raped Ortiz.  See Second Amended Complaint ¶¶ 1-66, at 1-16.  The Second Amended Complaint states that Bearden "violently raped" Ortiz "at least" twice during the two-week period that began sometime in late-September, 2015.  Second Amended Complaint ¶ 23, at 7.  The Second Amended Complaint does not provide sufficient detail to say with certainty that this is the third time that Bearden allegedly raped Ortiz.  See Second Amended Complaint at 1-16.  Because, however, Ortiz alleges this rape occurred on October 18, 2015, which is more than two weeks after the "approximately" two-week period began, Second Amended Complaint ¶ 17, at 5, the Court treats the alleged October 18, 2015, rape as a third alleged rape.  See Second Amended Complaint ¶ 28, at 8.

Second Amended Complaint ¶ 30, at 9.[7]   Ortiz tried "desperately" to end the rape.   Second Amended Complaint ¶ 31, at 9.   When the rape was complete, Bearden returned Ortiz to his cell. Second Amended Complaint ¶ 31, at 9.   Ortiz then was "overcome with severe physical and emotional distress in the form of grief, worry, anger, anxiety, depression, dizziness, nausea, and physical pain from the physical trauma inflicted by Bearden."   Second Amended Complaint ¶ 31, at 9.[8]   Soon after Bearden returned Ortiz to his cell, Bearden slid a letter under Ortiz' cell door. See Second Amended Complaint ¶ 32, at 10.   The letter "filled Mr. Ortiz with anxiety and dread, as he believed Bearden was threatening him with a future sexual assault and rape."   Second Amended Complaint ¶ 32, at 10.

After this October 18, 2015, rape, the "intense and frequent pressure of threats by the other inmates" for Ortiz to supply them drugs through Bearden put both Ortiz "and the general population housed in the facility in serious danger."   Second Amended Complaint ¶ 33, at 10.   On October 21, 2015, Ortiz arranged for Bearden to bring drugs into Western NM for other inmates the next day, October 22, 2015.   See Second Amended Complaint ¶ 33, at 10.   Bearden picked up

---

[7]The Second Amended Complaint states that this incident is "described in graphic detail" in the "WNMCF and NMSP investigative reports."   Second Amended Complaint ¶ 30, at 9.   These reports are not attached to the Second Amended Complaint, the First Amended Complaint to Remedy Civil Rights and New Mexico Tort Claims Act Violations, filed February 5, 2018 (Doc. 11), or the original complaint filed in State court and attached to the Notice of Removal, filed January 10, 2018 (Doc. 1).   The Court, therefore, is unable to consider any allegations in these reports for rule 12(b)(6) purposes.

[8]The Second Amended Complaint states that this incident is "described in graphic detail" in the "WNMCF, NMSP, and Albuquerque Sexual Assault Nurse Examiners Collaborative . . . reports."   Second Amended Complaint ¶ 31, at 9-10.   These reports are not attached to the Second Amended Complaint, the First Amended Complaint to Remedy Civil Rights and New Mexico Tort Claims Act Violations, filed February 5, 2018 (Doc. 11), or the original complaint filed in State court and attached to the Notice of Removal, filed January 10, 2018 (Doc. 1).   The Court, therefore, is unable to consider any allegations in these reports for rule 12(b)(6) purposes.

the drugs but did not show for work on October 22, 2015.  See Second Amended Complaint ¶ 33, at 10.  Ortiz's life was put in "serious jeopardy" because Bearden did not show up for work.  See Second Amended Complaint ¶ 33, at 10.  The other inmates "believed Mr. Ortiz had kept and used their drugs for himself."  Second Amended Complaint ¶ 34, at 10.  On October 22, 2015, with "danger rising and pressure mounting from other inmates," Ortiz attempted to find the drugs that Bearden had brought to the facility.  Second Amended Complaint ¶ 34, at 10.

Before the rape,[9] another inmate informed prison officials, including STIU Officer Damien Nunez, STIU Officer Carlos Gonzales, Lucero-Ortega, Perez, Baca, and Trujillo, that Ortiz was selling drugs.  See Second Amended Complaint ¶ 35, at 10-11.  As a result, these Western NM officials began monitoring and recording Ortiz' telephone calls.  See Second Amended Complaint ¶ 35, at 11.  These Western NM officials also discovered the Bearden's letters to Ortiz.  See Second Amended Complaint ¶ 35, at 11.  These prison officials learned about Bearden's "inappropriate sexual attraction" to Ortiz.  Second Amended Complaint ¶ 35, at 11.  As a result, these Western NM officials "in fact drew the subjective inference of the substantial risk of serious harm (the impending sexual assault) that would occur," and "chose to consciously disregard that known risk by doing nothing to prevent it."  Second Amended Complaint ¶ 35, at 11.  Rather than intervening to protect Ortiz, Western NM officials, including Lucero-Ortega and Perez, decided to use Ortiz "as bate to catch Bearden in the act of bringing drugs into the facility."  Second Amended Complaint ¶ 35, at 11.

By monitoring Ortiz' telephone calls, Western NM officials "became aware that a drug drop would take place upon Bearden's return to work" at Western NM on October 23, 2015.

---

[9]The Second Amended Complaint does not state which alleged rape.  See Second Amended Complaint ¶ 35, at 10.

Second Amended Complaint ¶ 35, at 11.  When Bearden returned to work on October 23, 2015, Western NM officials searched his vehicle, which uncovered the "contraband items Bearden intended to give to" Ortiz for the other inmates.  Second Amended Complaint ¶ 35, at 11.  New Mexico State Police officers were dispatched to Western NM that same day, October 23, 2015.[10] See Second Amended Complaint ¶ 36, at 11.  New Mexico State Police officers searched Bearden's vehicle, and found marijuana and methamphetamines that were intended for other inmates.  See Second Amended Complaint ¶ 36, at 11.  Western NM corrections officers logged these substances as evidence, and turned them over to NM State Police.  See Second Amended Complaint ¶ 36, at 11.

NM State Police officers investigated Bearden's October 18, 2015, "sexual assault, rape, and digital penetration" of Ortiz.  See Second Amended Complaint ¶ 37, at 12.  The investigation "substantiated Bearden's deprivation of Mr. Ortiz' constitutional rights."  Second Amended Complaint ¶ 39, at 12.  As a result of the investigation, Ortiz was moved from Western NM to the Albuquerque SANE Collaborative in Albuquerque, New Mexico, for a "full sexual assault examination."  Second Amended Complaint ¶ 37, at 12.  The examination confirmed that Bearden sexually assaulted Ortiz.[11]  See Second Amended Complaint ¶ 37, at 12.

---

[10]The Second Amended Complaint states that this dispatch occurred on October 23, 2017.  See Second Amended Complaint ¶ 36, at 11.  The Court assumes this date is a typographical error, and concludes that the Second Amended Complaint asserts that New Mexico State Police officers were dispatched on October 23, 2015, because it states the dispatch occurred the "same day," not two years later.  Second Amended Complaint ¶ 35, at 11.

[11]The Second Amended Complaint states that the "Albuquerque SANE Collaborative examination results are incorporated by reference."  Second Amended Complaint ¶ 37, at 12.  The examination's results are not attached to the Second Amended Complaint, the First Amended Complaint to Remedy Civil Rights and New Mexico Tort Claims Act Violations, filed February 5, 2018 (Doc. 11), or the original complaint filed in State court and attached to the Notice of

Bearden was terminated from his job at Western NM, and the State of New Mexico filed criminal charges against him.  See Second Amended Complaint ¶ 39, at 12.  On October 23, 2015, a state grand jury indicted Bearden for: (i) one count of Criminal Sexual Penetration, a second-degree felony; (ii) two counts of Bringing Contraband Into Prison, a third-degree felony; (iii) one count of Possession of a Controlled Substance, a fourth-degree felony; (iv) one count of Furnished Drugs to a Prisoner, a fourth degree felony; (v) and one count of Possession of Marijuana Less Than One Ounce, a petty misdemeanor.  See Second Amended Complaint ¶ 40, at 12.  Bearden pled guilty to "two counts of Criminal Sexual Contact in the Fourth Degree (Personal Injury) and one count of Bringing Contraband Onto Prison Grounds," a third-degree felony.  Second Amended Complaint ¶ 40, at 12.

### 2.      Facts for the Purpose of Rule 56.

This case arises from a series of sexual assaults that occurred between late September, 2015, and October, 2015, at Western NM.  See MSJ, at 7-8.  The Court draws its facts from the MSJ; the Plaintiff's Response to Motion for Summary Judgment on Qualified Immunity ¶¶ 1, 2, at 2, filed February 5, 2019 (Doc. 61)("MSJ Response"); the Defendants Reply in Support of Motion for Summary Judgment as to Second Amended Complaint Based on Qualified Immunity, filed March 5, 2019 (Doc. 64)("MSJ Reply"); and Defendant John Bearden, Sr.'s Reply in Support of Motion for Summary Judgment Based on Qualified Immunity, filed March 7, 2019 (Doc. 67)("Bearden MSJ Reply").  Most of the facts are undisputed.  The Court states here the undisputed material facts.  See Fed. R. Civ. P. 56.  Facts that are disputed are specifically noted.

---

Removal, filed January 10, 2018 (Doc. 1).  The Court, therefore, is unable to consider any allegations contained in these reports for rule 12(b)(6) purposes.

a.    **Background**.

In October 2015, Plaintiff Ortiz was an inmate incarcerated at Western NM.  See MSJ ¶ 5, at 8 (asserting this fact)(citing Affidavit of Roberta Lucero-Ortega, filed December 7, 2018 (Doc. 49-1) ¶ 7("Ortega Aff."); Affidavit of Carlos Gonzales, filed December 7, 2018 (Doc. 49-2) ¶ 15).[12]  Ortiz was one of about 360 inmates housed at Western NM.  See MSJ ¶ 4, at 8 (asserting this fact)(citing Ortega Aff. ¶ 6, at 2).[13]  At Western NM, Ortiz was housed in Housing Unit Two. See MSJ ¶ 5, at 8 (asserting this fact)(citing Ortega Aff. ¶ 5, at 2; Gonzales Aff. ¶ 7, at 2-3).[14] Housing Unit Two is a separate building from the Administration Building, where the Warden, Deputy Warden, Major, and Captain worked, and from Building F, where the Security Threat Intelligence Unit ("STIU") Officers worked. See MSJ ¶ 4, at 8 (asserting this fact)(citing Ortega Aff. ¶ 6, at 2).[15]  MSJ ¶ 7, at 9 (citing Gonzales Aff. ¶ 2, at 1)(defining STIU).[16]  The purpose of

---

[12]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[13]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[14]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[15]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[16]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The

the STIU is to monitor and prevent gang activity, violence, and the use of narcotics or other

dangerous items into Western NM.  See MSJ ¶ 7, at 9 (asserting this fact)(citing Gonzales Aff. ¶

4, at 1; Affidavit of Damian Nunez ¶ 4, at 1, filed December 7, 2018 (Doc. 49-3)("Nunez Aff.")).[17]

Defendants Perez, Baca, Trujillo worked in the Administration Building, while Nunez and

Gonzales worked in Building F.  See MSJ ¶ 6, at 8 (asserting this fact)(citing Ortega Aff. ¶ 7, at 2;

Gonzales Aff. ¶ 15, at 6-7).[18]  Perez, Baca, Trujillo, Nunez, and Gonzales all worked the day shift

at Western NM -- between 8:00 a.m. and 4:00 p.m.  See MSJ ¶ 6, at 8 (asserting this fact).[19]

           **b.      <u>The STIU Officers Monitor Ortiz and Bearden's Correspondence</u>.**

      Sometime in mid-October, 2015, the STIU received an anonymous tip that Ortiz was

getting illicit drugs from his mother and then smuggling them into Western NM.  See MSJ ¶ 8, at

9 (asserting this fact)(citing Gonzales Aff. ¶ 5, at 1-2; Nunez Aff. ¶ 5, at 1-2).[20]  Because of this

---

Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

      [17]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

      [18]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

      [19]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

      [20]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

tip, Gonzales and Nunez began to monitor and record the telephone calls between Ortiz and his mother, Stephanie Fawley, under the supervision of STIU Sergeant Harley Scott.  See MSJ ¶ 8, at 9 (asserting this fact)(citing Gonzales Aff. ¶ 5, at 1-2; Nunez Aff. ¶ 5, at 1-2).[21]

In a telephone conversation between Ortiz and his mother on October 12, 2015, Ortiz told his mother that he was "playing the part" and "going out with one," and that Ortiz would refer to "him" -- the person with whom he was "going out" -- as "her." MSJ ¶ 9, at 9 (asserting this fact)(asserting this fact) (citing Gonzalez Affidavit ¶ 6, at 2; Email from Gonzales to Scott with transcript of October 12, 2015, telephone call, filed December 7, 2018, (Doc. 49-2a)("October 12 Transcript")).[22] Ortiz and his mother also discussed getting something from "Ace" to put inside a card, which would be then be placed inside an sealed envelope, even if it meant his mother had to "smash it up" and "flatten it as good as" she could so it would fit inside the envelope.  MSJ ¶ 9, at 9-10 (citing Gonzales Aff. ¶ 6, at 2; October 12 Transcript).[23]  The STIU officers suspected this "something" to be drugs.  MSJ ¶ 9, at 9 (asserting this fact)(citing Gonzales Aff. ¶ 6, at 2).[24]  Ortiz

[21]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed." MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[22]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed." MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[23]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed." MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[24]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed." MSJ Response ¶ 3, at 2.  The

then told his mother to deliver the sealed envelope to an unnamed female -- the same person his

mother "went to kick it with last time." MSJ ¶ 9, at 9-10 (asserting this fact)(citing Gonzales Aff.

¶ 6, at 2; October 12 Transcript).[25]  Ortiz then said that "the girl I'm going out with" would then

"go and get" the sealed envelope from this unnamed female.  MSJ ¶ 9, at 10 (asserting this

fact)(citing October 12 Transcript).[26]  Ortiz also mentioned that the "girl" he was "going out with"

"works for there," which the STIU officers believed meant that "she" was employed at Western

NM.  MSJ ¶ 9, at 10 (asserting this fact)(citing Gonzales Aff. ¶ 6, at 2; October 12 Transcript).[27]

By monitoring other telephone calls, STIU officers learned that this "girl" was named

"John" or "Johnny."  MSJ ¶ 10, at 10 (asserting this fact)(citing Gonzales Aff. ¶ 7, at 2-3).[28]  STIU

officers determined that this was most likely Bearden, who worked in Housing Unit Two daily

from 2:00 p.m. to 10:00 p.m. but often continued to work after his shift was over.  See MSJ ¶ 10,

---

Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[25]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[26]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[27]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[28]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

at 10 (asserting this fact)(citing Gonzales Aff. ¶ 7, at 2-3).[29]   By monitoring other calls between

Ortiz and his mother, STIU officers learned that a drug drop was planned for October 22-23, 2015,

and that the person STIU officers suspected to be Bearden was supposed to bring the drugs to the

facility and then deliver them directly to Ortiz.   See MSJ ¶ 11, at 10 (asserting this fact)(citing

Gonzales Aff. ¶ 7, at 2-3).[30]   Ortiz, however, told his mother than "she" -- the person responsible

for delivering the drugs -- was not at work that day.   MSJ ¶ 11, at 10 (asserting this fact)(citing

Gonzales Aff. ¶ 7, at 2-3).[31]   The STIU officers confirmed that Bearden had called in sick that day,

October 22, 2015.   See MSJ ¶ 11, at 10 (asserting this fact)(citing Gonzales Aff. ¶ 7, at 2-3).[32]

On October 22, 2015, Ortiz asked his mother to call "her" – Bearden -- and "tell her that I

miss her and can't wait to see her."   MSJ ¶ 11, at 10 (asserting this fact)(citing Gonzales Aff. ¶ 7,

at 2-3).[33]   On another call on October 23, 2015, Ortiz asked his mother what "she" had told his

---

[29]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."   MSJ Response ¶ 3, at 2.   The Court, therefore, deems this fact undisputed.   See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[30]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."   MSJ Response ¶ 3, at 2.   The Court, therefore, deems this fact undisputed.   See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[31]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."   MSJ Response ¶ 3, at 2.   The Court, therefore, deems this fact undisputed.   See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[32]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."   MSJ Response ¶ 3, at 2.   The Court, therefore, deems this fact undisputed.   See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[33]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."   MSJ Response ¶ 3, at 2.   The

mother, and his mother responded that "[s]he said she misses you too."  MSJ ¶ 11, at 11-12 (asserting this fact)(citing Gonzales Aff. ¶ 7, at 2-3).[34]  On another call, Ortiz told his mother: "[m]y girl put my money on my books under my name. She sent me fifty bucks"; and that "she said she would take care of me while I'm here."  MSJ ¶ 12, at 11 (asserting this fact)(citing Gonzales Aff. ¶ 7, at 2-3).[35]  When his mother asked about the price of this loyalty, Ortiz responded: "Nothing, just be loyal to her."  MSJ ¶ 12, at 11 (asserting this fact)(citing Gonzales Aff. ¶ 7, at 2-3).[36]  Ortiz continued: "I'm just playing the part."  MSJ ¶ 12, at 11 (asserting this fact)(citing Gonzales Aff. ¶ 7, at 2-3).[37]  The STIU investigation later confirmed that Bearden had

---

Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[34]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[35]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[36]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[37]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

in fact arranged to provide a fifty-dollar money order to Ortiz.  See MSJ ¶ 13, at 11 (asserting this fact)(citing Gonzales Aff. ¶ 13, at 5).[38]

### c.  The STIU Officers Search Ortiz' Cell and Search Bearden.

The STIU officers eventually searched Ortiz' cell.  See MSJ ¶ 14, at 11 (asserting this fact)(citing Gonzales Aff. ¶ 9, at 4).[39]  They found an unsigned, undated, handwritten letter hidden under Ortiz' mattress.  See MSJ ¶ 14, at 11 (asserting this fact)(citing Gonzales Aff. ¶ 9, at 4).[40] The letter contains a series of amorous statements, including: "[h]ey handsome, I bet you didn't know how much I love your . . . cute face, you're so fucking adorable, I just wanna squeeze you"; "[i]t's pure torture not being able to kiss you every time I see you"; "I like it when you bite my lips, it's hot!";"[y]ou get a little rough and it turns me on"; and "[a]ctually you drive me fucking crazy, I don't show it but trust me, you do."  See MSJ ¶ 14, at 11 (asserting this fact)(citing Gonzales Aff. ¶ 9, at 4; Undated Handwritten Letter, filed December 7, 2018 (Doc. 49-2c)("Undated Handwritten Letter A"); Nunez Aff. ¶ 5, at 1-2).[41]  The Undated Handwritten Letter

---

[38]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[39]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[40]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[41]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The

A says, "I'm gonna get you that promise ring we talked about real soon."  MSJ ¶ 14, at 11 (asserting this fact)(citing Undated Handwritten Letter A).[42]  The STIU officers saw a similarity between the handwriting in the letter and Bearden's handwriting.  See MSJ ¶ 15, at 12 (asserting this fact)(citing Gonzalez Affidavit ¶ 10, at 4).[43]  On October 23, 2015, when Bearden was caught trying to smuggle methamphetamine into Western NM, he was shown the letter and admitted to being its author.  See MSJ ¶ 15, at 12 (asserting this fact).[44]

A second letter was found later in October 2015 by a Western NM Correctional Officer taking a smoking break in the prison parking lot.  See MSJ ¶ 16, at 12 (asserting this fact)(citing Gonzales Aff. ¶ 11, at 4-5).[45]  The Letter begins: "Hey there babe, kisses first off. I wish I could sleep with you 2, but for more than 1 night."  MSJ ¶ 16, at 12 (asserting this fact)(citing Undated

---

Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[42]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[43]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[44]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[45]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Handwritten Letter, filed December 7, 2018 (Doc. 49-2d)("Undated Handwritten Letter B").[46]
Undated Handwritten Letter B also contains statements like: "I want you forever"; "I never wanted
someone more than I want you"; "I feel wonderful when I am around you"; "[w]hen you look at
me I feel wanted "; and  "I fucking love what your [sic] doing to me."  MSJ ¶ 16, at 12 (asserting
this fact)(citing Undated Handwritten Letter B).[47]   The Undated Handwritten Letter B contains
hope for the future, including: "I dream of escaping and living with you at your house, making
meals and walking around naked, working on the truck."  MSJ ¶ 16, at 12 (asserting this fact)(citing
Undated Handwritten Letter B).[48]   The letter says: "I hope you like me as much as I like you" and
"[i]f you start loosing [sic] interest in me will you let me no [sic] please."  MSJ ¶ 16, at 12 (asserting
this fact)(citing Undated Handwritten Letter B).[49]   Undated Handwritten Letter B concludes, "I
loves [sic] you daddy." MSJ ¶ 16, at 12 (asserting this fact).[50]   The Letter is signed: "your secret."

_____

[46]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[47]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[48]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[49]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[50]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The

MSJ ¶ 16, at 12 (asserting this fact)(citing Undated Handwritten Letter B).[51]  The handwriting of

this letter, too, matches Bearden's, and, when questioned, Bearden admitted to writing it.  See MSJ

¶ 17, at 12 (asserting this fact)(citing Gonzales Aff. ¶ 12, at 5).[52]

At this point, the STIU officers were convinced that Ortiz and Bearden were collaborating

to smuggle drugs into the prison on October 22 or 23, 2015, and that they had an "inappropriate

relationship."  See MSJ ¶ 18, at 12-13 (asserting this fact)(citing Gonzales Aff. ¶ 13, at 5; Nunez

Aff. ¶ 6, at 2).[53]  Adopting all reasonable inferences in Ortiz' favor, the STIU officers had reason

to believe the relationship between Ortiz and Bearden was not consensual, as well as prohibited

by New Mexico law and prison policy.[54]

---

Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[51]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[52]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[53]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to
note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[54]The MSJ asserts: "Everything that the STIU Officers heard, read and learned during the
course of their investigation suggested to them that the relationship between [Ortiz] and Bearden
was consensual, albeit prohibited by New Mexico criminal statutes and prison policy."  See MSJ
¶ 19, at 13 (asserting this fact)(citing Gonzales Affidavit ¶ 13, at 5; Nunez Aff. ¶ 6, at 2).  The MSJ
also asserts: "in light of everything they knew, [the STIU officers] believed the relationship was a
consensual one between two adults . . . ."  See MSJ ¶ 20, at 13 )(asserting this fact)(citing Gonzales
Affidavit ¶ 13, at 5; Nunez Aff. ¶ 6, at 2.

Ortiz disputes these two points.  See MSJ Response ¶ 3a-b, at 2 (citing Affidavit of Raymond Ortiz ¶¶ 1, 6, 10-12, 14-28, 30, 33-38, at 1-8, filed February 5, 2019 (Doc. 61-1)("Ortiz Aff."); Affidavit of Kathleen Dennehy-Fay ¶¶ 4, 6, 7a, 7b, 7e, 7f, 7g, 7h, at 2-5, filed February 5, 2019 (Doc. 61-2)("Dennehy-Fay Aff."), ¶¶ 39-44, at 19-21 (citing Dennehy-Fay Aff. ¶7h, at 5; PREA Audit Report, filed February 5, 2019 (Doc. 61-4)("PREA Audit Report")).  The MSJ Response points to sections from the Ortiz Aff. that assert that the relationship was not consensual, see MSJ Response ¶ 3a, at 2, and to sections of the Dennehy-Fay Aff. that suggest that corrections officers should or would be aware that sexual relationships between prison guards and inmates are prohibited.  See MSJ Response ¶ 3a, at 2.  In particular, the Dennehy-Fay Aff. asserts that "[n]o reasonable corrections professional could conclude that the relationship between inmate Raymond Ortiz and Corrections Officer John Bearden was consensual."  Dennehy-Fay Aff. ¶ 7f, at 4.

Most of the portions of the Ortiz Aff. that Ortiz cites provide no insight into whether the STIU officers had any reason to believe the relationship between Ortiz and Bearden was not consensual.  Although the bulk of the Ortiz Aff. provides reason to doubt that the relationship was, consensual, that alone says little about the officers' beliefs.  Ortiz does, however, say that he was "under a lot of pressure, intimidation, and threats of violence from other inmates to try to take advantage of John Bearden's obvious advances.  The other inmates started calling me his favorite and the pressure I felt as a young inmate, new to the facility, as overwhelming."  Ortiz Aff. ¶ 12, at 3.  Taken in a light most favorable or Ortiz, this assertion provides reason to believe the STIU officers were aware of Bearden's obvious interest, and that other inmates were exploiting it to obtain drugs.  A reasonable finder of fact could infer that because the other inmates were aware of Bearden's "obvious advances," Ortiz Aff. ¶ 12, at 3, the STIU officers were as well.

The Dennehy-Fay Aff. provides more support for the assertion that the relationship was not consensual than it does about the STIU officers' beliefs.  The Dennehy-Fay Aff. explains how the unavoidable power dynamic between officers and inmates means that "those in custody are not in a position to ever freely consent to sexual contact with staff members."  Dennehy-Fay Aff. ¶ 9 at 6.  The Dennehy-Fay Aff. also argues that "[n]o reasonable corrections professional could conclude that the relationship between inmate Raymond Ortiz and Corrections Officer John Bearden was consensual."  Dennehy-Fay Aff. ¶ 7f, at 4.  This assertion goes more towards the question of qualified immunity than it does the STIU officers' beliefs, see Taylor v. Riojas, 141 S. Ct. 52, 54 (2020)(per curiam)(overturning a grant of qualified immunity on the basis that "no reasonable correctional officer could have concluded that . . . it was constitutionally permissible" to house an inmate in cells covered in human waste), but it is still some evidence of the reasonableness of the officers' beliefs and suggests that the officers could have drawn the inference that Ortiz and Bearden's relationship was not consensual.

The Dennehy-Fay Aff. reiterates, however, that at least some of the STIU officers heard Ortiz tell his mother on the telephone that he was "playing the part" in his relationship with Bearden. Dennehy-Fay Aff. ¶ 6, at 3. The MSJ acknowledges this fact too.  See MSJ ¶ 9, at 9; id. ¶ 12, at 11.  The MSJ suggests that what Ortiz meant when he stated he was "playing the part" that he was exploiting his relationship with Bearden for drugs.  See MSJ ¶ 9, at 9; id. ¶ 12, at 11.  A reasonable factfinder could conclude, however, that Ortiz meant that he was "playing the part" because he was under pressure both from Bearden and from other inmates to continue the relationship.  As the Dennehy-Fay Aff. asserts, "[o]nce sexual activity is initiated, prisoners may not have the freedom or ability to stop specific sexual acts, should they wish to do so.  Inmates

may feel coerced into sexual relationships with staff in exchange for resources or contraband." Dennehy-Fay Aff. ¶ 9, at 6. Because it is undisputed that the STIU officers twice heard Ortiz say to his mother that he was "playing the part," MSJ ¶ 9, at 9; id. ¶ 12, at 11, a reasonable factfinder could conclude that, because of their investigation, the STIU officers knew or had reason to know Bearden coerced Ortiz. The Court, therefore, determines the nature of Ortiz and Bearden's relationship to be in dispute.

The record, however, only includes facts alleging that STIU Officers Gonzales and Nunez, and STIU Sergeant Scott and STIU coordinator Ben Cavasos, neither of whom is named as a defendant, were aware of the content of these phone calls. See MSJ ¶ 8, at 9. The MSJ Response does not dispute or otherwise respond to this fact. See MSJ Response ¶ 3, at 2.

There is no genuine dispute that Perez and Baca did not learn about the investigation until October 23, 2015, when they intervened. See MSJ ¶ 21, at 13 (asserting this fact). There is also no dispute that Trujillo did not play a role in the matter. See MSJ Reply n.4, at 8 (asserting this fact). The MSJ Response asserts that, when taken in a light most favorable to Ortiz, this suggests that Perez, Baca, and Trujillo "all acquiesced in using [Ortiz] as bate to catch Bearden with drugs." MSJ Response ¶ 10, at 5. There is, however, no evidence in the record they had any knowledge of either the content of the phone calls between Ortiz and his mother or Bearden's behavior toward Ortiz. Ortiz does not dispute that Perez, Baca, Trujillo, Nunez, and Gonzales worked in a different building on a different shift than Bearden. See MSJ ¶ 6, at 8 (asserting this fact); MSJ Response ¶ 3, at 2; id. ¶ 10, at 5 (not disputing or otherwise responding to this fact). The Court therefore determines that this fact is only in dispute with respect to Gonzales and Nunez.

In addition, Court notes that Western NM passed its Prison Rape Elimination Act, 42 U.S.C. §§ 30301-30309 ("PREA") audit in 2015. See Bureau of Justice Assistance, National PREA Resource Center, WNMCF Audit 2015, at 20, filed February 5, 2019 (Doc. 61-5)("Western NM PREA Audit"). The Western NM PREA Audit states: "The audit team was impressed by how knowledgeable the correctional officers and other staff were about PREA, offender rights regarding PREA, first response, and evidence collection. The vast majority of staff clearly understood PREA and the agency's commitment to it." Western NM PREA Audit at 3. The audit team found "postings for inmates to read in both English and Spanish in every building that the public and inmates have access to that explains what PREA is, how to report concerns and the investigation process." Western NM PREA Audit at 7. The audit found that Western NM's employee training "meets" standards, based on "Power Point: PREA for Staff, Training Lesson plan: PREA for Staff, Staff Training Acknowledgement form, Pre-Service Training Schedule, In-Service Training Schedule, interview of Facility Staff, and review of training records . . . ." Western NM PREA Audit at 7-8. The audit notes also that the audit team "wishes to extend its appreciation to Warden Joseph Garcia and Deputy Warden Pete Perez and their staff for the professionalism, hospitality, and kindness they showed the audit team." Western NM PREA Audit, at 2.

Under the PREA, "sexual abuse of an inmate" includes "any of the following acts, with or without consent of the inmate . . . ":

(1)     Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

Because they suspected Bearden was going trying to smuggle drugs into Western NM to give to Ortiz when Bearden arrived at work on October 23, 2015, STIU Sergeant Scott and STIU Coordinator Cavasos met with Acting Warden Perez and Major Baca to update them on their

---

(2)     Contact between the mouth and the penis, vulva, or anus;

(3)     Contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(4)     Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(5)     Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(6)     Any attempt, threat, or request by a staff member, contractor, or volunteer to engage in the activities described in paragraphs (1) through (5) of this definition;

(7)     Any display by a staff member, contractor, or volunteer of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident, and

(8)     Voyeurism by a staff member, contractor, or volunteer.

28 C.F.R. § 115.6.

Section 155.6 and the Western NM PREA Audit further supports Ortiz' contention that there is a genuine issue of material fact whether the investigation did or could have suggested to the officers that "the relationship between [Ortiz] and Bearden was consensual, albeit prohibited by New Mexico criminal statutes and prison policy."  MSJ ¶19, at 13.  If the officers were trained in the PREA, they likely would have known that, under the PREA, whether an act is sexual abuse does not depend on the consent of the victim.  Accordingly, there a genuine dispute that the STIU officers knew Ortiz and Bearden's relationship was not consensual.

findings.  See MSJ ¶ 21, at 13 (asserting this fact)(citing Gonzales Aff. ¶ 14, at 6).[55]  At about 1:50

p.m. that day, officers interviewed Ortiz.  See MSJ ¶ 21, at 13 (asserting this fact)(citing Gonzales

Aff. ¶ 14, at 6).[56]  Ortiz admitted that his mother gave Bearden methamphetamine so that Bearden

could smuggle it into Western NM.  See MSJ ¶ 21, at 14 (asserting this fact)(citing Gonzales Aff.

¶ 14), at 6.[57]  Ortiz also acknowledged that Bearden had given him a "promise ring," cigarettes,

and a fifty-dollar money order.  MSJ ¶ 21, at 14 (asserting this fact)(citing Gonzales Aff. ¶ 14, at

6).[58]

Before Bearden began his shift at Western NM that day, Scott, Cavasos, Perez, and Baca

intercepted him and searched his car.  See MSJ ¶ 21, at 14 (asserting this fact)(citing Gonzales

Aff. ¶ 14, at 6).[59]  They found marijuana and methamphetamine, both of which they tested and

---

[55]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[56]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[57]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[58]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[59]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

confiscated.  See MSJ ¶ 21, at 14 (asserting this fact)(citing Gonzales Aff. ¶ 14, at 6).[60]  The

methamphetamine was in a small bag that had been placed inside a card, which was then sealed in

an envelope that had "Hugs and Kisses" written on it.  MSJ ¶ 21, at 14 (asserting this fact)(citing

Gonzales Aff. ¶ 14, at 6).[61]  At this point, the STIU contacted New Mexico State Police, who came

to Western NM and took over the investigation.  See MSJ ¶ 21, at 14 (asserting this fact)(citing

Gonzales Aff. ¶ 14, at 6).[62]  Bearden was placed on administrative leave and was later terminated.

See MSJ ¶ 21, at 14 (citing Gonzales Aff. ¶ 14, at 6).[63]  Bearden later was charged.  See MSJ ¶ 21,

at 14 (citing Gonzales Aff. ¶ 14, at 6).[64]  Bearded plead guilty to two counts of Criminal Sexual

Contact in the Fourth Degree Resulting in Personal Injury under New Mexico law, N.M.S.A. § 30-

9-12(C).  See MSJ ¶ 25, at 17 (asserting this fact)(citing Affidavit of R. David Pederson ¶ 5, at 2,

---

[60]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[61]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[62]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[63]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[64]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

filed December 7, 2018 (Doc. 49-6)("Pederson Aff."); John Bearden Plea and Disposition Agreement, at 1, filed December 7, 2018 (Doc. 49-6)("Bearden Plea"))(asserting this fact); MSJ Response ¶ 1, at 2 (asserting this fact)(not citing anything but noting it is "undisputed"); Declaration of Defendant John E. Bearden, Sr. ¶ 55, at 8, filed March 7, 2019 (Doc. 67-1)("Bearden Declaration")(asserting this fact).[65]

### d.   The Ortiz Letters.

After criminal charges were brought against Bearden, he produced to his defense counsel several letters that Ortiz had written to him. See MSJ ¶ 22, at 14 (citing Affidavit of John Bearden, Sr. ¶ 4, at 1, filed December 7, 2018 (Doc. 49-4)("Bearden Aff.").[66]  The letters were written during their relationship in the Fall of 2015, while Bearden was a Correctional Officer and Ortiz was an inmate at Western NM.  See MSJ ¶ 22, at 14 (asserting this fact)(citing Bearden Aff. ¶ 4-5, at 1; Undated Handwritten Letters C).[67]  Bearden's defense counsel shared the handwritten

---

[65]In their MSJ reply, Perez, Baca, Trujillo, Nunez, and Gonzales do not mention or otherwise respond to this fact. See MSJ Reply. The Court, therefore, deems this fact undisputed. See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[66]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed." MSJ Response ¶ 3, at 2. The Court, therefore, deems this fact undisputed. See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[67]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed." MSJ Response ¶ 3, at 2. The Court, therefore, deems this fact undisputed. See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

letters with prosecutors.  See MSJ ¶ 22, at 14 (asserting this fact)(citing Bearden Aff. ¶ 4-5, at 1; Undated Handwritten Letters C).[68]

One letter includes: "I want to be able to hold you. Thank you for the kiss I got yesterday. This is just a quick note letting [sic] you no [sic] I'm thinking of you."  Letter from Ortiz to Bearden at 3 (no date), filed December 7, 2018 (Doc. 49-4a)("First Ortiz Letter").[69]  Another letter, see Letter from Ortiz to Bearden at 4 (no date), filed December 7, 2018 (Doc. 49-4a)("Second Ortiz Letter"), says: "Babe, the last thing in the world I want you to think is that I really like you a lot."  However, the letter continues with:

> I'm falling in love with you. Your [sic] my foundation, without I am nothing. I was stoned last night and fell asleep. I'm sorry babe. I wish I could be with you rite [sic] now. I am sad that I cannot be with you all the time. I really want to leave here so I can be with you more. Babe I promise I want to be with you. I will tell you if I am loosing [sic] interest but I am not. I told my mom about us. . . . We are creating a love story and I want ours to be a happy ending. I really am falling in love with you. I asked for a ring because I wanna be with you forever. . . . Your [sic] my man and I'm yours. You have me doing things I've never done before and I like it.

Oritz signed the letter: "[Y]our dark Lil secret."  Second Ortiz Letter at 4.

> Another letter says:

> Whats [sic] up babe, How was your weekend? I missed you so fucking much its [sic] not even funny. I can't wait until we get to be alone. I want you so fucking bad its [sic] not even cool. I want to lay naked with you and be able to touch your body and lick you all over. I am glad you like my ring. I'm sorry its [sic] not gold with dimond [sic] but it will do for now. . . . I really do love you babe. I would escape in a heartbeat just to be with you. As of the 25th your [sic] my everything

---

[68]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[69]There are between seven nine letters marked as Exhibit 4a attached to the MSJ.  Some of the copies could be both sides of a letter written on both sides of a single piece of paper.  None of the letters is dated.

and my all. . .  Babe do you think I can have some smokes please.  I've been craving some. Well thats [sic] it for now. I love you and I will rite [sic] you more ASAP.

Letter from Ortiz to Bearden at 5 (no date), filed December 7, 2018 (Doc. 49-4a)("Third Ortiz Letter").  Ortiz signed the letter, "[Y]our secret."  Third Ortiz Letter at 5.

Ortiz writes in another letter that he talked to his sister who told him she has "mail" for him.  Letter from Ortiz to Bearden at 7 (no date), filed December 7, 2018 (Doc. 49-4a)("Fourth Ortiz Letter").  Ortiz then asks Bearden:

Do you think you could call and get it for me daddy please. I really need it. She told me that they have been trying to get it to me and have been unable. If you would you please pick it up 2morrow 4 me [sic]. I will do whatever you want daddy.

Fourth Ortiz Letter at 7.  Ortiz then writes:

Thank you daddy and thank you for being there for me and for waiting cuz [sic] I really do love you. . . . Love you honey bunches of oats daddy. Hugs and all kinds of kisses all over your body. Your [sic] the best relationship I have ever been in. I will rite [sic] you more 2morrow [sic].

Fourth Ortiz Letter at 7.  Ortiz signed this letter: "[Y]ours truly and 4 ever."  Fourth Ortiz Letter at 7.

In a fifth letter, see Letter from Ortiz to Bearden at 8 (no date), filed December 7, 2018 (Doc. 49-4a)("Fifth Ortiz Letter"), Ortiz says:

Hey babe. Don't worry your [sic] my daddy and I will never forget about you. I'm glad you came last night. That's great. I love you daddy. Hey don't be made because I have not rote [sic] you any notes I just don't want no one noing [sic] about us because I do not want to loose [sic] you. I want you forever. Your [sic] my greatest and hopefully forever man. Kisses all over your body. Love you honey bunches of oats. I will rite [sic] you a letter 2morrow [sic]. Good night daddy, hugs and kisses. I love you.

Fifth Ortiz Letter at 8.  Ortiz signed this letter: "[Y]our secret."  Fifth Ortiz Letter at 8.

In a sixth letter, see Letter from Ortiz to Bearden at 9 (no date), filed December 7, 2018 (Doc. 49-4a)("Sixth Ortiz Letter"), Ortiz says:

> First I love you to [sic] babe. I hope you stay with me. I will believe you when you get me a ring, size 11, LOL. I want you to help me escape so I can be with you. We can move to a different state, LOL. It would be nice, nuh [sic].

Sixth Ortiz Letter at 9.  Ortiz then asks Bearden to get a "fat stack of bud" from his sister's boyfriend because he is "tired of doing subs, unless [Bearden] can get [him] a real sack of bud and then [he] won't need it . . . ." Sixth Ortiz Letter at 9.  Ortiz then writes, "[h]opefully we can fuck around this weekend in my room," again discusses the purchase of what is likely marijuana, and states, "I love you and I will rite [sic] you more later." Sixth Ortiz Letter at 9.

In a seventh letter, see Letter from Ortiz to Bearden at 10 (no date), filed December 7, 2018 (Doc. 49-4a)("Seventh Ortiz Letter"), Ortiz says:

> Thank you for everything. I appreciate it. I love you daddy. I really do hope you wait for me. If you don't it's going to hurt me prety [sic] bad. I am falling sick for some reason I don't no [sic] why daddy. My stomach hurts like Im [sic] going to throw up. I cant [sic] wait till [sic] we get to kick it and holdeachother [sic] uhh it sucks that we cant [sic] be together more often. I think that it stresses me out and it is involved with my stomach hurting. IDK. I just want to be with you. I love you and will rite you more later.

Seventh Ortiz Letter at 10.

### e.    Bearden's Charges.

The State of New Mexico ("State") charged Bearden with a series of crimes arising out of this incident. See MSJ ¶ 24, at 17 (asserting this fact).[70] R. David Pederson, currently the Chief Deputy District Attorney for the Eleventh Judicial district of the State of New Mexico, who was then the Deputy District Attorney for the Thirteenth Judicial District in Cibola County, New Mexico, prosecuted the case. See MSJ ¶ 24, at 17 (asserting this fact)(citing Pederson Aff. ¶ 1-5,

---

[70]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed." MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed. See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

at 1-2; Bearden Plea at 1-6).[71]   In addition to two counts of Criminal Sexual Contact in the Fourth

Degree, Bearden pled guilty to one count of Bringing Contraband onto Prison Grounds, a third-

degree[72] felony.   Bearden was sentenced to five years of supervised probation with the possibility

of a conditional discharge upon the successful completion of probation, which would also include

the removal of the felony convictions from his record.   See MSJ ¶ 26, at 17 (asserting this fact).[73]

One reason that the State accepted a relatively lenient sentence was because it concluded that the

relationship was consensual.   See MSJ ¶ 26, at 17 (asserting this fact).[74]

_____

[71]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[72]The MSJ asserts that this is a fourth-degree felony, see MSJ ¶ 25, at 17, but the plea agreement which Bearden signed notes that it is a third-degree felony, see Plea and Disposition Agreement ¶ 25, at 17, filed December 7, 2018, (Doc. 49-6)("Bearden Plea Agreement").

[73]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[74]In the MSJ Response, Ortiz does not mention or otherwise respond to this fact except to note that "many of the facts presented in the motion are undisputed."  MSJ Response ¶ 3, at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").
          Whether the relationship was in fact consensual, however, is disputed.  The Court concludes that there is a genuine issue of material fact whether the relationship was consensual, but draws all inferences in favor of Ortiz, the non-movant.  The MSJ states: "One reason for the State's decision to accept a relatively lenient sentence from Mr. Bearden was the prosecutor's conclusion based on the evidence that the sexual relationship between inmate Raymond Ortiz and Correctional Officer John Bearden, although prohibited by statute, was consensual in nature." MSJ ¶ 26, at 17.
          Ortiz does not mention or otherwise respond to the fact about the State's decision-making process.  See MSJ Response.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Ortiz disputes, however, that, "based on the evidence that the sexual relationship between inmate Raymond Ortiz and Correctional Officer John Bearden, although

prohibited by statute, was consensual in nature." MSJ Response ¶ 3c, at 3 (citing Bearden Plea; State of New Mexico Corrections Department Memorandum from Jillian Shane to Raymond Ortiz at 1-2 (December 4, 2015), filed December 5, 2019 (Doc. 61-4). See MSJ Response ¶¶ 45-48, at 21-23 (not citing any facts).

Ortiz stresses that the crime to which Bearden pled is a non-consensual sexual offense. See MSJ Response ¶ 3c, at 3. Under New Mexico law, Criminal Sexual Contact is: "[T]he unlawful and intentional touching of or application of force, without consent, to the unclothed intimate parts of another who has reached his eighteenth birthday, or intentionally causing another who has reached his eighteenth birthday to touch one's intimate parts." N.M.S.A. § 30-9-12(A). Section 30-9-12(C) states:

> Criminal sexual contact in the fourth degree consists of all criminal sexual contact perpetrated: (1) by the use of force or coercion that results in personal injury to the victim; (2) by the use of force or coercion when the perpetrator is added or abetted by one or more persons; or (3) when the perpetrator is armed with a deadly weapon.

N.M.S.A. § 30-9-12(C).

Bearden's plea alone does not create a genuine dispute of material fact, because that Bearden pleaded to a crime says nothing about the facts underlying the crime, only that a judge accepted the plea deal. As Oritz argues, however, see MSJ Response ¶ 45, at 21, Bearden's plea does trigger judicial estoppel. See discussion on judicial estoppel infra. See, e.g., Doe v. Chee, No. 19-CIV-1148 RB/CG, 2021 WL 218037, at * 6-7 (D.N.M. Jan. 21, 2021)(Brack, J.)(finding that a defendant who had pled guilty to a nonconsensual sexual offense under state law was judicially estopped from using consent as a defense to an Eighth Amendment claim).

Ortiz also points to the NM Corrections Memo. that "substantiated" Ortiz' allegations. MSJ Response ¶ 3c, at 3. See NM Corrections Memo. ("The investigation into the matter was conducted by our Office of Professional Standards and the allegations were determined to be substantiated." (emphasis in original)). Ortiz also highlights that the NM Corrections Memo. states that Ortiz can take advantage of a series of options that the New Mexico Department of Corrections offers, including counseling and corresponding with the state and local Rape Crisis Centers. MSJ Response ¶ 3c, at 3 (citing NM Corrections Memo.).

Ortiz also "expressly refutes consent" and argues that there is "no way consent is an undisputed fact." MSJ Response ¶ 47, at 22. The Ortiz Aff. expressly refutes any allegation of consent. See Ortiz Aff ¶¶ 33-38, at 6-7. It notes explicitly that the "sexual encounters that occurred with John Bearden were not consensual." Ortiz Aff. ¶ 33, at 6. The Court therefore determines that whether the relationship between Ortiz and Bearden was consensual is a genuine dispute of material fact. See Fed. R. Civ. Pro. 56(a).

The Defendants assert strenuously that other materials in the record blatantly contradict the assertions in the Ortiz Aff. and the Court should therefore not adopt the Ortiz Aff.'s assertions for the purposes of ruling on MSJ. See MSJ Reply at 4-7 (citing Scott v. Harris, 550 U.S. 372 (2007)). See Bearden MSJ Reply at 2 citing Scott v. Harris, 550 U.S. 372). A discussion of Scott v. Harris and its relevance to the MSJ is in the Analysis § IV(B) below. The Court concludes there that the express-contradiction exception articulated in Scott v. Harris does not apply. Further, the Court

f.      **The Aftermath.**

The New Mexico Corrections Department conducted an investigation into this incident.

See State of New Mexico Corrections Department Memorandum from Jillian Shane to Raymond

Ortiz at 1 (December 4, 2015), filed December 5, 2019 (Doc. 61-4)("NM Corrections Memo.").[75]

The investigation was conducted by the Office of Professional Standards and they determined

Ortiz' allegations to be "substantiated."[76]   NM Corrections Memo. at 1.   The NM Corrections

Memo. does not, however, state what Ortiz alleged that prompted the investigation.[77]   See NM

Corrections Memo. at 1.   The New Mexico Corrections Department offered Ortiz a series of

---

notes that even if where "the prisoner concedes that the sexual relationship is 'voluntary,' because
sex is often traded for favors (more phone privileges or increased contact with children) or
'luxuries' (shampoo, gum, cigarettes), it is difficult to characterize sexual relationships in prison
as truly the product of free choice."   Wood v. Beauclair, 692 F.3d 1041, 1047 (9th Cir. 2012)(citing
Human Rights Watch Women's Rights Project, All Too Familiar: Sexual Abuse of Women in U.S.
State Prisons 102, 420 (1996)(describing an environment where prisoners engage in sexual acts
with staff in exchange for favorable treatment or coveted items such as gum, cigarettes, and drugs
and quoting one prisoner who commented "The women here will [perform sexual acts] for
gum.")).   Accordingly, the Court concludes that whether the Ortiz and Bearden's relationship was
consensual is disputed.

   [75]In their MSJ reply, Perez, Baca, Trujillo, Nunez, and Gonzales do not mention or
otherwise respond to this fact.   See MSJ Reply.   The Bearden MSJ Reply also does not mention
or otherwise respond to this fact.   See Bearden MSJ Reply.   The Court, therefore, deems this fact
undisputed.   See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be
deemed undisputed unless specifically controverted.").

   [76]In their MSJ reply, Perez, Baca, Trujillo, Nunez, and Gonzales do not mention or
otherwise respond to this fact.   See MSJ Reply.   The Bearden MSJ Reply also does not mention
or otherwise respond to this fact.   See Bearden MSJ Reply.   The Court, therefore, deems this fact
undisputed.   See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be
deemed undisputed unless specifically controverted.").

   [77]In their MSJ reply, Perez, Baca, Trujillo, Nunez, and Gonzales do not mention or
otherwise respond to this fact.   See MSJ Reply.   The Bearden MSJ Reply also does not mention
or otherwise respond to this fact.   See Bearden MSJ Reply.   The Court, therefore, deems this fact
undisputed.   See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be
deemed undisputed unless specifically controverted.").

options to help him cope with the incident, including counseling, and corresponding with the state Rape Crisis Centers and Just Detention International.[78]  See NM Corrections Memo. at 1-2.

Ortiz had a psychological evaluation on July 8, 2018.[79]  See Samuel Roll Psychological Report of Ray Ortiz at 1, filed February 5, 2019 (Doc. 61-3)("Ortiz Psych.").  Dr. Samuel Roll conducted the evaluation, see Ortiz Psych. at 5, and found that Ortiz suffered from "chronic and severe posttraumatic stress disorder" that was "the result of the repetitive, sexual exploitation by a corrections officer when Mr. Ortiz was incarcerated at the Western New Mexico Correctional Facility."[80]  Ortiz Psych. at 2.  The Ortiz Psych. states that Ortiz has "occasional nightmares," frequently involving "'being raped and seeing him," but the nightmares "have subsided."  Ortiz Psych. at 2.[81]  Dr. Samuel Roll found that, as is common with posttraumatic stress disorder

---

[78]In their MSJ reply, Perez, Baca, Trujillo, Nunez, and Gonzales do not mention or otherwise respond to this fact.  See MSJ Reply.  The Bearden MSJ Reply also does not mention or otherwise respond to this fact.  See Bearden MSJ Reply.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[79]In their MSJ reply, Perez, Baca, Trujillo, Nunez, and Gonzales do not mention or otherwise respond to this fact.  See MSJ Reply.  The Bearden MSJ Reply also does not mention or otherwise respond to this fact.  See Bearden MSJ Reply.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[80]In their MSJ reply, Perez, Baca, Trujillo, Nunez, and Gonzales do not mention or otherwise respond to this fact.  See MSJ Reply.  The Bearden MSJ Reply also does not mention or otherwise respond to this fact.  See Bearden MSJ Reply.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be deemed undisputed unless specifically controverted.")

[81]In their MSJ reply, Perez, Baca, Trujillo, Nunez, and Gonzales do not mention or otherwise respond to this fact.  See MSJ Reply.  The Bearden MSJ Reply also does not mention or otherwise respond to this fact.  See Bearden MSJ Reply.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be deemed undisputed unless specifically controverted.")

(PTSD), Ortiz "will sometimes forget some of the details of the assaults," including "what the Officer told him while he forced Mr. Ortiz to submit to anal penetration," even though Ortiz "has a clear memory of the Officer penetrating him anally." Ortiz Psych. at 3.[82] The Ortiz Psych. recommends Ortiz have "intensive treatment of at least twice-per-week sessions of psychotherapy" for at least eighteenth months, followed by weekly session for twelve more months. Ortiz. Psych. at 4.[83] Dr. Samuel Roll writes that, "[w]ith appropriate treatment, Mr. Ortiz has a moderate to good prognosis." Ortiz Psych. at 4.[84]

## PROCEDURAL HISTORY

Ortiz filed his Second Amended Complaint on October 31, 2018. See Second Amended Complaint to Remedy Civil Rights, filed October 31, 2018 (Doc. 30)("Second Amended Complaint"). In the Second Amended Complaint, Ortiz alleges a series of constitutional violations

---

[82]In their MSJ reply, Perez, Baca, Trujillo, Nunez, and Gonzales do not mention or otherwise respond to this fact. See MSJ Reply. The Bearden MSJ Reply also does not mention or otherwise respond to this fact. See Bearden MSJ Reply. The Court, therefore, deems this fact undisputed. See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be deemed undisputed unless specifically controverted.")

[83]In their MSJ reply, Perez, Baca, Trujillo, Nunez, and Gonzales do not mention or otherwise respond to this fact. See MSJ Reply. The Bearden MSJ Reply also does not mention or otherwise respond to this fact. See Bearden MSJ Reply. The Court, therefore, deems this fact undisputed. See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be deemed undisputed unless specifically controverted.")

[84]In their MSJ reply, Perez, Baca, Trujillo, Nunez, and Gonzales do not mention or otherwise respond to this fact. See MSJ Reply. The Bearden MSJ Reply also does not mention or otherwise respond to this fact. See Bearden MSJ Reply. The Court, therefore, deems this fact undisputed. See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be deemed undisputed unless specifically controverted.")

against Lucero-Ortega,[85] Perez, Baca, Trujillo, Nunez, Gonzales, Bearden, Jane Does 1-10, and John Does 1-10, Corrections Officers, employees, and/or administrators of Western NM ("Defendants").   Ortiz alleges that, by tacitly allowing Bearden to sexually assault him, the Defendants violated his (i) due process rights under the Fourteenth Amendment, U.S. Const. amend XIV § 1; (ii) equal protection rights under the Fourteenth Amendment; (iii) right to be free from cruel-and-unusual punishment under the Eighth Amendment, U.S. Const. amend VIII; and (iv) right to be secure in his person under the Fourth Amendment, U.S. Const. amend IV.   See Second Amended Complaint ¶ 42-65, at 12-15.  Ortiz also includes a jury demand pursuant to rule 38 of the Federal Rules of Civil Procedure.  See Second Amended Complaint ¶ 66, at 15.  Because Ortiz alleges that the Defendants were "acting under color of law and had an affirmative duty to implement the Prison Rape Elimination Act [34 U.S.C. §§ 30301-30309] . . . to protect inmates housed at Western NM against deprivations of rights secure by the Constitution of the United States," Second Amended Complaint ¶ 6, at 3, pursuant to 42 U.S.C. §§ 1983 and 1988, Ortiz seeks (i) compensatory damages for his injuries; (ii) attorney's fees and costs; (iii) punitive damages, and; (iv) "such other and further relief and the Court deems just."   Second Amended Complaint ¶ 66, at 15.

### 1.     **The Opposed Motion to Intervene.**

Risk Management asks to intervene in the case, pursuant to rule 24 of the Federal Rules of Civil Procedure.  See Opposed Motion to Intervene, filed November 6, 2018 (Doc. 36)("Motion to Intervene").  Risk Management offers fifteen grounds in support of its motion to intervene: (i)

---

[85]Lucero-Ortega was dismissed with prejudice from this suit after Lucero-Ortega, Perez, Baca, Trujillo, Nunez, and Gonzales filed their Motion for Summary Judgment.  See Stipulation of Dismissal with Prejudice at 1, filed February 6, 2019 (Doc. 62).

that the Court permitted Ortiz to file a Second Amended Complaint and re-plead his claims under § 1983; (ii) the gist of Ortiz' Second Amended Complaint is that Bearden assaulted and raped Ortiz, and Ortiz acquired drugs from Bearden out of fear of retaliation from other inmates, and Ortiz would provide these drugs to other inmates; (iii) at the time of the violent rapes, sexual assaults, and drug smuggling, Bearden was a "public employee" who was "acting under color of law and in the court and scope of his employment" by the State of New Mexico; (iv) Ortiz asks for compensatory and punitive damages, and attorney's fees, under the Eighth, Fourth, and Fourteenth Amendments of the United States Constitution pursuant to § 1983; (v) Western NM is part of the State of New Mexico Corrections Department and is therefore entitled to sovereign immunity, and subject to the requirements of the New Mexico Tort Claims Act, N.M.S.A. §§ 41-4-3(B), 41-4-3(H), 41-4-4(A), which include the duty to pay any settlement or judgment based on the commission of a tort or violation of § 1983 by a "public employee" of Western NM that is acting within the scope of his or her duty or under color of state law, N.M.S.A. § 41-4-4(D); (vi) the New Mexico Tort Claims Act waives sovereign immunity for acts that public employees commit when acting within the scope of their duty, see N.M.S.A. § 41-4-3(G); (vii) the applicable law obligates Risk Management to cover the potential liability for these violations, see N.M.S.A. §§ 41-4-20(A)(2), 41-4-23; (viii) Bearden's behavior was not within the scope of his employment and, if a jury agrees, Risk Management would not have an obligation to cover the settlement or judgment, see N.M.S.A. § 41-4-4; Soto v. Galvan, No. CIV. 06-0738 WFD/LFG, 2007 WL 9734042 (D.N.M. April 12, 2007)(Garcia, M.J.); (ix) Risk Management's summarized position is that, if a jury finds that the acts alleged in Ortiz' Second Amended occurred, it does not have an obligation to pay any settlement or judgment that might later be entered against Bearden; (x) Risk Management has an interest related to this action's outcome, and no other party adequately can

assert claims on its behalf, see Fed. R. Civ. P. 24(a)(2); Coal. of Ariz./N.M. Cntys. For Stable

Econ. Growth v. Dep't of Interior, 100 F.3d 837, 840 (10th Cir. 1996); Soto v. Galvan, 2007 WL

9734042; Morgan v. Carrejo, No. Civ. 12-0583, 2013 WL 12330025 (D.N.M. May 28,

2013)(Johnson, J.); (xi) by the United States District Court for the District of New Mexico

previously decided the right to intervene in these circumstances, see Soto v. Galvan, 2007 WL

9734042; Morgan v. Carrejo, 2013 WL 12330025; (xii) even if not entitled to intervene as a matter

of right, the Court should permit Risk Management to intervene, because Risk Management has a

claim that shares "with the main action a common question of law or fact," Fed. R. Civ. P.

24(b)(1)(B); (xiii) there will be no substantial delay or prejudice to existing parties if Risk

Management intervenes, but that Risk Management will be prejudiced if it is not allowed to

intervene because it may be estopped collaterally from asserting contrary positions in later actions;

(xiv) an actual controversy exists between Ortiz, "Defendant,"[86] and Risk Management that is

cognizable under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 and the New Mexico

Declaratory Judgment Act, N.M.S.A. §§ 44-6-1–44-6-15, and is within the United States District

Court's supplemental jurisdiction; and (xv) Bearden's and Ortiz' counsel oppose Risk

Management's intervention. See Motion to Intervene at 1-6. Risk Management also provides its

proposed complaint-in-intervention. See Complaint in Intervention, filed November 6, 2018 (Doc.

36-1).

## 2.   The Response to the Motion to Intervene.

Ortiz responds to the Motion to Intervene. See Response to the Motion to Intervene, file

December 4, 2018 (Doc. 47)("Intervention Response"). Ortiz contends that (i) Risk Management

---

[86]The Motion to Intervene does not specify which defendant. See Motion to Intervene, at 6.

is not entitled to intervene because, although it has an interest in the action's outcome, its motion

is premature, because no determination has been made yet about liability for the harm that Ortiz

allegedly suffered; (ii) the State's interest will not be impaired or impeded, because the only

plausible outcome is a finding that Bearden was acting within the scope of his duties, see David v.

City & Cnty. of Denver, 101 F.3d 1344 (10th Cir. 1996); Risk Mgmt. Div. v. McBrayer, 2000-

NMCA-103, 129 N.M. 778, 14 P.3d 43; Celaya v. Hall, 2004 NMSC-005, 135 N.M. 115, 85 P.3d

239; and; (iii) the State's interests are protected adequately because its attorney represents all the

remaining defendants except Bearden.  See Intervention Response at 2-3, 6.

### 3.    **Bearden's Notice of Incorporation of the Motion to Intervene.**

Bearden seeks to incorporate the arguments that Ortiz makes in the Intervention Response.

See Defendant John Bearden's Notice of Joinder in the Plaintiff's Response to the Motion to

Intervene, filed December 6, 2018 (Doc. 48)("Bearden Interv. Resp. Joinder").  The Bearden

Interv. Resp. Joinder notes that, pursuant to rule 10(c) of the Federal Rules of Civil Procedure, he

"adopts by reference and incorporates herein the arguments, points and authorities of" Oritz'

Intervention Response.  Bearden Interv. Resp. Joinder at 1.[87]  The Bearden Interv. Resp. Joinder

does not cite to D.N.M. LR-Civ. 7.1(a).

---

[87]Although the Bearden Interv. Resp. Joinder uses the word "joinder" and cites to rule
10(c), the Court treats it as adoption by reference of the arguments in the Intervention Response
pursuant to the District of New Mexico Local Rules of Civil Procedure.[87]  See D.N.M. LR-Civ.
7.1(a).  In other words, the Court treats this document as if Bearden has filed a response to the
Motion to Intervene that makes all the same arguments and points, and invokes all the same
authorities as the Intervention Response, insofar as they apply to Bearden.  See the section entitled
"Bearden is Entitled To Adopt By Reference The Arguments in The Intervention Response and
The MSJ, Because D.N.M. Lr-Civ. 7.1(A) Permits It, infra.

### 4.    The MSJ.

On December 7, 2018, all Defendants except Bearden moved for summary judgment based on qualified immunity.  See MSJ at 1.  These Defendants assert qualified immunity based on their status as State employees, see MSJ at 5, and argue that  (i) Ortiz' Second Amended Complaint violates rule 8 of the Federal Rules of Civil Procedure, because it "fails to specify '*exactly* who is alleged to have done *what* to *whom*' and fails to give each defendant 'fair notice as to the basis of the claims against him or her, as distinguished from collective allegations,'"  MSJ at 18 (quoting Robbins v. Oklahoma, 519 F.3d 1242, 1250 (10th Cir. 2008)(italics in Robbins v. Oklahoma); and (ii) there is no genuine dispute of material fact because the undisputed evidence shows that the relationship between Ortiz and Bearden was consensual and, even if it was not consensual, there is no genuine dispute that the other prison employees subjectively believed the relationship not to be consensual,  see MSJ at 19-22.

### 5.    The Reply in Support of Opposed Motion to Intervene.

Risk Management replies in support of its Motion to Intervene.  See Reply in Support of Opposed Motion to Intervene, filed December 21, 2018 (Doc. 54)("Intervention Reply").  Risk Management first submits that the Motion to Intervene is moot if the Court grants the MSJ.  See Intervention Reply at 1.  In addition, Risk Management argues that: (i) because the United States District Court for the District of New Mexico previously has permitted Risk Management to intervene in other cases, it should do so again here, see Soto v. Galvan, 2007 WL 9734042; Morgan v. Carrejo, 2013 WL 12330025; (ii) Ortiz does not respond to Risk Management's permissive-intervention argument; (iii) the "scope of duty" question is a factual one for the jury, so it is irrelevant to whether Risk Management can intervene, Risk Mgmt. Div. v. McBrayer, 2000-NMCA-104, 129 N.M. 778, 14 P.3d 43; (iv) Risk Management's intervention would serve judicial

economy and efficiency, which is rule 24's primary purpose, see Coal. of Ariz./N.M. Cntys. For

Stable Econ. Growth v. Dep't of Interior, 100 F.3d 837 (10th Cir. 1996); (iv) the Motion to

Intervene is timely, because the case has yet to proceed to discovery, see Morgan v. Carrejo, 2013

WL 12330025; (v) Ortiz' reliance on N.M.S.A. § 41-4-4(E)[88] is misplaced, because Risk

Management seeks to intervene to argue that Bearden was not acting within the scope of his duties,

and; (vi) even though the same attorney represents several of the existing Defendants, the State's

interest is not represented adequately, because those Defendants have been sued in their individual

capacities and, therefore, without Risk Management, "there is no one to argue the scope-of-duty

issue," Intervention Reply at 6.  See Intervention Reply at 1-6.

### 6.    Bearden's Notice of Incorporation of the MSJ.

On December 18, 2018, Bearden asks to join the MSJ.  See Bearden Joinder at 1.  Bearden

notes that, pursuant to rule 10(c) of the Federal Rules of Civil Procedure, he "adopts by reference

and incorporates herein the arguments, exhibits, points and authorities of" the other Defendants'

MSJ "insofar as they apply to Defendant Bearden."[89]   Bearden Joinder at 1.   Bearden seeks

---

[88]Section 41-4-4(E) states:

A governmental entity shall have the right to recover from a public
employee the amount expended by the public entity to provide a defense and pay a
settlement agreed to by the public employee or to pay a final judgment if it is shown
that, while acting within the scope of his duty, the public employee acted
fraudulently or with actual intentional malice causing the bodily injury, wrongful
death or property damage resulting in the settlement or final judgment.

N.M.S.A. § 41-4-4(E).

[89]Although the Bearden Joinder uses the word "joinder" and cites to rule 10(c), the Court
treats it as adoption by reference of the arguments in the MSJ pursuant to D.N.M. LR-Civ. 7.1(a).
In other words, the Court treats this document as if Bearden has filed an MSJ that makes all the
same arguments, and adopts all the same exhibits, points, and authorities as the MSJ.  See the

dismissal of counts 1-4 of the Second Amended Complaint, because they "do not rise to the level of a constitutional violation." Bearden Joinder at 2. The Bearden Joinder does not cite to D.N.M. LR-Civ. 7.1(a).

### 7.      Ortiz' Response.

Ortiz responds by arguing: (i) that the defendants are not entitled to qualified immunity, because the rights he alleges the Defendants violated were clearly established, and because the Defendants' conduct was not objectively reasonable; and (ii) that there are genuine disputes regarding (a) whether Ortiz and Bearden's the relationship was consensual and (b) whether the other Defendants believed or had reason to believe the relationship was consensual. See MSJ Response ¶ 3, at 2; ¶¶ 25-48, at 12-23.

Ortiz asserts that qualified immunity depends in part on the "reasonableness of Defendant's actions under the existing law" and that there is reason to doubt that the Defendants' actions are reasonable. MSJ Response ¶ 3, at 2. Ortiz argues that the Defendants' are not entitled to immunity, because the Defendants knew that the relationship between Ortiz and Bearden was not consensual, but let it continue anyway, which amounts to "deliberate indifference" and "rises to the level of plain incompetence." MSJ Response ¶ 6, at 4-5. Ortiz submits that he has alleged properly violations of his rights under the Eighth, Fourth, and Fourteenth Amendments, and the Prison Rape Elimination Act, 42 U.S.C. §§ 30301-30309("PREA"), -- although Ortiz acknowledges the PREA does not give rise to a private cause of action -- and that each of those rights was clearly established at the time of the alleged sexual assaults. See MSJ Response ¶¶ 8-24, at 5-12.

---

section entitled "Bearden is Entitled To Adopt By Reference The Arguments in The Intervention Response and The MSJ, Because D.N.M. Lr-Civ. 7.1(A) Permits It, infra.

Ortiz also seeks to preclude summary judgment by pointing to facts that are in dispute. Ortiz asserts that there is a genuine dispute whether the prison employees acted with deliberate indifference -- that they knew or had reason to know the relationship between Ortiz and Bearden was coercive, yet failed to intervene. See MSJ Response ¶¶ 27-48, at 13-23. Specifically, Ortiz disputes two factual assertions in the MSJ -- from MSJ ¶¶ 19 and 20 -- which suggest that the STIU Officers had reason to believe that the relationship between Ortiz and Bearden was not consensual. See MSJ Response ¶ 3, at 2. Ortiz points to his affidavit, see Ortiz Aff., and the affidavit of Kathleen Dennehy-Fay, a former employee at the National PREA Resource Center, see Dennehy-Fay Aff., to refute the assertion that the rest of the Defendants -- everyone but Bearden -- had no reason to believe the relationship was not consensual. MSJ Response ¶ 3, at 2; see id. ¶ 27-48, at 13-23. Ortiz also asserts that there is a genuine issue of fact whether the relationship between Ortiz and Bearden was, in fact, consensual. See MSJ Response ¶ 3c at 3, ¶ 27-48, at 13-23. Ortiz again points to his affidavit, which begins: "The purpose of this affidavit is to dispute that I had a consensual sexual relationship with Correction Officer John Bearden. It was not consensual it was coercive." Ortiz Aff. ¶ 1, at 1. To support the assertion that the relationship was not consensual, Ortiz also relies on the fact that Criminal Sexual Contact in the Fourth Degree, to which Bearden pled guilty, involves the "use of force" or "a deadly weapon, N.M.S.A. § 30-9-12(C). See MSJ Response ¶ 45, at 21.

## 8.    **Defendants' Reply.**

Perez, Baca, Trujillo, Nunez, and Gonzales -- all remaining defendants except Bearden -- filed their MSJ Reply on March 5, 2019. In the MSJ Reply, these Defendants (i) assert that Ortiz

does not dispute any issue of material fact except those relating to the issue of consent;[90] (ii) argue that Ortiz' arguments about the PREA are "irrelevant as a matter of law"; (iii) argue that despite that "any sexual relationship was prohibited by state criminal and agency policy," there is no genuine dispute whether the sexual relationship between Ortiz and Bearden was consensual; (iv) assert that, even if the sexual relationship was not consensual, the Defendants are still entitled to qualified immunity, because they "did not subjectively draw the inference" that Bearden was raping Ortiz; and (v) insist that Ortiz has not met his burden to identify clearly established law that would defeat the Defendants' assertion of qualified immunity.  See MSJ Reply at 1-10.

These Defendants argue that the relationship was consensual, and although they concede that the Ortiz Aff. disputes the issue of consent, they contend that it is "self-serving fiction" and is "blatantly contradicted by" the record.  MSJ Reply at 4.

### 9.   Bearden's Reply.

Bearden filed a reply in support of the MSJ on March 7, 2019.  See Bearden MSJ Reply at 1.  In the Bearden MSJ Reply, Bearden argues: (i) Ortiz cannot assert a due-process violation under the Fourteenth Amendment when the governmental conduct at issue is typically analyzed under another constitutional amendment; (ii) because Ortiz has not met his burden to identify a similarly situated individual that the Defendants also treated differently, Ortiz has not stated a viable equal protection claim; (iii) Ortiz has not pointed to specific factual allegations that support a viable Fourth Amendment violation, because prison rape is not a search and instead raises Eighth Amendment concerns; (iv) the evidence unequivocally shows that the relationship between Ortiz and Bearden was consensual, because (a) Ortiz does not dispute the authenticity of the exhibits

---

[90]Ortiz also disputes that STIU Officers' had no reason to believe the relationship was not consensual.  See MSJ Response ¶ 3 at 2; ¶¶ 27-48, at 13-23.

that contradict the statements in the Ortiz Aff., which means that they are not inadmissible hearsay; (b) sexual contact between a correctional officer and an inmate is not per se unconstitutional, see Graham v. Sheriff of Logan County, 741 F.3d 1118 (10th Cir. 2013); and (c) there is no evidence Ortiz lacked the capacity to consent to sex with Bearden, and; (v) Bearden is not judicially estopped from arguing the relationship was consensual, because he did not plead guilty to the "type of coercion or *quid pro quo* that would violate the Eighth Amendment," Bearden MSJ Reply at 13 (emphasis in original). See MSJ Reply at 3-14.

**10.    The January 26, 2019 Hearing.**

The Court held a hearing on January 26, 2019. See Clerk's Minutes at 1, filed January 16, 2019 (Doc. 58). The parties discussed whether Risk Management can intervene under rule 24, either permissively or as of right. See Draft Transcript of Jan. 16, 2019, Hearing at 3:23 (taken Jan. 16, 2019)(Jan. Hearing Tr.).[91] Risk Management argued that it is allowed to intervene both permissively and as of right under rule 24. See Jan. Hearing Tr. at 5:13-15:16; id. 15:17-18:15 (Dickman). Bearden explained that he adopts by reference Ortiz' arguments opposing Risk Management's intervention, see Jan. Hearing Tr. at 18:1-11 (Gardner), and argued that, although it would be "hard to say that" Risk Management "doesn't have a financial interest" in the litigation, Jan. Hearing Tr. at 20:7-9 (Gardner), Risk Management's interests are adequately represented until the other Defendants are dismissed from the litigation, see Jan. Hearing Tr. at 20:14-25 (Gardner). Ortiz' attorney asserted that Risk Management is not entitled to intervene, because it would be a "waste of our time and efforts, and also convolute the proceedings . . . ." Jan. Hearing Tr. at 24:2-

---

[91]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited version. Any final transcripts may contain slightly different page and/or line numbers.

3 (Zabicki).  In addition, Oritz contested Risk Management's argument that it has an interest in the action's outcome, <u>see</u> Jan. Hearing Tr. at 28:20-23 (Zabicki), and that the disposition of this lawsuit would impede its ability to protect its interest, because "we would be able to prevail based on the arguments" that Bearden was acting within the scope and course of his duty, Jan. Hearing Tr. at 32:7-8 (Zabicki). The Court stated that it was inclined to agree with Risk Management that it is permitted to intervene as a matter of right.  <u>See</u> Jan. Hearing Tr. at 43:14-23 (Court).

> **11.     <u>The September 13, 2019 Hearing</u>.**

The Court held a hearing on September 13, 2019.  <u>See</u> Clerk's Minutes at 1, filed September 13, 2019 (Doc. 76).  The parties discussed whether the Court should grant the MSJ. <u>See</u> Draft Transcript of Sept. 13, 2019, Hearing (taken Sept. 13, 2019)(Sept. Hearing Tr.).  The Court focused on the applicability of <u>Scott v. Harris</u>, 550 U.S. 372 (2007), and stated that it "can't think of a situation where [it] would really apply outside of the videotape context."  Sept. Hearing Tr. at 5:21-22 (Court).  The Defendants argued that <u>Scott v. Harris</u> applies, because "there is no contention that these weren't written by the people they were written by" and "no contention that they've been altered or forged or tampered with in any way."  Sept. Hearing Tr. at 10:22-25 (Dickman).  Ortiz suggested that the Court should grant the MSJ, because the issue of consent is contested, and because Bearden "worked at the facility for 13 years . . . . So he is well aware that this type of relationship [is] completely inappropriate; that it's not acceptable."  Sept. Hearing Tr. at 19:9-11 (Zabicki).  Ortiz also argued that, "again, it all boils down to that consent issue.  These supervisors . . . the deputy warden they all acknowledge that they had some subjective knowledge of this relationship," but that they "believed it to be consensual despite New Mexico law indicating that it is not -- there is no way it can be consensual."  Sept. Hearing Tr. at 23:17-25 (Zabicki).

12.     **The Order.**

The Court filed an Order on September 13, 2019, that disposes of the Motion to Intervene and the MSJ, but does not address the requests in the Bearden Joinder.  See Order at 1 n.1, 2 n.3, filed September 13, 2019 (Doc. 75)("Order").   In the Order, the Court concludes: (i) Risk Management may intervene, because it has met its burden of satisfying rule 24(a)'s requirements; (ii) there is a genuine issue of material fact whether the relationship between Ortiz and Bearden was consensual; (iii) even if Ortiz and Bearden's relationship was not consensual, Perez, Baca, Trujillo, Nunez, and Gonzales did not act with deliberate indifference; and (iv) Perez, Baca, Trujillo and Gonzales are entitled to qualified immunity, because Ortiz has not met his burden of demonstrating that his asserted right is clearly established.  See Order at 2-3.  Accordingly, the Court grants the Motion to Intervene and the MSJ.  See Order at 3, 17.  The Court reserves deciding the requests in the Bearden Joinder, however.  See Order at 2, n.3.

## LAW REGARDING INTERVENTION AS A MATTER OF RIGHT

Rule 24(a) of the Federal Rules of Civil Procedure provides that, on a timely motion, a court "must permit anyone to intervene who":

(1)     is given an unconditional right to intervene by a federal statute; or

(2)     claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).  The movant bears the burden of establishing its right to intervene.  See United States v. Texas E. Transmission Corp., 923 F.2d 410, 414 (5th Cir. 1991).  Rule 24(a)(2) entitles a movant to intervene as a matter of right if: (i) the motion is timely; (ii) the movant claims an interest relating to the property or transaction which is the subject of the action; (iii) the movant's interest relating to the property may be impaired or impeded; and (iv) the movant's

interest is not adequately represented by existing parties.  See WildEarth Guardians v. National

Park Serv., 604 F.3d 1192, 1198 (10th Cir. 2010).

A motion's timeliness is determined "in light of all the circumstances."  Okla. ex rel.

Edmondson v. Tyson Foods, Inc., 619 F.3d 1223, 1232 (10th Cir. 2010).  The United States Court

of Appeals for the Tenth Circuit explains that three non-exhaustive factors are "particularly

important" to determine timeliness:  (1) the length of time since the movant knew of their interests

in the case; (2) prejudice to the existing parties; and (3) prejudice to the movants.  Okla. ex rel.

Edmonson v. Tyson Foods, Inc., 619 F.3d at 1232.  See Western Energy All. v. Zinke, 877 F.3d

1157, 1164 (10th Cir. 2017).  Determining whether a movant has an interest in the subject of the

litigation is "a highly fact-specific determination." Western Energy All. v. Zinke, 877 F.3d at 1164

(quoting Coal. of Ariz./N.M. Cntys. For Stable Econ. Growth v. Dep't of Interior, 100 F.3d 837,

841).  Though federal courts have had difficulty defining what constitutes a sufficient interest to

satisfy rule 24(a), the Supreme Court of the United States has said that, at a minimum, it must be

"significantly protectable." Donaldson v. United States, 400 U.S. 517, 531 (1971).  The "interest"

element is "primarily a practical guide to disposing of lawsuits by involving as many apparently

concerned persons as is compatible with efficiency and due process."  Utah Ass'n of Cntys. v.

Clinton, 255 F.3d 1246, 1251-52 (10th Cir. 2001)(quoting In re Kaiser Steel Corp, 998 F.2d 783,

841 (10th Cir. 1993)).  Though the Tenth Circuit "tend[s] to follow a somewhat liberal line in

allowing intervention," Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d 1111, 1115

(10th Cir. 2002), it does requires that the interest be "direct, substantial, and legally protectable."

Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1251 (quoting In re Kaiser Steel Corp, 998 F.2d 783,

791 (10th Cir. 1993)).[92]  The Tenth Circuit has noted, however, that the "direct, substantial, and legally protectable" standard is "problematic" because it is vague and "malleable."  San Juan Cnty., Utah v. United States, 503 F.3d 1163, 1192-93 (10th Cir. 2007)(en banc)(abrogated on other grounds by Hollingsworth v. Perry, 570 U.S. 693 (2013)).  A movant has a protectable interest if the interest "would be 'impeded by the disposition of the action.'"  Western Energy All. v. Zinke, 877 F.3d at 1165 (quoting San Juan Cnty., Utah v. United States, 503 F.3d at 1203).  A relationship to the original plaintiff is not required "if the claims or interest of the two parties are related or share a common question of law or fact."  United States ex rel. Precision Co. v. Koch Industries, Inc., 31 F.3d 1015, 1017 (10th Cir. 1994).

Whether an economic injury dependent on the outcome of the litigation is a sufficient interest to satisfy rule 24(a) has divided the courts.  The United States Court of Appeals for the Third Circuit, for example, holds that "a mere economic interest in the outcome of litigation is insufficient to support a motion to intervene."  Liberty Mut. Ins. Co. v. Treesdale, Inc., 419 F.3d 216, 220 (3d Cir. 2005).  See Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, 72 F.3d 361, 366 (3d Cir. 1995).  Similarly, the Eighth Circuit also finds that "an economic interest in the outcome of the litigation is not itself sufficient to warrant mandatory intervention."  Medical Liability Mut. Ins. Co. v. Alan Curtis, LLC, 485 F.3d 1006, 1008 (8th Cir. 2007).[93]  In the Tenth

---

[92]The United States Courts of Appeals for the Ninth Circuit takes a somewhat different approach.  See Northwest Forest Resource Council v. Glickman, 82 F.3d 825, 837 (9th Cir. 1996) ("'[n]o specific legal or equitable interest need be established.'")(quoting Greene v. United States, 996 F.2d 973, 976 (9th Cir. 1993)).

[93]The United States Court of Appeals for the Eighth Circuit, however, has conflicting precedents.  See United States v. Union Elec. Co., 64 F.3d 1152 (8th Cir. 1995).  In United States v. Union Elec. Co., the Eighth Circuit wrote that intervention "may be based on an interest that is contingent upon the outcome of the litigation."  64 F.3d at 1162.  While it may appear that the conclusion of Medical Liability, 485 F.3d, 1006, that an economic interest in the litigation's

Circuit, however, the mere "threat of economic injury" is sufficient to satisfy this rule 24(a) element. Utahns for Better Transp. v. U.S. Dept. of Transp., 295 F.3d at 1115. See Payne v. Tri-State Careflight, LLC, No. CIV 14-1044-JB/KBM, 2016 WL 9738302, at * 24 (D.N.M. July 12, 2016)(Browning, J.). The interest cannot be "wholly remote and speculative," but it can be "contingent upon the outcome of the litigation." San Juan Cnty., Utah, v. United States, 503 F.3d at 1203.

To demonstrate that their interest may be impaired or impeded, movants must show "it is 'possible' that the interests they identify will be impaired." Western Energy All. v. Zinke, 877 F.3d at 1167 (quoting WildEarth Guardians v. National Park Serv., 604 F.3d at 1199). This element "presents a minimal burden." WildEarth Guardians v. National Park Serv., 604 F.3d at 1200, and is "intertwined" with the sufficient-interest requirement, Federal Deposit Ins. Corp. v. Jennings, 816 F.2d 1488, 1492 (10th Cir. 1987). A movant is entitled to intervene if the movant's interest "'would be substantially affected in a practical sense by the determination made in an action.'" WildEarth Guardians v. U.S. Forest Service, 573 F.3d at 995 (quoting San Juan Cnty., Utah, v. United States, 503 F.3d at 1195. A movant's interest may be sufficiently impaired to satisfy rule 24(a) "when the resolution of the legal questions in the case effectively foreclose the rights of the proposed intervenor in later proceedings, whether through *res judicata*, collateral

---

outcome is not "sufficient" is a reference to the other rule 24(a)'s requirements, the prior sentence begins, "[a]n interest is cognizable under Rule 24(a) . . .," Medical Liability Mut. Ins. Co. v. Alan Curtis, LLC, 485 F.3d, 1006, 1008 (8th Cir. 2007), suggests that "sufficient" refers to fulfilling the "sufficient interest" requirement and not to entirety of rule 24(a)(2) in its entirety. 485 F.3d at 1008.

estoppel, or *stare decisis*." Ute Distrib. Corp. v. Norton, 43 F. App'x 272, 279 (10th Cir. 2002).[94]

See Payne v. Tri-State Careflight, LLC,  2016 WL 9738302, at * 25.

A qualifying interest in the litigation on its own, however, is insufficient to establish

intervention as a matter of right.  See Statewide Masonry v. Anderson, 511 F. App'x 801, 806

(10th Cir. 2013).  The nonparty attempting to intervene also "bears the burden of demonstrating

that no existing party adequately represents its interest."  Statewide Masonry v. Anderson, 511 F.

App'x at 806.  See also Coal. of Ariz./N.M. Cntys. For Stable Econ. Growth v. Dep't of Interior,

100 F.3d at 844.  This requirement is satisfied if the applicant "shows that representation of his

interest 'may be' inadequate; and the burden of making that showing should be treated as

---

[94]The Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir.2005)(citations omitted). ).  The Court concludes that Ute Distrib. Corp. v. Norton, 43 F. App'x 272 (10th Cir. 2002); Statewide Masonry v. Anderson, 511 F. App'x 801 (10th Cir. 2013); Pola v. Utah, 458 F. App'x. 760 (10th Cir. 2012); McNamara v. Brauchler, 570 F. App'x 741 (10th Cir. 2014); Hooten v. Ikard Servi Gas, 525 F. App'x 663 (10th Cir. 2013); Nard v. City of Okla. City, 153 F. App'x 529 (10th Cir. 2005); Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006); Belcher v. United States, 216 F. App'x 821 (10th Cir. 2007); United States v. Reed, 195 F. App'x 815 (10th Cir. 2006); Lobozzo v. Colorado Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011); Routt v. Howry, 835 F. App'x. 379 (10th Cir. 2020); Williams v. Stewart Title Co., 806 F. App'x 625 (10th Cir. 2020); Young v. Addison, 490 F. App'x 960 (10th Cir. 2012); Poore v. Glanz, F. App'x 635 (10th Cir. 2018); Ross v. Burlington N. and Santa Fe Ry. Co., 528 F. App'x 960 (10th Cir. 2013); Joint Technology, Inc. v. Weaver, 567 F. App'x 585 (10th Cir. 2014); Richeson v. United States, 849 F. App'x 726, 728 (10th Cir. 2021); Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018); United States v. Velarde, 2021 WL 2472349 (10th Cir. June 17, 2021); and Mann v. Hutchinson Pub. Schs., 202 F.3d 282 (table), at *1-2 (10th Cir. 1999) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Amended Order.

minimal." Trbovich v. United Mine Workers of America, 404 U.S. 528, 538 n. 1 (1972)(no

citation for quotation)(citing 3B J. Moore, Federal Practice 24.09 - 1(4) (1969)). Representation

is usually adequate for Rule 24(a) purposes when the movant's objective is "identical to that of

one of the parties." Bottoms v. Dresser Indus., Inc., 797 F.2d 869, 872 (10th Cir. 1986). The

divergence of interest between the movant and a party "'need not be great'" to meet rule 24(a)'s

threshold. Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d at 1117 (quoting Natural

Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n, 578 U.S. 1341, 1346 (10th Cir. 2002).

The movant's burden to show inadequate representation is further reduced when the

government is supposed to adequately represent the movant's interest. Movants can show

inadequate representation when the movant "has expertise the government may not." Utah Ass'n

of Cntys. v. Clinton, 255 F.3d at 1246, at 1255. This showing is particularly common, because

typically the government cannot both adequately represent the interests of the public it represents

and those of a private intervenor. See Western Energy All. v. Zinke, 877 F.3d at 1167 ("we have

held that the government cannot adequately represent the interests of a private intervenor *and* the

interests of the public" (emphasis in original)). As the Tenth Circuit has explained, the

government's "representation of the public interest generally cannot be assumed to be identical to

the individual parochial interest of a particular member of the public merely because both entities

occupy the same posture in the litigation." Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1255-56.

Representation may be inadequate if the government and private party "would only be aligned if

the district court ruled in a particular way." Western Energy All. v. Zinke, 877 F.3d at 1168. Thus,

the burden of demonstrating inadequate representation is met when the prospective intervenor

"shows that the 'public interest the government is obligated to represent may differ from the

would-be intervenor's particular interest.'" Payne v. Tri-State Careflight, LLC 2016 WL 9738302,

at *16 (quoting <u>Utah Ass'n of Cntys. v. Clinton</u>, 255 F.3d at 1255).  <u>See</u> <u>United States v. City of Albuquerque</u>, No. CIV 14-1025 JB\SMV, 2020 WL 3129825, at *44 (D.N.M. June 12, 2020)(Browning, J.).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  <u>Herrera v. Santa Fe Pub. Schs.</u>, 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991)(alteration in <u>Herrera v. Santa Fe Pub. Schs.</u>)).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)("<u>Celotex</u>").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, <u>or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim</u>, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Celotex</u>, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment."  <u>Cardoso v. Calbone</u>, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

<u>Plustwik v. Voss of Nor. ASA</u>, No. 11-CV-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."

Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[95]  Once the movant meets

this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is

a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 256 (1986)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Piping,

Inc., 184 F. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the

defendant when the plaintiff did not offer expert evidence supporting causation or proximate

causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.

184 F. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-

contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability

claim's proximate-causation requirement with mere common knowledge, and so New Mexico law

required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not

provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the

requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's

case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks

omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence,

the defendant, even without any competent evidence itself, may secure summary judgment by

pointing out the plaintiff's lack of competent evidence.  See Celotex, 477 U.S. at 323-25 (providing

---

[95]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme
Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the
law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727,
at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent
both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how
the standard was applied to the facts of the case.").

that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that the defendants defectively manufactured an oil distributor). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim). See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or

denials of his pleadings." Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."  (quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).

A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).  To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [First Nat. Bank of Ariz. v.] Cities Service,[] 391 U.S. [253], 288-[89] . . . . If the evidence

is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 87 . . . (per curiam), or is not significantly probative, Cities Service, . . . at 290 . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). Fourth, the court cannot decide any credibility issues. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified-immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the United States Supreme Court concluded that summary judgment is appropriate where video evidence clearly contradicted the plaintiff's version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty., third and fourth alterations in York v. City of Las Cruces). "The Tenth Circuit, in *Rhoads v. Miller*, [352 F. App'x 289 (10th Cir. 2009),] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony." Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

Parties may allege new claims in motions for summary judgment. See Evans v. McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991). When a party raises a new claim in a motion for summary judgment, a court treats the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure. See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998). The Tenth Circuit has stated:

> [a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."

Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quoting 4 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1219, at 94 (4th ed. 2021)("Wright & Miller")). While the purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case." Evans v. McDonald's Corp., 936 F.2d at 1091.

**LAW REGARDING RULE 7(a)**

Rule 7(a) states:

> (a)   Pleadings. Only these pleadings are allowed:
>
>> (1)    a complaint;
>>
>> (2)   an answer to a complaint;
>>
>> (3)   an answer to a counterclaim designated as a counterclaim;
>>
>> (4)   an answer to a crossclaim;
>>
>> (5)    a third-party complaint;
>>
>> (6)   an answer to a third-party complaint; and

(7)      if the court orders one, a reply to an answer.

Fed. R. Civ. P. 7(a).  The list of pleadings in rule 7(a) is "exclusive."  <u>Bank of America, N.A. v.</u>

<u>Lebreton</u>, No. 14-CV-0318, 2015 WL 2226266, at *35 (D.N.M. April 20, 2015)(Browning, J.).

"Under rule 7(a), motions and other papers are not pleadings."  <u>Applied Capital, Inc. v. Gibson</u>,

No. 05-CV-0098 JB/ACT, 2007 WL 5685131, at *7 (D.N.M. Sept. 27, 2007)(Browning,. J.).

### LAW REGARDING RULE 8 AND NOTICE PLEADING

Rule 8(a) states:

(a)      Claim for Relief. A pleading that states a claim for relief must contain:

    (1)      a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

    (2)      a short and plain statement of the claim showing that the pleader is entitled to relief; and

    (3)      a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a).

The Tenth Circuit clarified recently that a plaintiff "does not need to provide exact details

to" comply with Rule 8(a).  <u>Richeson v. United States</u>, 849 F. App'x 726, 728 (10th Cir. 2021).

"He needs only to provide allegations which are clear enough so that the opposing party and the

court can discern a factual and legal basis for his claims."  <u>Richeson v. United States</u>, 849 F. App'x

at 728.  In <u>Richeson v. United States</u>, the Tenth Circuit determined that the United States District

Court for the District of Colorado dismissed properly a complaint containing "84 pages of

attachments," which "provide a few pieces of the puzzle as to what has happened" and

"demonstrate only a general allegation of wrongdoing." 849 F. App'x at 728.  The Tenth Circuit

also repeatedly has rejected "shotgun" complaints that bring every conceivable claim against

multiple defendants.  <u>Glenn v. First Nat. Bank in Grand Junction</u>, 868 F.2d 368, 371 (10th Cir. 1989)("The law recognizes a significant difference between notice pleading and 'shotgun' pleading."); <u>Pola v. Utah</u>, 458 F. App'x. 760, 762 (10th Cir. 2012)(affirming the dismissal of a complaint that was "incoherent, rambling, and include[s] everything but the kitchen sink"); <u>McNamara v. Brauchler</u>, 570 F. App'x 741, 743 (10th Cir. 2014)(allowing shotgun pleadings to survive screening "would force the Defendants to carefully comb through [the documents] to ascertain which . . . pertinent allegations to which a response is warranted").

## LAW REGARDING ADOPTION BY REFERENCE UNDER RULE 10

In relevant part, rule 10 of the Federal Rules of Civil Procedure allows a "statement in a pleading" to be "adopted by reference elsewhere in the same pleading or in any other pleading or motion."  Fed. R. Civ. P. 10(c).  "Pleadings" are listed in rule 7.  Fed. R. Civ. P. 7(a).  Rule 10(c) "encourage[s] pleadings that are short, concise, and free of unwarranted repetition as well as to promote convenience in pleading."  <u>Wright & Miller</u> supra § 1326.  This rule is particularly useful in multiparty litigation "when the presence of common question often results in the pleadings of the parties on the same side of the litigation being virtually identical."  <u>Wright & Miller</u> supra § 1326.  Because the rule facilitates more efficient pleading, incorporating statements from earlier pleadings into later pleadings is now a common practice.

Though the rule allows sets no express standards, adoption by reference must be sufficiently direct and explicit for an opposing party to have fair notice of the claims against them.  <u>See Shelter Mut. Ins. Co. v. Public Water Supply Dist. No. 7 of Jefferson Cnty., Mo.</u>, 747 F. 2d 1195, 1198 (8th Cir. 1984)("The Federal Rules of Civil Procedure envision a system in which concise, direct, and clear statements afford each party fair notice of the other's claims."); <u>Security First Bank v. Burlington N.</u>, 213 F. Supp. 1087, 1093 (D.Neb. 2002)(Caffrey, J.)("Although

Fed. R. Civ. P. 10(c) authorizes adoption by reference in third-party complaint of matter contained in the original complain, it must be done with a degree of clarity which enables the third-party defendant to ascertain the nature and extent of the incorporation.").

Rule 10(c) contemplates incorporation of a statements only from a "pleading." See Fed. R. Civ. P. 10(c). Rule 7(a) enumerates documents that are "pleadings." Fed. R. Civ. P. 7(a). Rule 7(a) lists seven pleadings and states that those are the "only" ones "allowed." Fed. R. Civ. P. 7(a). By contrast, rule 7(b) sets out basic requirements for motions. See Fed. R. Civ. P. 7(b). A party cannot, therefore, "join" a motion by using Rule 10's procedures for adoption by reference. As the Honorable Paul D. Borman, United States District Judge for the United States District Court for the District of Michigan, explained, "Rule 10(c) merely provides that statements made *in a pleading* may be adopted by reference elsewhere . . . . Documents that constitute 'pleadings' are specifically enumerated in Fed. R. Civ. P. 7(a), and a motion (or a response to a motion) is *not* a pleading." Marco Int'l, LLC v. Como-Coffee, LLC, No. 17-cv-10502, 2018 WL 1790171, at *1 n. 1 (E.D. Mich. April 16, 2018)(Borman, J.)(emphasis in original). See Wilson v. PL Phase One Operations L.P., 422 F.Supp. 3d 971, 978 (D.Md. 2019)(Chasanow, J.)("Rule 10(c) does not contemplate the incorporation of statements from prior motions"); Express Scripts, Inc. v. Kincaid, No. CIV 19-00007-SKL, 2020 WL 3027200, at *2 n. 3 (E.D. Tenn. June 5, 2020)(Lee, M.J.)("[t]he Court notes Rule 10(c) only permits parties to adopt, by reference, statements made in pleadings, not other motions."); Wright & Miller supra § 1326 ("Rule 10(c) does not contemplate the incorporation of statements from prior motions (only statements 'in a pleading' may be adopted by reference elsewhere).").

Despite rule 10(c)'s language, some district courts have allowed parties to incorporate statements from prior motions. In Smith v. LVNV Funding, LLC, No. CIV 11-0356, 2014 WL

4441195 (E.D. Tenn. Sept. 9, 2014)(Greer, J.), one defendant adopted by reference the same arguments that another defendant's motion for summary judgment advanced.  2014 WL 4441195, at *1.  The court noted that "there are times arguments can be improperly incorporated by reference" but, because of the "procedural posture of similar related cases," the court decided that this case was not such a situation.  2014 WL 4441195, at * 5.  Another court found it "sufficient" under rule 10(c) to incorporate by statements from a memorandum filed in support of an earlier motion.  Shuler v. Regency House of Wallingford, Inc. No. 3:05CV480(RNC), 2006 WL 118383, at *1 n. 1, (D.Conn. Jan. 13, 2006)(Chatigny, J.).

Difficulty arises, however, when parties incorporate statements from earlier motions that affect arguments advanced elsewhere.  For example, in Wilson v. PL Phase One Operations, the defendant filed a consolidated motion to dismiss that incorporated arguments from its earlier motion to dismiss that had been impacted by the plaintiff's amended complaint.  See 422 F. Supp. 3d. at 978.  Instead of responding to the defendant's first motion to dismiss, the plaintiff filed the amended complaint, in which it included additional allegations that appeared to respond to the arguments advanced in the defendant's first motion to dismiss.  See 422 F. Supp. 3d. at 978. The court noted the "difficulty" and explained that it is "not the role of the court to try to discern which, if any, arguments still apply."  422 F. Supp. 3d. at 978.

Excessive incorporation can also be problematic.   Incorporating earlier statements indiscriminately "can result in an unnecessarily long and confusing pleading and counts that contain irrelevant facts or defenses, and it can prevent the opposing party from reasonably being able to prepare a response or simply make the burden of doing so more difficult."  Wright & Miller supra § 1326.  Courts sometimes refer to this practice as a form of "shotgun pleading."  E.g., Anderson v. District Bd. Of Tr. of Cent. Fla. Cmty. Coll., 77 F.3d 364, 366 (11th Cir. 1996)(noting

that "'shotgun' pleading" makes it "virtually impossible to know which allegations of fact were intended to support which claim(s) for relief."   The Tenth Circuit rejects "shotgun" pleading. See e.g., Glenn v. First Nat. Bank in Grand Junction, 868 F.2d 368, 371 (10th Cir. 1989)("The law recognizes a significant difference between notice pleading and 'shotgun' pleading.")(no citation for quotation); Pola v. Utah, 458 F. App'x 760, 762 (10th Cir. 2012)(affirming the dismissal of a complaint that was "incoherent, rambling, and include[s] everything but the kitchen sink"); McNamara v. Brauchler, 570 F. App'x 741, 743 (10th Cir. 2014)(allowing shotgun pleadings to survive screening "would force the Defendants to carefully comb through [the documents] to ascertain . . . [the] pertinent allegations to which a response is warranted").   See Macias v. New Mexico Dep't of Labor, 300 F.R.D. 529, 562-63 (D.N.M. March 31, 2014)(Browning, J.)(noting that ineffective incorporation can result in "shotgun pleading").   Because trouble can arise when parties incorporate arguments by reference, parties must use rule 10(c) carefully.

Although the Federal Rules of Civil Procedure do not permit expressly adoption by reference or incorporation of statements in prior motions, the District of New Mexico Local Rules of Civil Procedure provide for adoption of statements from motions.   See D.N.M. LR-Civ. 7.1(a). D.N.M. LR-Civ. 7.1(a) states that "[a] party may adopt by reference another party's motion or other paper by making specific reference to the filing date and docket number of such motion or other paper."   D.N.M. LR-Civ. 7.1(a), therefore, does what the Federal Rules do not -- allow a party to, in effect, join another party's motion as if it were its own.   D.N.M. LR-Civ. 7.1(a) allows parties to refrain from having to draft motions that are sometimes -- if not wholly -- duplicative. "The purpose of Local Rule 7.1(a) is to promote judicial efficiency and economy by precluding the unnecessary filing of motions, responses, and orders." Hooten v. Ikard Servi Gas, 525 F. App'x 663, 667 (10th Cir. 2013). Accord Gilman v. New Mexico, No. CIV-20-0213 KG/SCY, 2020 WL

5232273, at *3 (D.N.M. 2020)(Gonzales, J.)(same).  D.N.M. LR-Civ. 7.1(a) "encourages parties to work together to prevent the filing of needless motions and helps narrow the scope of briefing to the most important issues, promoting judicial efficiency and improving the quality of the briefs." Lunnon v. United States, No. CIV 16-1152 MV/JFR 2020 WL 1820499, at *5 (D.N.M.)(Robbenhaar, M.J.).

### LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555.  "'At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face.'" Rivero v. Bd. of Regents of Univ. of New Mexico, No. CIV 16-0318 JB\SCY, 2019 WL 1085179, at *47 (D.N.M. March 7, 2019)(Browning, J.)(quoting Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.)).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  This standard requires "'more than a sheer possibility that a defendant has acted unlawfully.'" Nowell v. Medtronic Inc., 372 F. Supp. 3d 1166, 1245 (D.N.M. 2019)(Browning, J.)(quoting Ashcroft v. Iqbal, 556 U.S. at 678).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted).  The United States Court of Appeals for the Tenth Circuit has stated:

"[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct,

> much of it innocent, then the plaintiffs "have not nudged their claims across the line
> from conceivable to plausible."  The allegations must be enough that, if assumed to
> be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(citations

omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).  See Gallegos v. Bernalillo Cty.

Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

　　　"When a party presents matters outside of the pleadings for consideration, as a general rule

'the court must either exclude the material or treat the motion as one for summary judgment.'"

Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir.

2017)(quoting Alexander v. Okla., 382 F.3d 1206, 1214 (10th Cir. 2004)).  There are three limited

exceptions to this general principle: (i) documents that the complaint incorporates by reference,

see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in

the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the

documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and

(iii) "matters of which a court may take judicial notice,"  Tellabs, Inc. v. Makor Issues & Rights,

Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103-

04 (holding that the district court did not err by reviewing a seminar recording and a television

episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended

complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").

"[T]he court is permitted to take judicial notice of its own files and records, as well as facts which

are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000),

abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

　　　In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion

with numerous documents, and the district court cited portions of those motions in granting the

motion." 627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005).  In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which missed deadline the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." Douglas v. Norton, 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing.  See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court reasoned that the complaint did not incorporate the documents by reference, nor were the documents central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness.  See 2013 WL 312881, at *50-51.  The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was

aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree").  The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23.

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).  See, e.g., S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions.  First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity defense – the courts handle these cases differently than other motions to dismiss.  See Glover v. Gartman,

899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009)); Robbins v. Oklahoma, 519 F.3d at 1247.  Second, the defendant can raise the defense on a motion to dismiss where the facts establishing the affirmative defense are apparent on the face of the complaint.  See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").  The defense of limitations is the affirmative defense that the complaint's uncontroverted facts is most likely to establish.  See Wright & Miller supra at § 1277.  If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union P. R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945)(Phillips, J.); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).

The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute.  The Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(Major, J.)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts establishing an exception to the affirmative defense).  It appears that, from case law in several Courts of Appeals, the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage – by refraining from pleading specific or identifiable dates.  See Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.); Hollander v. Brown, 457 F.3d 688, 691

n.1 (7th Cir. 2006)(Ripple, J.).  Although the Tenth Circuit has not squarely addressed this practice, the Court has permitted this practice.  See Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING MOTIONS TO AMEND UNDER RULE 15

"While Rule 15 governs amendments to pleadings generally, rule 16 of the Federal Rules of Civil Procedure governs amendments to scheduling orders."  Bylin v. Billings, 568 F.3d 1224, 1231 (10th Cir. 2009)(citing Fed. R. Civ. P. 16(b)).  When a court has not entered a scheduling order in a particular case, rule 15 governs amendments to a plaintiff's complaint.  See Fed. R. Civ. P. 15.  When a scheduling order governs the case's pace, however, amending the complaint after the deadline for such amendments implicitly requires an amendment to the scheduling order, and rule 16(b)(4) governs changes to the scheduling order.  See Bylin v. Billings, 568 F.3d at 1231.

Rule 15(a) provides:

(1)   Amending as a Matter of Course.  A party may amend its pleading once as a matter of course within:

(A)   21 days after serving it, or

(B)   if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion of Rule 12(b), (e), or (f), whichever is earlier.

(2)   Other Amendments.  In all other cases, a party may amend its pleadings only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

(3)   Time to Respond.  Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

Fed R. Civ. P. 15(a).  Under rule 15(a), the court should freely grant leave to amend a pleading where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. Russell, No. CIV 04-1396 JB/WDS, 2007 WL 709041, at *1-2 (D.N.M. 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Coop., No. CIV 05-0073 JB/KBM, 2005 WL 3664299, at *1-2 (D.N.M. Sept. 23, 2005)(Browning, J.).  The Supreme Court has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . [,] repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given.  Fomen v. Davis, 371 U.S. 178, 182 (1962).  See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001); In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  Because rule 15 was "designed to facilitate the amendment of pleadings except where prejudice to the opposing party would result," United States v. Hougham, 364 U.S. 310, 316 (1960), a district court has "'wide discretion to recognize a motion for leave to amend in the interest of a just, fair, or early resolution of litigation,'" Bylin v. Billings, 568 F.3d 1224, 1229 (10th Cir. 2009)(quoting Calderon v. Kan. Dep't of Soc. & Rehab. Servs., 181 F.3d 1180, 1187 (10th Cir. 1999)(omitting further internal quotations)).

A court should deny leave to amend under rule 15(a) where the proposed "amendment would be futile."  Jefferson Cty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  An amendment is "futile" if the pleading "as amended, would be subject to dismissal."  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory

motive, [or] failure to cure deficiencies by amendments previously allowed." In re Thornburg

Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357, 1365-66

(10th Cir. 1993)).  See Youell v. Russell, 2007 WL 709041, at *2-3 (D.N.M. 2007)(Browning, J.);

Lymon v. Aramark Corp., No. CIV 08-0386 JB/DJS, 2009 WL 1299842 (D.N.M.

2009)(Browning, J.).  The Tenth Circuit has also noted:

> It is well settled in this circuit that untimeliness alone is a sufficient reason
> to deny leave to amend, see Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452,
> 1462 (10th Cir. 1991); Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893
> F.2d 1182, 1185 (10th Cir. 1990); First City Bank v. Air Capitol Aircraft Sales, 820
> F.2d 1127, 1133 (10th Cir. 1987), especially when the party filing the motion has
> no adequate explanation for the delay, Woolsey, 934 F.2d at 1462.  Furthermore,
> "[w]here the party seeking amendment knows or should have known of the facts
> upon which the proposed amendment is based but fails to include them in the
> original complaint, the motion to amend is subject to denial." Las Vegas Ice, 893
> F.2d at 1185.

Frank v. U.S. W., Inc., 3 F.3d at 1365-66.[96]  The longer the delay, "the more likely the

motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent

and the court, is itself a sufficient reason for the court to withhold permission to amend." Minter

v. Prime Equip. Co., 451 F.3d at 1205 (citing Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st

Cir. 2004)).  Undue delay occurs where the plaintiff's amendments "make the complaint 'a moving

target.'" Minter v. Prime Equip. Co., 451 F.3d at 1206 (quoting Viernow v. Euripides Dev. Corp.,

157 F.3d 785, 799-800 (10th Cir. 1998)).  "[P]rejudice to the opposing party need not also be

shown." Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d at 1185.  "Where the party

---

[96]The Court notes that there is older authority in the Tenth Circuit that seems to be to the
contrary.  See R.E.B., Inc. v. Ralston Purina Co., 525 F.2d 749, 751 (10th Cir. 1975)("Lateness
does not of itself justify the denial of the amendment.").  Minter v. Prime Equipment Co. seems to
clarify that the distinction is between "delay" and "undue delay." Minter v. Prime Equipment Co.,
451 F.3d at 1205-06.  Delay is undue "when the party filing the motion has no adequate explanation
for the delay." Minter v. Prime Equipment Co., 451 F.3d at 1206.

seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d at 1185 (quoting State Distribs., Inc. v. Glenmore Distilleries Co., 738 F.2d 405 (10th Cir. 1984)). Along the same vein, the court will deny amendment if the party learned of the facts upon which its proposed amendment is based and nevertheless unreasonably delayed in moving to amend its complaint. See Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir. 1994)(noting motion to amend filed "was not based on new evidence unavailable at the time of the original filing").

Refusing leave to amend is generally justified only upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment. A district court is justified in refusing leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." Sinclair Wyoming Refining Co. v. A & B Builders, Ltd., 989 F.3d 747, 777 (10th Cir. 2021)(quoting Bylin v. Billings, 568 F.3d 1224, 1229 (10th Cir. 2009)). See Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1585 (10th Cir. 1993)(citing Foman v. Davis, 371 U.S. at 182). Again, the matter is left to the Court's discretion. Frank v. U.S. W., Inc., 3 F.3d at 1365-66. See Duncan v. Manager, Dep't of Safety, City & Cty. of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005)(quoting Frank v. U.S. West, Inc., 3 F.3d at 1365-66, and stating that resolving the issue whether to allow a plaintiff to file a supplement to his complaint is "well within the discretion of the district court"). "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" B.T. ex rel. G.T. v. Santa Fe Pub. Schs., No. CIV 05-1165 JB/RLP, 2007

WL 1306814, at *2 (D.N.M. March 12, 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).  "Specifically, the . . . Tenth Circuit has determined that district courts should grant leave to amend when doing so would yield a meritorious claim." Burleson v. ENMR-Plateau Tel. Co-op., 2005 WL 3664299 at *2 (citing Curley v. Perry, 246 F.3d at 1284).

### RELEVANT LAW REGARDING RULE 54(b)

As rule 54(b) of the Federal Rules of Civil Procedure states, a court's order or decision

that adjudicates that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).  Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of a judgment."  Fed. R. Civ. P. 54(b).  The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders."  Been v. O.K. Indus., Inc., 495 F.3d 1217, 1225 (10th Cir. 2007).  In the Tenth Circuit, "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another."  Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225).  In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)). In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order.  It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to

establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.  See Rivero v. Bd. of Regents of Univ. of N.M., No. 16-0318 JB\SCY, 2019 WL 1085179, at *58-62 (D.N.M. Mar. 7, 2019)(Browning, J.).

Nevertheless, despite this general rule, the Court may order entry of judgment on a particular claim or claims if it "expressly determines that there is not just reason for delay." Fed. R. Civ. P. 54(b).  A party can appeal the district court's order or decision if the court enters a rule 54(b) certification order, determining that its judgment is final and that no just reason for delay of its entry of judgment exists.  See Stockman's Water Co., LLC v. Vaca Partners, L.P., 425 F.3d 1263, 1264 (10th Cir. 2005).

## LAW REGARDING ERIE AND THE RULES ENABLING ACT

"In diversity cases, the Erie[97] doctrine instructs that federal courts must apply state substantive law and federal procedural law."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d 1152, 1162 (10th Cir. 2017).  "If a federal rule of civil procedure answers the question in dispute, that rule governs our decision so long as it does not 'exceed[ ] statutory authorization or Congress's rulemaking power.'"  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162 (quoting Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins., 559 U.S. 393, 398 (2010)("Shady Grove")).  "When faced with a choice between a state law and an allegedly conflicting federal rule," the Tenth Circuit "follow[s] the framework described by the Supreme Court in [Shady Grove], as laid out by Justice Stevens in his concurring opinion."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162.  "First, the court must decide whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law."  Racher v. Westlake Nursing Home Ltd. P'ship, 871

---

[97]Erie R. Co. v. Tompkins, 304 U.S. 64 (1983).

F.3d at 1162 (citations and quotations omitted).  There is a conflict between federal and state law if there is a "direct collision" that is "unavoidable," but there is no collision if the state and federal rules "can exist side by side . . . each controlling its own sphere of coverage."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163 (citations omitted).  If there is no direct collision, "there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under Erie."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163.  If there is a direct collision, a court must follow the federal rule if it is a valid exercise of the Supreme Court's rulemaking authority under the Rules Enabling Act, 28 U.S.C. § 2072, that is, it must "not abridge, enlarge or modify a substantive right." 28 U.S.C. § 2072(b).  See Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163-64.

> Justice Stevens, in his controlling concurrence in Shady Grove, addressed how, in a diversity case where state substantive law applies, to analyze whether a federal rule of procedure abridges, enlarges or modifies a substantive right. [Shady Grove, 559 U.S. at 418-21 (Stevens, J., concurring) ]; see Gasperini [v. Center for Humanities, Inc.], 518 U.S. [415] at 427 (1996)].  Justice Stevens advised courts not to rely on "whether the state law at issue takes the form of what is traditionally described as substantive or procedural." Shady Grove, 559 U.S. at 419 (Stevens, J., concurring).  Rather, a more nuanced approach is required. [Shady Grove, 559 U.S. at 419-20].  Justice Stevens observed that "[a] state procedural rule, though undeniably 'procedural' in the ordinary sense of the term, may exist to influence substantive outcomes, and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." [Shady Grove, 559 U.S. at 419-20](citation and internal quotation marks omitted).  One example of such a law is a procedural rule that "may . . . define the amount of recovery." [Shady Grove, 559 U.S. at 420].  Ultimately, a court must consider whether the federal procedural rule has displaced "a State's definition of its own rights or remedies." [Shady Grove, 559 U.S. at 418,].  If so, the federal rule may be invalid under the Rules Enabling Act because the federal rule abridges, enlarges or modifies a state substantive right.

Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1164 (citations omitted)(alteration in the original)(quoting Shady Grove, 559 U.S. at 418-20 (Stevens, J., concurring)).  "[W]hen state law creates a cause of action, it also defines the scope of that cause

of action," which includes "the applicable burdens, defenses, and limitations." Racher v. Westlake

Nursing Home Ltd. P'ship, 871 F.3d at 1164-65.  Consequently, even though burdens of proof,

affirmative defenses, and liability limitations are all legal concepts that savor of procedure,

"[f]ailing to enforce such attendant attributes of a state law would lead to different measures of the

substantive rights enforced in state and federal courts," i.e., would modify substantive rights.

Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1165.  See Walker v. Spina, 359 F.

Supp. 3d 1054, 1082-83 (D.N.M. 2019)(Browning, J.).

## LAW REGARDING 42 U.S.C § 1983 CLAIMS

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen
> of the United States or other person within the jurisdiction thereof to the deprivation
> of any rights, privileges, or immunities secured by the Constitution and laws, shall
> be liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983.  § 1983 creates only the right of action; it does not create any substantive rights;

substantive rights must come from the Constitution or from a federal statute.  See Nelson v.

Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create any substantive

rights, but merely enforce[s] existing constitutional and federal statutory rights . . . .'" (second

alteration added by Nelson v. Geringer)(quoting Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186,

1197 (10th Cir. 1998))).  § 1983 authorizes an injured person to assert a claim for relief against a

person who, acting under color of state law, violated the claimant's federally protected rights.  To

state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a

deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted

under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  The Court has noted:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal

Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)(second alteration in original)(quoting Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)).

The Supreme Court clarified that, in alleging a § 1983 action against a government agent in his or her individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662 676 (2009). Consequently, there is no respondeat superior liability under § 1983. See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens[98] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor. See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 689 (1978). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew

---

[98]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), the Supreme Court of the United States held that a violation of the Fourth Amendment of the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." Bivens, 403 U.S. at 389. Thus, in a Bivens action, a plaintiff may seek damages when a federal officer acting in the color of federal authority violates the plaintiff's constitutional rights. See Bivens, 403 U.S. at 389. See also Ashcroft v. Iqbal, 556 U.S. at 675-76 (stating that Bivens actions are the "federal analog" to § 1983 actions).

or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  In Dodds v. Richardson, then-United States Circuit Judge for the Tenth Circuit stated:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  Then-Judge Gorsuch noted, however, that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy

. . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds

v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

The specific example that the Tenth Circuit used to illustrate this principle is Rizzo v.

Goode, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials

liable under § 1983 for constitutional violations that unnamed individual police officers

committed.  See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at

371).  The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between

the police misconduct and the city officials' conduct, because there was a deliberate plan by some

of the named defendants to "'crush the nascent labor organizations.'" Dodds v. Richardson, 614

F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

## LAW REGARDING § 1988

Section 1983 "and its fee-shifting provision, 42 U.S.C. § 1988, seek to encourage attorneys

to litigate civil rights violations." Copar Pumice Co. v. Morris, No. CIV 07-0079 JB/ACT, 2012

WL 2383667, at *13 (D.N.M. June 13, 2012)(Browning, J.).  Section 1988(b) provides: "[T]he

court, in its discretion, may allow the prevailing party, other than the United States, a reasonable

attorney's fee as part of the costs."  42 U.S.C. § 1988(b).  "[T]here are two elements in deciding

whether to award attorney's fees.  First, the party seeking fees must qualify as a 'prevailing party.'

Second, the fee itself must be 'reasonable.'" Phelps v. Hamilton, 120 F.3d 1126, 1129 (10th Cir.

1997)(quoting 42 U.S.C. § 1988(b)).

For the purpose of determining attorney's fees, a court may determine that plaintiffs are

"prevailing parties . . . if they succeed on any significant issue in litigation which achieves some

of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. at 433 (internal

quotation marks omitted)(citation omitted).  In Farrar v. Hobby, 506 U.S. 103 (1992), the Supreme

Court later elaborated on this description:

> Therefore, to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to affect the behavior of the defendant toward the plaintiff. Only under these circumstances can civil rights litigation effect the material alteration of the legal relationship of the parties and thereby transform the plaintiff into a prevailing party. In short, a plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

506 U.S. at 111 (citations omitted)(internal quotation marks omitted)(alterations omitted). The Supreme Court has stated that "this is a generous formulation that brings the plaintiff only across the statutory threshold." Hensley v. Eckerhart, 461 U.S. at 433. See Copar Pumice Co., Inc. v. Morris, 2012 WL 2383667, at *19 (concluding that Copar Pumice qualified as a prevailing party under the "generous formulation" that the Supreme Court set in Hensley v. Eckerhart). The district court must then determine what fee is "reasonable." Hensley v. Eckerhart, 461 U.S. at 433; Obenauf v. Frontier Fin. Grp., Inc., 785 F. Supp. 2d 1188, 1210 (D.N.M. 2011)(Browning, J.)("Once a court determines that a party is a prevailing party, it must then determine what amount of reasonable attorney's fees should be awarded.").

"To determine a reasonable attorneys fee, the district court must arrive at a 'lodestar' figure by multiplying the hours plaintiffs' counsel reasonably spent on the litigation by a reasonable hourly rate." Jane L. v. Bangerter, 61 F.3d 1505, 1509 (10th Cir. 1995)(citing Blum v. Stenson, 465 U.S. at 888; Hensley v. Eckerhart, 461 U.S. at 433). This lodestar figure "provides an objective basis on which to make an initial estimate of the value" of an attorney's services. Hensley v. Eckerhart, 461 U.S. at 433. While the Court "agrees that attorneys' fees should be adequate to attract competent counsel," they should "not be so large that it is a windfall for

attorneys -- who should not be encouraged to grow fat off of lackluster cases, or pester the court with trifles in the hopes of capturing large attorneys' fees from dubious claims." Obenauf v. Frontier Financial Group, Inc., 785 F. Supp. 2d at 1214.  The prevailing party requesting an award of its fees must submit evidence to support its claim of time spent and rates claimed.  See Hensley v. Eckerhart, 461 U.S. at 434.  If the evidence is inadequate, the district court may reduce the fee award accordingly.  See Hensley v. Eckerhart, 461 U.S. at 434. See also Ysasi v. Brown, 2015 WL 403930, at *14 (reducing the plaintiffs' counsel's requested fees because the time records were of poor quality, lacked detail, and were general in their wording).

A district court may also adjust the lodestar to reflect a plaintiff's overall success level. See Jane L. v. Bangerter, 61 F.3d at 1511 (citing Hensley v. Eckerhart, 461 U.S. at 435-36).  "In making such adjustments, however, Hensley requires that lower courts make qualitative comparisons among substantive claims before adjusting the lodestar either for excellent results or limited success."  Jane L. v. Bangerter, 61 F.3d at 1511.  The district court must consider the relationship between the fees awarded and the degree of success obtained and must make a qualitative assessment to determine when limited results will nonetheless justify full recovery or to what extent a plaintiff's "limited success" should reduce the lodestar.  Jane L. v. Bangerter, 61 F.3d at 1511.  "There is no precise rule or formula" for making such determinations.  Hensley v. Eckerhart, 461 U.S. at 436.  In Hensley v. Eckerhart, the Supreme Court explained the rationale behind this approach:

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours on a claim-by-claim basis.  Such a lawsuit cannot be viewed as a series of discrete claims.  Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

461 U.S. at 435.

Furthermore, when a plaintiff brings related claims, failure on some claims should not preclude full recovery if the plaintiff achieves success on a significant, interrelated claim. See Hensley v. Eckerhart, 461 U.S. at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."); Jane L. v. Bangerter, 61 F.3d at 1512. Claims are related when they are either based on "a common core of facts" or based on "related legal theories." Hensley v. Eckerhart, 461 U.S. at 435. In both cases, the district court should refrain from reducing the amount of the prevailing party's attorney's fee award. See Jane L. v. Bangerter, 61 F.3d at 1512. The Tenth Circuit has "refused to permit the reduction of an attorneys fee request if successful and unsuccessful claims are based on a common core of facts." Jane L. v. Bangerter, 61 F.3d at 1512 (internal quotation marks omitted)(quoting Tidwell v. Fort Howard Corp., 989 F.2d 406, 412-13 (10th Cir. 1993)(holding that the trial court abused its discretion in reducing attorney's fees for a plaintiff who prevailed under some provisions of the Equal Pay Act, but failed on her Title VII and state law claims)). The Tenth Circuit has also recognized that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." Jane L. v. Bangerter, 61 F.3d at 1512 (quoting Hensley v. Eckerhart, 461 U.S. at 435).

## LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain

reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972).  "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)).  The Supreme Court has

> made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money.  By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72.  "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men.  In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process.  Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)].  See Flemming v. Nestor, 363 U.S. 603, 611 . . . [(1960)].  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a

municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. at 334. The Supreme Court has explained that

> the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the

subsequent proceedings.  In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545(footnote omitted).

The United States Court of Appeals for the Second Circuit has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335).  A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335. . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has previously considered procedural due process violations several times.  See A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.)("Youngers").  For example, in Youngers, the Court concluded that the New Mexico Department of Health violated due process when it afforded

a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no process for deprivation.  <u>See</u> <u>Youngers</u>, 2015 WL 13668431, at *37-43.  The Court has also concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing.  <u>See</u> <u>Salazar v. City of Albuquerque</u>, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").  <u>See</u> <u>also</u> <u>Duprey v. Twelfth Judicial Dist. Court</u>, 760 F. Supp. 2d at 1215 (denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers."); <u>Camuglia v. City of Albuquerque</u>, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), <u>aff'd</u>, <u>Camuglia v. City of Albuquerque</u>, 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

### LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due-process rights and not for third parties' acts.  <u>See</u> <u>Robbins v. Oklahoma</u>, 519 F.3d at 1251 (citing <u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. at 197). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."  <u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal

level of safety and security.  See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.

### 1.  Exceptions to the General Rule.

There are, however, two exceptions to this general rule.  The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d at 923).  "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'"  Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2.  Special-Relationship Exception.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due process clause is the special-relationship doctrine.  A plaintiff must show that he or she was involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)."  Uhlrig v. Harder,

64 F.3d 567, 572 (10th Cir. 1995).

**3.      Danger-Creation Exception.**

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573.  The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."  Currier v. Doran, 242 F.3d at 923.  See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm.").  Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573.  A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima facie case, the plaintiff must show that his or her danger-creation claim for due process violations meets a five-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted recklessly in conscious disregard of that risk.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v.

City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk

of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City &

Cty. of Denver, 960 F.2d at 1496.  The intent to place a person unreasonably at risk is present

where the defendant "is aware of a known or obvious risk" creating a high probability that serious

harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable

disregard of the consequences."  Medina v. City & Cty. of Denver, 960 F.2d at 1496 (citations

omitted).

4.      **Conduct that Shocks the Conscience.**

A government actor's official conduct intended to injure in a way that cannot reasonably

be justified by any government interest most likely shocks the conscience.  See Cty. of Sacramento

v. Lewis, 523 U.S. at 849("[C]onduct intended to injure in some way unjustifiable by any

government interest is the sort of official action most likely to rise to the conscience-shocking

level.").  "[A] plaintiff must do more than show that the government actor intentionally or

recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v.

City of Albuquerque, 448 F.3d at 1222 (internal quotation marks omitted)(quoting Moore v.

Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)).  "The plaintiff must demonstrate a degree of

outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."

Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (internal quotation marks omitted)(quoting

Uhlrig v. Harder, 64 F.3d at 574).

> Establishing these limits advances "three basic principles highlighted by the
> Supreme Court in evaluating substantive due process claims: (1) the need for
> restraint in defining their scope; (2) the concern that § 1983 not replace state tort
> law; and (3) the need for deference to local policymaking bodies in making
> decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), a corrections officer's widow sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132. The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience." 265 F.3d at 1134. The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052, the plaintiffs alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due process rights when they did not take

sufficient action to prevent a student at the school from "racking"[99] the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate.  Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

> While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy.  Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1074-75.

## LAW REGARDING EQUAL PROTECTION CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'"  Soskin v. Reinertson, 353 F.3d 1242, 1247 (10th Cir. 2004)(quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).  "The Clause 'creates no substantive rights.  Instead, it embodies a general rule that States must treat like cases

---

[99]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles."  716 F. Supp. 2d at 1059 n.2 (citations omitted)(internal quotation marks omitted).

alike but may treat unlike cases accordingly.'" Teigen v. Renfrow, 511 F.3d 1072, 1083 (10th Cir. 2007)(quoting Vacco v. Quill, 521 U.S. 793, 799 (1997)).

Generally, to state a claim under § 1983 for violation of the Equal Protection Clause, a plaintiff must show that he or she is a member of a class of individuals that is being treated differently from similarly situated individuals who are not in that class. See SECSYS, LLC v. Vigil, 666 F.3d 678, 688 (10th Cir. 2012). The plaintiff must demonstrate that the "'decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of' the law's differential treatment of a particular class of persons." SECSYS, LLC v. Vigil, 666 F.3d at 685 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. at 279). In other words, "a discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action." SECSYS, LLC v. Vigil, 666 F.3d at 685.

A state actor can generally be subject to liability only for its own conduct under 42 U.S.C. § 1983. See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)). At least in the Tenth Circuit, however, under some circumstances, harassment by a third-party can subject a supervisor or municipality to liability for violation of the equal-protection clause -- not for the harasser's conduct, per se, but for failure to take adequate steps to stop it. See Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1249-51 (10th Cir. 1999). The plaintiff "must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority." Murrell v. Sch. Dist. No. 1, 186 F.3d at 1249 (citations omitted). The failure to prevent discrimination before it occurs is not actionable. Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250 n.7.

**LAW REGARDING EIGHTH AMENDMENT DELIBERATE INDIFFERENCE CLAIMS**

When a prisoner is incarcerated, the Eighth Amendment protects him or her from "a prison official's 'deliberate indifference' to a substantial risk of serious harm," as well as from the intentional use of excessive force.  Farmer v. Brennan, 511 U.S. 825, 828 (1994)(quoting Helling v. McKinney, 509 U.S. 25, 28 (1993)).  "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates."  Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).  An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind."  Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted).  The second condition represents the functional application of the deliberate-indifference standard.  See Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006)("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component.")(quoting Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003)).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused."  Helling v. McKinney, 509 U.S. 25, 36 (1993).  Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk."  Helling v. McKinney, 509 U.S. at 36.  "In other words, the

prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. at 36.  The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action.").  The Tenth Circuit has noted that, "in Hudson, the Supreme Court evidenced its 'commit[ment] to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual force that results in sufficient injury.'" United States v. LaVallee, 439 F.3d 670, 688 (10th Cir. 2006).  Were it otherwise, the Tenth Circuit reasoned, "a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis." United States v. LaVallee, 439 F.3d at 688.  See Hudson v. McMillian, 503 U.S. at 13 (Blackmun, J., concurring)("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks.").  Thus, to establish excessive force in violation of the Eight Amendment, the plaintiff need not establish that he or she "suffered a certain level or type of injury." United States v. LaVallee, 439 F.3d at 688.

The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. at 298.  Courts apply this subjective inquiry to determine whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred. Wilson v. Seiter, 501 U.S. 294, 299 (1991).  The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of

negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836. The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837. For Eighth Amendment purposes, the Tenth Circuit has equated deliberate indifference with recklessness. See Belcher v. United States, 216 F. App'x 821, 823-24 (10th Cir. 2007)(quoting Smith v. Cummings, 445 F.3d at 1258).

In Riddle v. Mondragon, 83 F.3d 1197 (10th Cir. 1996), the Tenth Circuit addressed a case where the plaintiff asserted claims that they were "denied necessary medical care [in prison] in violation of their rights under the Eighth and Fourteenth Amendments." 83 F.3d at 1202. In determining whether to apply Eighth Amendment standards or substantive due process standards when reviewing the plaintiffs' claims in Riddle v. Mondragon, the Tenth Circuit noted that, "where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process." 83 F.3d at 1202 (citing Berry v. City of Muskogee, 900 F.2d 1489, 1493 (10th Cir. 1990)). Thus, the Tenth Circuit reviewed the plaintiffs' claims for denial of medical care in prison under the Eighth Amendment and did not consider the plaintiffs' substantive due-process theory. See Riddle v. Monragon, 83 F.3d at 1202 ("Accordingly, we will review plaintiffs' claims under the Eighth Amendment as made applicable to the states through the Fourteenth Amendment."). See also Salazar v. San Juan Cty. Det. Ctr., No. CIV 15-0417,

- 98 -

2016 WL 335447, at *30-32 (D.N.M. Jan. 15, 2016)(Browning, J.); Hinzo v. N.M. Dep't of Corrections, No. CIV 10-0506, 2012 WL 13081442, at *6 (D.N.M. 2012)(Browning, J.).

### RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

The Supreme Court has long held that the Fourth Amendment "protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967). A "search" generally occurs when an individual "'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,'" but an official intrudes into that private sphere. Carpenter v. United States, 138 S. Ct. 2206, 2213 (2018)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)). See United States v. Dahda, 2021 WL 1712570, at * 6 (10th Cir. 2021 Apr. 30, 2021)( "The 'basic purpose' of the Amendment 'is to safeguard the privacy and security of individuals against arbitrary invasion by governmental officials.' (quoting Carpenter v. United States, 138 S. Ct. at 2206)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is

reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)).  "In the criminal context, reasonableness usually requires a showing of probable cause."  Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)).  The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

### 1.    United States v. Jones.

The defendant in United States v. Jones was suspected of drug trafficking, and a joint Federal Bureau of Investigation and District of Columbia Metropolitan Police Department task force obtained a warrant authorizing installation in Washington, D.C., within ten days, of a Global Positioning System device to the defendant's car.  See 565 U.S. at 402.  On the eleventh day, task force agents attached the GPS device to the bottom of the defendant's car while the car was in Maryland.  The agents then used the GPS device to track the defendant's movements over the next twenty-eight days, replacing the battery once, and collecting over two-thousand pages of data sent from the device.  See 565 U.S. at 402.

The Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the majority, in which Chief Justice Roberts and Justices Kennedy, Thomas, and Sotomayor joined, held that "the Government's installation of a GPS device on a target's vehicle, and its use of that

device to monitor the vehicle's movements, constitutes a 'search.'"  565 U.S. at 404.  Justice Scalia

reasoned that the United States' conduct was a Fourth Amendment search, because the government

trespassed on a constitutionally protected area.  See 565 U.S. at 404 ("The Fourth Amendment

provides . . . that '[t]he right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures, shall not be violated.'  It is beyond dispute that a

vehicle is an 'effect' as that term is used in the Amendment.").  Such a physical intrusion, Justice

Scalia opined, would have come within the Framers' intended definition of a "search":

> It is important to be clear about what occurred in this case: The Government
> physically occupied private property for the purpose of obtaining information.  We
> have no doubt that such a physical intrusion would have been considered a 'search'
> within the meaning of the Fourth Amendment when it was adopted.

565 U.S. at 404-05.  Justice Scalia reconciled the Supreme Court's conclusion that attaching a GPS

device to track a Jeep in plain view was a Fourth Amendment search with New York v. Class, 475

U.S. 106 (1986), in which the Supreme Court concluded that a visual examination of the outside

of a vehicle while in plain view does not constitute a search, by noting that "[i]n Class itself we

suggested that this [physical invasion] would make a difference, for we concluded that an officer's

momentary reaching into the interior of a vehicle did constitute a search."  565 U.S. at 410.

Justice Scalia reasoned that the Fourth Amendment's text supports taking a property law

based approach to determine whether there is a search, but did not shy away from the fact that, in

recent history, the Supreme Court had deviated from this approach:

> The text of the Fourth Amendment reflects its close connection to property,
> since otherwise it would have referred simply to "the right of the people to be secure
> against unreasonable searches and seizures"; the phrase "in their persons, houses,
> papers, and effects" would have been superfluous.
>
> Consistent with this understanding, our Fourth Amendment jurisprudence
> was tied to common-law trespass, at least until the latter half of the 20th century.
> Kyllo v. United States, 533 U.S. [at] 31 . . . .  Our later cases, of course, have
> deviated from that exclusively property-based approach. . . . [and] have applied the

analysis of Justice Harlan's concurrence in [Katz v. United States], which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," id., at 464 . . . .

565 U.S. at 406.

The United States had contended that, under the "Harlan standard" -- i.e., the Katz v. United States reasonable-expectation-of-privacy approach -- "no search occurred here, since Jones had 'no reasonable expectation of privacy' in the area of the Jeep accessed by the Government agents (its underbody) and in the locations of the Jeep on the public roads, which were visible to all." 565 U.S. at 406. Justice Scalia concluded, however, that the Supreme Court "need not address the Government's contentions" in relation to the Katz v. United States reasonable-expectation-of-privacy test analysis, because the trespass-based search approach, which existed at the time of the Fourth Amendment's adoption, disposed of the issue:

> Jones's Fourth Amendment rights do not rise or fall with the Katz formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." Kyllo[ v. United States, 533 U.S. at 34]. As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates. Katz did not repudiate that understanding. Less than two years later the Court upheld defendants' contention that the Government could not introduce against them conversations between other people obtained by warrantless placement of electronic surveillance devices in their homes. The opinion rejected the dissent's contention that there was no Fourth Amendment violation "unless the conversational privacy of the homeowner himself is invaded." Alderman v. United States, 394 U.S. 165, 176 . . . (1969). "[W]e [do not] believe that Katz, by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home . . . ." Id., at 180.

565 U.S. at 408 (some alteration in original)(footnotes omitted).

In her concurrence, Justice Sotomayor agreed that "the trespassory test applied in the majority's opinion reflects an irreducible constitutional minimum: When the Government physically invades personal property to gather information, a search occurs. The reaffirmation of

that principle suffices to decide this case."  565 U.S. at 415 (Sotomayor, J., concurring).  She

continued:

> Of course, the Fourth Amendment is not concerned only with trespassory
> intrusions on property.  See, e.g., Kyllo v. United States, 533 U.S. [at] 31-33 . . . .
> Rather, even in the absence of a trespass, "a Fourth Amendment search occurs when
> the government violates a subjective expectation of privacy that society recognizes
> as reasonable." Id., at 33; see also Smith v. Maryland, 442 U.S. 735, 740-741 . . .
> (1979); Katz v. United States, 389 U.S. [at] 361 . . . (Harlan, J., concurring).

565 U.S. at 414 (Sotomayor, J., concurring).  Justice Sotomayor's concurrence focused on the

reality, in her view, that,

> physical intrusion is now unnecessary to many forms of surveillance. . . .
> In cases of electronic or other novel modes of surveillance that do not depend upon
> a physical invasion on property, the majority opinion's trespassory test may provide
> little guidance. But "[s]ituations involving merely the transmission of electronic
> signals without trespass would remain subject to Katz analysis."

565 U.S. at 414 (Sotomayor, J., concurring)(alteration in original)(quoting the majority opinion,

565 U.S. at 411).

Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan, concurred in the judgment

only, reasoning that, although he agreed with the result, given the use of twenty-first century

technology, he would have analyzed whether the government's long-term monitoring of the

defendant violated the Katz v. United States reasonable-expectation-of-privacy test:

> This case requires us to apply the Fourth Amendment's prohibition of
> unreasonable searches and seizures to a 21st-century surveillance technique, the
> use of a Global Positioning System (GPS) device to monitor a vehicle's movements
> for an extended period of time.  Ironically, the Court has chosen to decide this case
> based on 18th-century tort law.  By attaching a small GPS device to the underside
> of the vehicle that respondent drove, the law enforcement officers in this case
> engaged in conduct that might have provided grounds in 1791 for a suit for trespass
> to chattels.  And for this reason, the Court concludes, the installation and use of the
> GPS device constituted a search.  [132 S. Ct.] at 948-949.

> This holding, in my judgment, is unwise.  It strains the language of the
> Fourth Amendment; it has little if any support in current Fourth Amendment case
> law; and it is highly artificial.

I would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove.

565 U.S. at 419 (Alito, J., concurring in the judgment).  Justice Alito first took issue with what he called the majority's "questionable proposition that the[] two procedures [of attaching and using a GPS device] cannot be separated for Fourth amendment purposes."  565 U.S. at 420 (Alito, J., concurring in the judgment).  Justice Alito submitted that, "[i]f these two procedures are analyzed separately, it is not at all clear from the Court's opinion why either should be regarded as a search." 565 U.S. at 420 (Alito, J., concurring in the judgment).

Justice Alito contended that the majority's opinion suggests that "the concept of a search, as originally understood, comprehended any technical trespass that led to the gathering of evidence," but disagreed with the majority, stating: "[W]e know this is incorrect."  565 U.S. at 420 (Alito, J., concurring in the judgment).  Justice Alito pointed out that the open-fields doctrine grew out of the distinction between a physical intrusion of any private property and property that is part of a home: "At common law, any unauthorized intrusion on private property was actionable, but a trespass on open fields . . . does not fall within the scope of the Fourth Amendment because private property outside the curtilage is not part of a 'hous[e]' within the meaning of the Fourth Amendment."  565 U.S. at 420 (Alito, J., concurring in the judgment)(quoting Oliver v. United States, 466 U.S. 170 (1984)).

Justice Alito asserted that the trespass-based approach that the majority used was "repeatedly criticized" and ultimately "repudiated," based largely on its incompatibility with cases involving wiretapping and eavesdropping surveillance.  United States v. Jones, 565 U.S. at 421 (Alito, J., concurring in the judgment).  Justice Alito contended that "the majority is hard pressed to find support in post-Katz cases for its trespass-based" decision that, when the United States

attached the GPS device to Jones' Jeep, it trespassed on his effects and performed a Fourth Amendment search.  565 U.S. at 424 (Alito, J., concurring in the judgment).  Justice Alito pointed to multiple problems that he believes the majority's trespass-based approach creates.  First, he asserted that the majority's analysis is irreconcilable with the element of the United States' conduct that he contends society would find offensive -- the GPS-monitoring and not the attachment of the device.  If the United States could follow a car without physically trespassing on a person, home, paper, or effect, such as remotely monitoring a car via an internal GPS device, this monitoring would not constitute a Fourth Amendment search under the majority's analysis.  See 565 U.S. at 423-24 (Alito, J., concurring in the judgment).  Second, along the same lines, Justice Alito pointed out an "incongruous result[]" from the majority's opinion that a short-term tracking of a vehicle with a GPS device, merely tracking a vehicle down a single street, is a Fourth Amendment search, while, "if the police follow the same car for a much longer period using unmarked cars and aerial assistance, this tracking is not subject to any Fourth Amendment constraints."  565 U.S. at 425 (Alito, J., concurring in the judgment).  Justice Alito also asserted that, by tying Fourth Amendment searches to property law and trespass concepts, the Fourth Amendment's protections "may vary from State to State," based on different property and contract laws in the various states. 565 U.S. at 425 (Alito, J., concurring in the judgment).

### 2.  **Florida v. Jardines**.

In Florida v. Jardines, 569 U.S. 1 (2013), Justice Scalia, writing for the majority once again, held that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search.  569 U.S. at 11.  Justices Thomas, Ginsburg, Sotomayor, and Kagan joined Justice Scalia's majority opinion in Florida v. Jardines.  The Honorable Elena Kagan, Associate Justice of the Supreme Court, filed a separate concurring opinion, in which Justices

Ginsburg and Sotomayor joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full." 569 U.S. at 16 (Kagan, J., concurring). Justice Alito dissented, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer joined his opinion.

In Florida v. Jardines, based on a tip that the defendant, Jardines, was growing marijuana in his home, the Miami-Dade, Florida, police department and the Drug Enforcement Administration sent a surveillance team to Jardines' home. See 569 U.S. at 3. Observing nothing of note in the first fifteen minutes watching the home, two detectives approached the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes. See 569 U.S. at 3. As the dog approached Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point." 569 U.S. at 3. The dog's handler then immediately left the porch, and told the other agents and officers at the scene that there had been a positive alert for drugs, at which time the officers applied for and received a search warrant for the residence, the execution of which revealed marijuana plants. See 569 U.S. at 3. Jardines was arrested for trafficking in marijuana and moved to suppress the evidence based on an illegal search. See 569 U.S. at 3.

Justice Scalia held that the use of a drug-sniffing dog was a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

569 U.S. at 5.  Justice Scalia noted that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." 569 U.S. at 6 (quoting Oliver v. United States, 466 U.S. at 176).  Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text."  569 U.S. at 6.

Justice Scalia held that "the officers' investigation took place in a constitutionally protected area," the home, because the front porch is the home's curtilage.  569 U.S. at 7.  Justice Scalia then "turn[ed] to the question of whether it was accomplished through an unlicensed physical intrusion," 569 U.S. at 5, and reasoned that it was:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. Ciraolo, 476 U.S. 207, 213 (1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner." Id. Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." 2 Wils. K.B., at 291.  As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so.  He had not.

569 U.S. at 7-8.  Justice Scalia noted that, while society recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," he concluded that "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating

evidence is something else. There is no customary invitation to do <u>that</u>."  569 U.S. at 9 (emphasis in original).  Justice Scalia explained:

> An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker.  To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to -- well, call the police.  The scope of a license -- express or implied -- is limited not only to a particular area but also to a specific purpose.  Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics.  Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

569 U.S. at 3.

The State of Florida argued "that investigation by a forensic narcotics dog by definition cannot implicate any legitimate privacy interest."  569 U.S. at 10.  The State of Florida cited to <u>United States v. Place</u>, 462 U.S. 696 (1983), <u>United States v. Jacobsen</u>, 466 U.S. 109 (1984), and <u>Illinois v. Caballes</u>, 543 U.S. 405 (2005), "which held, respectively, that canine inspection of luggage in an airport, chemical testing of a substance that had fallen from a parcel in transit, and canine inspection of an automobile during a lawful traffic stop, do not violate the 'reasonable expectation of privacy' described in <u>Katz</u>."  569 U.S. at 10.  Justice Scalia pointed out that, in <u>United States v. Jones</u>, the Supreme Court had already concluded that "[t]he <u>Katz</u> reasonable-expectations test 'has been <u>added to</u>, not <u>substituted for</u>,' the traditional property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the test under <u>Katz v. United States</u>] when the government gains evidence by physically intruding on constitutionally protected areas."  569 U.S. at 11 (quoting <u>United States v. Jones</u>, 565 U.S. at 409).  Because the Supreme Court had already concluded that the conduct was a Fourth Amendment search under the

trespass-based analysis, therefore, it held that it was unnecessary to consider whether the conduct

amounts to a search under the Katz v. United States reasonable-expectation-of-privacy analysis:

> Thus, we need not decide whether the officers' investigation of Jardines'
> home violated his expectation of privacy under Katz.  One virtue of the Fourth
> Amendment's property-rights baseline is that it keeps easy cases easy.  That the
> officers learned what they learned only by physically intruding on Jardines'
> property to gather evidence is enough to establish that a search occurred.

569 U.S. at 11.

Justice Kagan wrote a concurring opinion, noting: "The Court today treats this case under

a property rubric; I write separately to note that I could just as happily have decided it by looking

to Jardines' privacy interests."  569 U.S. at 13 (Kagan, J., concurring).  Justice Kagan analogized

the government's conduct in using a drug sniffing dog on Jardines' porch to a stranger coming to

the front door, who "doesn't knock or say hello," but instead, peers through the windows "into

your home's furthest corners" with "super-high-powered binoculars," and "in just a couple of

minutes, his uncommon behavior allows him to learn details of your life you disclose to no one."

569 U.S. at 12 (Kagan, J., concurring).  This conduct, she posited, is a trespass which exceeds any

implied license and is also an invasion of reasonable expectations of privacy; she argued that, like

her analogy, the facts in Florida v. Jardines likewise involved a trespass and a violation of privacy

expectations:

> That case is this case in every way that matters.  Here, police officers came
> to Joelis Jardines' door with a super-sensitive instrument, which they deployed to
> detect things inside that they could not perceive unassisted.  The equipment they
> used was animal, not mineral.  But contra the dissent, see [133 S. Ct.] at 1420
> (opinion of Alito, J.)(noting the ubiquity of dogs in American households), that is
> of no significance in determining whether a search occurred.

569 U.S. at 12 (Kagan, J., concurring).  According to Justice Kagan, had she written the majority

opinion based on the Katz v. United States reasonable-expectations-of-privacy search test,

[a] decision along those lines would have looked . . . well, much like this one.  It would have talked about "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  [133 S. Ct.] at 1414 (quoting Silverman v. United States, 365 U.S. 505, 511 . . . (1961)).  It would have insisted on maintaining the "practical value" of that right by preventing police officers from standing in an adjacent space and "trawl[ing] for evidence with impunity."  [133 S. Ct.] at 1414.  It would have explained that "'privacy expectations are most heightened'" in the home and the surrounding area.  [133 S. Ct.] at 1414-15 (quoting California v. Ciraolo, 476 U.S. [at] 213 . . . ).  And it would have determined that police officers invade those shared expectations when they use trained canine assistants to reveal within the confines of a home what they could not otherwise have found there.  See [133 S. Ct.] at 1415-16, and n. 2-3.

569 U.S. at 13 (Kagan, J., concurring).

Justice Alito's dissenting opinion, in which Chief Justice Roberts, and Justices Kennedy and Breyer, joined, submitted that "[t]he Court's decision in this important Fourth Amendment case is based on a putative rule of trespass law that is nowhere to be found in the annals of Anglo-American jurisprudence."  569 U.S. at 15 (Alito, J., dissenting).  Justice Alito noted that general trespass law permits a license to public members to use a walkway to approach a house's door, including strangers such as mailmen and solicitors, and the majority's conclusion that "the police officer in this case, Detective Bartelt, committed a trespass because he was accompanied during his otherwise lawful visit to the front door of respondent's house by his dog, Franky," is without a sound basis in trespass law.  569 U.S. at 16 (Alito, J., dissenting).  Justice Alito also asserted that decision is inconsistent with the Katz v. United States' reasonable-expectations-of-privacy test: "A reasonable person understands that odors emanating from a house may be detected from locations that are open to the public, and a reasonable person will not count on the strength of those odors remaining within the range that, while detectible by a dog, cannot be smelled by a human." Florida v. Jardines, 569 U.S. at 17 (Alito, J., dissenting).

Justice Alito contended that the majority's opinion that the detective "exceeded the boundaries of the license to approach the house that is recognized by the law of trespass, . . . is

unfounded." 569 U.S. at 18 (Alito, J., dissenting).  Justice Alito pointed out that the law of trespass does not distinguish between visitors or reasons for the visit in granting an implied license to approach a house's front door.  See 569 U.S. at 18 (Alito, J., dissenting).  He also asserted: "As I understand the law of trespass and the scope of the implied license, a visitor who adheres to these limitations is not necessarily required to ring the doorbell, knock on the door, or attempt to speak with an occupant," and uses mail carriers as an example of such a visitor.  569 U.S. at 20-21(Alito, J., dissenting).  Justice Alito pointed out that the implied license also applies to law enforcement and cited to Kentucky v. King, 563 U.S. 452 (2011), in which the Supreme Court held that law enforcement officers approaching the front door of a residence to conduct a "'knock and talk'" is not a Fourth Amendment search.  Florida v. Jardines, 569 U.S. at 21 (Alito, J., concurring)(no citation for quotation).  Given that "Detective Bartelt did not exceed the scope of the license to approach respondent's front door," Justice Alito took issue with the majority's conclusion "that Detective Bartelt went too far because he had the *objectiv[e] . . . purpose* to conduct a search.'" 569 U.S. at 22 (Alito, J., dissenting)(emphasis in original).  According to Justice Alito, because approaching a house to conduct a knock and talk is not a search,

> [w]hat the Court must fall back on, then, is the particular instrument that Detective Bartelt used to detect the odor of marijuana, namely, his dog. But in the entire body of common-law decisions, the Court has not found a single case holding that a visitor to the front door of a home commits a trespass if the visitor is accompanied by a dog on a leash.  On the contrary, the common law allowed even unleashed dogs to wander on private property without committing a trespass.
>
> The Court responds that "[i]t is not the dog that is the problem, but the behavior that here involved use of the dog."  But where is the support in the law of trespass for this proposition? Dogs' keen sense of smell has been used in law enforcement for centuries. The antiquity of this practice is evidenced by a Scottish law from 1318 that made it a crime to "disturb a tracking dog or the men coming with it for pursuing thieves or seizing malefactors."  If bringing a tracking dog to the front door of a home constituted a trespass, one would expect at least one case to have arisen during the past 800 years.  But the Court has found none.

569 U.S. at 23 (Alito, J., dissenting)(emphasis in original)(internal citations omitted).  Justice Alito

thus concluded: "For these reasons, the real law of trespass provides no support for the Court's

holding today.  While the Court claims that its reasoning has 'ancient and durable roots,' its

trespass rule is really a newly struck counterfeit."  569 U.S. at 23 (Alito, J., dissenting)(internal

citations omitted).

Justice Alito did not look any more favorably upon Justice Kagan's conclusion that

Detective Bartelt's conduct violated Jardines' reasonable privacy expectations, asserting:

> [W]e have already rejected a very similar, if not identical argument, see
> Illinois v. Caballes, . . . and in any event I see no basis for concluding that the
> occupants of a dwelling have a reasonable expectation of privacy in odors that
> emanate from the dwelling and reach spots where members of the public may
> lawfully stand.

569 U.S. at 24 (Alito, J., dissenting).  Justice Kagan asserted that Detective Bartelt's use of Franky,

the drug-sniffing dog, was an invasion of Jardines' privacy in his home, because the government's

conduct was similar to the conduct in Kyllo v. United States, in which the Supreme Court held that

using a thermal imaging device to monitor movements in a home was a Fourth Amendment search.

Justice Alito pointed out that "[t]his Court . . . has already rejected the argument that the use of a

drug-sniffing dog is the same as the use of a thermal imaging device.  The very argument now

advanced by the concurrence appears in Justice Souter's Caballes dissent.  But the Court was not

persuaded."  569 U.S. at 25 (Alito, J., dissenting)(internal citations omitted)(citing Illinois v.

Caballes, 543 U.S. at 409-10 and 413 n.3).  Justice Alito contended that "Kyllo is best understood

as a decision about the use of new technology. . . .  A dog, however, is not a new form of

'technology' or a 'device.'  And, as noted, the use of dogs' acute sense of smell in law enforcement

dates back many centuries."  569 U.S. at 25 (Alito, J., dissenting).  Justice Alito therefore

concluded that the government's conduct in Florida v. Jardines "did not constitute a trespass and

did not violate respondent's reasonable expectations of privacy.  I would hold that this conduct

was not a search, and I therefore respectfully dissent." 569 U.S. at 26.

> ### 3.      __Fourth Amendment Standing__.

The Tenth Circuit has referred to the test whether a particular search implicates a

defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable

privacy expectation -- as one of "standing." E.g., United States v. Creighton, 639 F.3d 1281, 1286

(10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a

subjective expectation of privacy in the [item searched] that society is prepared to recognize as

reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising

a Fourth Amendment challenge must first demonstrate that he has standing to object to the

search.")(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)); United

States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a

search only if he or she has a reasonable expectation of privacy in the area being searched.").

Accordingly, the Court, tracing the Tenth Circuit's language has also referred to this test as one of

standing.  See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the

defendant to show 'that he had a subjective expectation of privacy in the premises searched and

that society is prepared to recognize that expectation as reasonable.'")(quoting United States v.

Poe, 556 F.3d at 1121).  The Supreme Court's decisions in United States v. Jones and Florida v.

Jardines, however, suggest that this test has now expressly been designated a substantive Fourth

Amendment analysis alongside the trespass-based Fourth Amendment analysis, rather than a

distinct analysis under the rubric entitled standing.

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the

inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one

of standing, rather than simply recognizing it as one involving the substantive question of whether

or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by

the search and seizure which he seeks to challenge." 439 U.S. at 133.  Dispensing with this label,

the Supreme Court noted:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain <u>Jones</u>[ v. United States, 362 U.S. 257 (1960, <u>overruled by</u> <u>United States v. Salvucci</u>, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis.  Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant.  However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," <u>Simmons v. United States</u>, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim.  We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in <u>Jones</u> and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine.  Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  The inquiry under either approach is the same.  But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.  The Court in <u>Jones</u> also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks.  362 U.S., at 261, 263, 265 . . . .

439 U.S. at 138-39.  The Supreme Court emphasized:

> [N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . .  But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

- 114 -

439 U.S. at 139-40.  In Minnesota v. Carter, the Supreme Court recognized that Rakas v. Illinois

put an end to the Fourth Amendment standing analysis as separate from the substantive Fourth

Amendment search analysis:

> The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in Rakas . . . .  Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."  Id., at 140 . . . .

525 U.S. at 87-88.  The Supreme Court has thus noted that the analysis under either approach --

the substantive Fourth Amendment doctrine that the rights that the Amendment secures are

personal versus the separate notion of "standing" -- is the same and that Katz v. United States'

reasonable-expectation-of-privacy analysis has now been classified as a substantive Fourth

Amendment test, as opposed to a standing test.  Rakas v. Illinois, 439 U.S. at 139.

> Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.

Rakas v. Illinois, 439 U.S. at 139 (footnote omitted).  This development is in line with the Supreme

Court's guidance that the analysis "is more properly subsumed under substantive Fourth

Amendment doctrine."  Rakas v. Illinois, 439 U.S. at 139.

### 4.    Whether a Fourth Amendment Search Occurred.

A Fourth Amendment search occurs either where the government, to obtain information,

trespasses on a person's property or where the government, to collect information, violates a

person's subjective expectation of privacy that society recognizes as reasonable.  See United States

v. Jones, 565 U.S. at 406.  "[T]he Katz reasonable-expectation-of-privacy test has been added to,

not substituted for, the common-law trespassory test." United States v. Jones, 565 U.S. at 409

(emphasis in original)(citing Alderman v. United States, 394 U.S. 165, 176 (1969); Soldal v. Cook

Cnty., 506 U.S. 56, 64 (1992)).

a.      **Trespass-Based Analysis.**

The Fourth Amendment "establishes a simple baseline, one that for much of our history

formed the exclusive basis for its protections: When 'the Government obtains information by

physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning

of the Fourth Amendment' has 'undoubtedly occurred.'" Florida v. Jardines, 569 U.S. at 1

(quoting United States v. Jones, 565 U.S. at 406 n.3 ("[A] 'search' within the original meaning of

the Fourth Amendment" occurs "[w]here . . . the Government obtains information by physically

intruding on a constitutionally protected area.")).  "[A]n actual trespass," however, "is neither

necessary nor sufficient to establish a constitutional violation." United States v. Jones, 565 U.S.

at 408 n.5 (Scalia, J.)(emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t]resspass alone does not qualify, but there

must be conjoined with that . . . an attempt to find something or to obtain information." United

States v. Jones, 565 U.S. at 408 n.5.  The Supreme Court has also noted that "[p]hysically invasive

inspection is simply more intrusive than purely visual inspection." Bond v. United States, 529

U.S. 334, 337 (2000).  Moreover, the Supreme Court in Florida v. Jardines suggested that the

trespass-based analysis applies only when the trespass occurs in one of the four places or things

listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and
> things encompassed by its protections": persons, houses, papers, and effects. The
> Fourth Amendment does not, therefore, prevent all investigations conducted on
> private property; for example, an officer may (subject to Katz) gather information

> in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . .  But when it comes to the Fourth Amendment, the home is first among equals.

569 U.S. at 6.

In United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.), the Court analyzed whether the Secret Service's digital scan of electronic information contained in the defendants' credit and debit cards' magnetic strips was a Fourth Amendment search under a trespass-based analysis, concluding that it was not, because the Secret Service properly possessed the credit and debit cards, and the additional act of scanning the cards to read the virtual data contained on the strips did not involve a physical intrusion or physical penetration of space.  See 943 F. Supp. 2d at 1264-65.  The Court noted that, "[e]ven if the Supreme Court were to extend the trespass-based analysis for Fourth Amendment searches to virtual invasions, the Secret Service's conduct scanning the thirty-one credit and debit cards still would not amount to a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card separately, is not a constitutionally protected area.  943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes.  In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip.  Protecting this area from law enforcement search and seizure would thus not further the Fourth Amendment's express purpose of protecting "[t]he right of the people to be secure in their persons, houses, papers, and effects . . . ."  U.S. Const. amend IV.

943 F. Supp. 2d at 1273 (alteration in original).

b.   **Katz v. United States'** **Reasonable-Expectations-of-Privacy Search Test Remains Good Law.**

The Court has noted that, in light of the Supreme Court's decisions in Florida v. Jardines and United States v. Jones, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the Katz v. United States reasonable-expectation-of-privacy test is still good law."  United States v. Alabi, 943 F. Supp. 2d at 1242 (citing Minnesota v. Carter, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)).  Justice Scalia has consistently criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the Katz test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in Katz . . .) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable.  When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has occurred (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment.  That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'"  Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the Constitution would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

Minnesota v. Carter, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(internal citations omitted).[100]  In both United States v. Jones and Florida v. Jardines, however, Justice Scalia, writing for the majority, never stated that the Supreme Court was substituting the trespass-based analysis for Katz v. United States' reasonable-expectation-of-privacy analysis.  Rather, his

---

[100]The Honorable Clarence Thomas, Associate Justice, was the only other Justice to join Justice Scalia's Minnesota v. Carter concurrence.

majority opinions asserted that the Katz v. United States reasonable-expectation-of-privacy analysis added to the trespass-based analysis.  See Florida v. Jardines, 569 U.S. at 11 ("The Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment." (emphasis in original))(quoting United States v. Jones, 565 U.S. at 408).  The Court concluded in United States v. Alabi that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the Katz v. United States reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach."  943 F Supp. 2d 1201, 1243.

In June, 2013, Justice Scalia dissented from the Supreme Court's decision in Maryland v. King, 569 U.S. 435 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure," 569 U.S. at 465.  Justice Scalia criticized the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to Katz v. United States and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'" Maryland v. King, 569 U.S. at 477 (Scalia, J., dissenting).  Justice Scalia also pointed out that a person's "privacy-related concerns" in their body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the body is at stake? (The Fourth Amendment lists "persons" first among the entities protected against unreasonable searches and seizures.)

Maryland v. King, 569 U.S. at 469 (Scalia J., dissenting)(emphasis in original).  Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the

> "identity" of the flying public), applies for a driver's license, or attends a public
> school. Perhaps the construction of such a genetic panopticon is wise. But I doubt
> that the proud men who wrote the charter of our liberties would have been so eager
> to open their mouths for royal inspection.

Maryland v. King, 569 U.S. at 469 (Scalia J., dissenting). The Court therefore concludes that

Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when

determining whether a search is reasonable for Fourth Amendment purposes, although Justice

Scalia may not turn to the expectations prong until he runs the facts through the trespass prong.

See Apodaca v. New Mexico Adult Probation and Parole, No. CIV 13-0113 JB/SMV, 2014 WL

712588, at *14 (D.N.M. Feb. 13, 2014)(Browning, J.)(reaching this conclusion).

   c.   **Katz v. United States' Reasonable-Expectations-of-Privacy Analysis.**

      "'Fourth Amendment rights are personal rights which, like some other

constitutional rights, may not be vicariously asserted.'"  Rakas v. Illinois, 439 U.S. at 133-34

(quoting Alderman v. United States, 394 U.S. at 174). "A district court cannot suppress evidence

unless the movant proves that a search implicates personal Fourth Amendment interests." United

States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original). "'[N]o interest

legitimately protected by the Fourth Amendment' is implicated by governmental investigative

activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon

when he places himself or his property within a constitutionally protected area.'" United States v.

Miller, 425 U.S. 435, 440 (1976)(quoting Hoffa v. United States, 385 U.S. 293, 301-02 (1966)).[101]

---

[101]The Court has previously stated: "[T]he Supreme Court has vigorously asserted that the
proper analysis under the Fourth Amendment is not whether the place searched is a
'constitutionally protected area.'"  Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d
1176, 1219 (D.N.M. 2012)(Browning, J.)(quoting Katz. v. United States, 389 U.S. at 351). In
support for this proposition, the Court relied on the majority's decision in Katz v. United States,
where the Supreme Court stated that focusing on whether the area is a "constitutionally protected

The Tenth Circuit has thus noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched." United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)). Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests still depends, after conducting a trespass-based analysis, on "whether the defendant had an expectation

---

area . . . . deflects attention from the problem," as it focuses attention on the place, rather than the person:

> Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls.  The petitioner has strenuously argued that the booth was a "constitutionally protected area."  The Government has maintained with equal vigor that it was not.  But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case.  For the Fourth Amendment protects people, not places.  What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.  See Lewis v. United States, 385 U.S. 206, 210 [1966]; United States v. Lee, 274 U.S. 559, 563 . . . (1927).  But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.  See Rios v. United States, 364 U.S. 253 . . . [1960]; Ex parte Jackson, 96 U.S. 727, 733 . . . [1877].

Katz v. United States, 389 U.S. at 351-52.  The Supreme Court appears to have changed course.  In Florida v. Jardines, the particular place at which the search occurred weighs heavily on the Supreme Court's holding, reasoning that "[t]he [Fourth] Amendment establishes [as] a simple baseline . . . . protections 'when the Government does engage in a physical intrusion of a constitutionally protected area.'"  569 U.S. at 5 (original alterations and original emphasis omitted)(emphasis added)(quoting United States v. Knotts, 460 U.S. 276, 286 (1983)(Brennan, J., concurring)).  See United States v. Jones, 565 U.S. at 407 ("Katz did not erode the principle 'that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment. . . . Katz did not narrow the Fourth Amendment's scope.'" (emphasis added)).  The Court thus concludes that, while it may be true that the analysis does not turn on the place searched, the Court's prior statement -- "the Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area,'" Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d at 1219 -- may no longer accurately reflect the Supreme Court's recent reversion to property-based analysis as a Fourth Amendment analysis baseline.

of privacy in the place searched and whether that expectation was objectively reasonable." Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.).

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123). The Supreme Court has thus recognized that, rather than determining whether law enforcement conduct was a search, it sometimes proves easier to "assess[] when a search is not a search." Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in Katz v. United States. Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth. As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33. The Supreme Court thus articulated the Katz v. United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed. 2004)(citing Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 383-388 (1974)(criticizing this formulation of the standard and explaining that "the common formula for Katz fails to capture Katz at any point because the Katz decision was written to resist captivation in any formula") -- which posits: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States, 533 U.S. at 33 (emphasis in original)(quoting California v. Ciraolo, 476 U.S. at 211).

- 122 -

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" United States v. Jones, 565 U.S. at 408.  See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . .").  In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." Rakas v. Illinois, 439 U.S. at 143 & n.12.  While ownership or lawful possession is not determinative under the Katz v. United States reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession." United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

### i.      Subjective Expectation of Privacy.

A defendant maintains a subjective expectation of privacy when the defendant "has shown that 'he sought to preserve something as private.'" Bond v. United States, 529 U.S. at 338 (internal alterations omitted)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).  There is no reasonable expectation of privacy, therefore, in otherwise private information disclosed to a third party.  Under the Katz v. United States expectation-of-privacy test -- although perhaps not under United States v. Jones and Florida v. Jardines -- "[t]he Fourth Amendment protects people, not places.  What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. at 351.  The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to

> Government authorities, even if the information is revealed on the assumption that
> it will be used only for a limited purpose and the confidence placed in the third
> party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do

not always coincide with the interests that the Fourth Amendment is universally thought to protect.

In Smith v. Maryland, for instance, the Supreme Court identified situations in which it would not

follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry
> would provide an inadequate index of Fourth Amendment protection.  For example,
> if the Government were suddenly to announce on nationwide television that all
> homes henceforth would be subject to warrantless entry, individuals thereafter
> might not in fact entertain any actual expectation or [sic] privacy regarding their
> homes, papers, and effects.  Similarly, if a refugee from a totalitarian country,
> unaware of this Nation's traditions, erroneously assumed that police were
> continuously monitoring his telephone conversations, a subjective expectation of
> privacy regarding the contents of his calls might be lacking as well.  In such
> circumstances, where an individual's subjective expectations had been
> "conditioned" by influences alien to well-recognized Fourth Amendment freedoms,
> those subjective expectations obviously could play no meaningful role in
> ascertaining what the scope of Fourth Amendment protection was.  In determining
> whether a "legitimate expectation of privacy" existed in such cases, a normative
> inquiry would be proper.

442 U.S. at 740 n.5.  Most recently, in Jones v. United States, Justice Sotomayor commented that,

given the reality of technology in the twenty-first century, it may no longer be sound to universally

hold to the third-party disclosure rule to determine whether a subjective expectation of privacy

exists:

> [I]t may be necessary to reconsider the premise that an individual has no
> reasonable expectation of privacy in information voluntarily disclosed to third
> parties.  This approach is ill suited to the digital age, in which people reveal a great
> deal of information about themselves to third parties in the course of carrying out
> mundane tasks.  People disclose the phone numbers that they dial or text to their
> cellular providers; the URLs that they visit and the e-mail addresses with which
> they correspond to their Internet service providers; and the books, groceries, and

> medications they purchase to online retailers.[102]  Perhaps, as Justice Alito notes,
> some people may find the "tradeoff" of privacy for convenience "worthwhile," or
> come to accept this "diminution of privacy" as "inevitable," and perhaps not.  I for
> one doubt that people would accept without complaint the warrantless disclosure to
> the Government of a list of every Web site they had visited in the last week, or
> month, or year. But whatever the societal expectations, they can attain
> constitutionally protected status only if our Fourth Amendment jurisprudence
> ceases to treat secrecy as a prerequisite for privacy.  I would not assume that all
> information voluntarily disclosed to some member of the public for a limited
> purpose is, for that reason alone, disentitled to Fourth Amendment protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(internal citations omitted).  Regardless what the

Supreme Court decides to do with social media on the internet, only the most ignorant or gullible

think what they post on the internet is or remains private.  See United States v. Meregildo, 883 F.

Supp. 2d 523, 526 (S.D.N.Y. 2012)(Pauley, J.)(holding that a person posting to his Facebook

profile had "no justifiable expectation that his 'friends' would keep his profile private").

### ii.     Privacy Expectation that Society is Prepared to Recognize as Reasonable.

Under the second step of Katz v. United States' reasonable-expectation-of-privacy

approach, courts must determine "whether society is prepared to recognize that [subjective

privacy] expectation as objectively reasonable."  United States v. Ruiz, 664 F.3d at 838.  The

Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to

recognize as reasonable is, by its very nature, critically different from the mere expectation,

however well justified, that certain facts will not come to the attention of the authorities."  United

States v. Jacobsen, 466 U.S. 109, 122 (1984).  Determining whether society would view the

expectation as objectively reasonable turns on whether the government's intrusion infringes on a

---

[102]URL is the abbreviation for a "uniform resource locator, . . . .  URLs occur most
commonly to reference web pages (http), but are also used for file transfer (ftp), email (mailto),
database access (JDBC), and many other applications."  Uniform Resource Locator,
Wikipedia.org, http://en.wikipedia.org/wiki/ Uniform_resource_locator (last visited July 31,
2015).

legitimate interest, based on the values which the Fourth Amendment protects.  See California v. Ciraolo, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment")(quoting Oliver v. United States, 466 U.S. at 181-83).  This second factor of the Katz v. United States reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'" LaFave, supra §2.1(d), at 439 (quoting Katz v. United States, 389 U.S. at 353).  Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather whether the expectation of privacy is justified or legitimate.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  In United States

v. Place, the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment."  United States v. Place, 462 U.S. at 707. The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it.  See 462 U.S. at 699.  The drug sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand grams of cocaine.  See 462 U.S. at 699.  While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could disclose only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment.  A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage.  Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search.  Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

> In these respects, the canine sniff is *sui generis*.  We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.  Therefore, we conclude that the particular course of investigation that the agents intended to pursue here -- exposure of respondent's luggage, which was located in a public place, to a trained canine -- did not constitute a "search" within the meaning of the Fourth Amendment.

462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical field test of a white powdery substance to reveal that the substance was cocaine. See 466 U.S. at 122-24. A Federal Express employee and supervisor had opened a damaged package, and exposed four zip-lock plastic bags containing six and one-half ounces of white powder. See 466 U.S. at 111. They then called the DEA and repacked the contents in the original packaging, before they provided the package to the DEA officers. See 466 U.S. at 111. When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine. See 466 U.S. at 111-12. The Supreme Court first held that removal of the plastic bags from the tubes and the agent's visual inspection were not Fourth Amendment searches:

> The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search. It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

466 U.S. at 120 (footnote omitted). The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment." United States v. Jacobsen, 466 U.S. at 122. The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine. It could tell him nothing more, not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?

. . . .

A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.  This conclusion is not dependent on the result of any particular test.  It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised.  But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest.  Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.

. . . .

Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement."  Illinois v. Caballes, 543 U.S. at 409.[103]  The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the line of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at] governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interests.'"  Illinois v. Caballes, 543 U.S. at 408

---

[103]The Honorable John Paul Stevens, former Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes.  Out of the current Supreme Court Justices, Justices Scalia, Kennedy, Thomas, and Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented.  See 543 U.S. at 405.

(quoting United States v. Jacobsen, 466 U.S. at 123)(emphasis in original).  The Supreme Court

explained: "This is because the expectation 'that certain facts will not come to the attention of the

authorities' is not the same as an interest in 'privacy that society is prepared to consider

reasonable.'" Illinois v. Caballes, 543 U.S. at 408-09 (quoting United States v. Jacobsen, 466 U.S.

at 122).  The Supreme Court in Illinois v. Caballes noted that its decision was consistent with Kyllo

v. United States, as the thermal imaging device in Kyllo v. United States could detect lawful,

"intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use
> of a thermal-imaging device to detect the growth of marijuana in a home constituted
> an unlawful search.  Kyllo v. United States, 533 U.S. 27 . . . .  Critical to that
> decision was the fact that the device was capable of detecting lawful activity -- in
> that case, intimate details in a home, such as "at what hour each night the lady of
> the house takes her daily sauna and bath." Id., at 38 . . . .  The legitimate expectation
> that information about perfectly lawful activity will remain private is categorically
> distinguishable from respondent's hopes or expectations concerning the
> nondetection of contraband in the trunk of his car.  A dog sniff conducted during a
> concededly lawful traffic stop that reveals no information other than the location of
> a substance that no individual has any right to possess does not violate the Fourth
> Amendment.

Illinois v. Caballes, 543 U.S. at 409-10.

In United States v. Alabi, the defendants possessed thirty-one credit and debit cards, "many

of them in their own names, several of which had information on the magnetic strips that related

to persons other than the Defendants."  943 F. Supp. 2d at 1275.  The Court reluctantly accepted

the defendants' assertion that they "subjectively intended not to disclose this information to a third

party -- i.e., intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy

expectation in the account information stored on credit and debit cards' magnetic strips -- separate

and beyond the credit and debit cards themselves -- is not objectively reasonable," 943 F. Supp.

2d at 1280.  The Court explained that the Secret Service's scan of the cards' magnetic strips

"reveals only the same information revealed in a private search when the card is used as intended,"

and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully . . . ." 943 F. Supp. 2d at 1281. Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals." 943 F. Supp. 2d at 1287.

## 5.   **Reasonable Government Searches.**

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable. Kentucky v. King, 131 S. Ct. at 1856 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)). "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121 (citing, as an e.g. cite, Terry v. Ohio, 392 U.S. 1 (1968)). The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"   Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).   See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."   At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)).   The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.   In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.   Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the Tenth Circuit look to the individual's privacy expectations.   See, e.g., United States v. Knights, 534 U.S. 112, 119-120 (2001)(noting that the petitioner had a "significantly diminished . . .

reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, noting: "Those who have never been convicted of a felony are the last distinct category. What is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population."); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions." Florida v. Jardines, 569 U.S. at 13 (Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)). Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." 515 U.S. at 654 (internal citations omitted).

**6.      Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable cause requirements. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). When an individual consents to a police search, and the consent is

"freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government (i) "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,'" and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."  United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no

one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

### 7.    The Probable Cause Requirement for Search Warrants.

Probable cause must support a search warrant, which requires "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between suspected

criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d 927, 937

(10th Cir. 1990). The task of the Magistrate Judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(quoting Illinois v. Gates,

462 U.S.213, 238 (1983)). See United States v. Glover, 104 F.3d 1570, 1578

(10th Cir. 1997)(finding that, in determining whether an affidavit supports a finding of probable

cause, the court must review the affidavit as a whole and look to the totality of the information

contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009).

In making his or her determination, the Magistrate Judge "may draw reasonable inferences from

the material provided in the warrant application." United States v. Rowland, 145 F.3d 1194, 1205

(10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of

probable cause." United States v. Reed, 195 F. App'x at 822. The court's duty is "simply to ensure

that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." Illinois

v. Gates, 462 U.S. at 236, 238-39. This deference is appropriate to further the Fourth

Amendment's strong preference for warrants. See Massachusetts v. Upton, 466 U.S. 727, 733

(1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of the

constitutionality of a search warrant should begin with the rule that the informed and deliberate

determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried

action of office[r]s . . . ."). Because of the strong preference for warrants, "in a doubtful or marginal

case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. at 106.

The deference accorded a Magistrate Judge's probable cause determination, however, is not boundless. See United States v. Leon, 468 U.S. 897, 914 (1984). The Court should not defer to a Magistrate Judge's probable cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause. See United States v. Danhauer, 229 F.3d at 1006. Specifically, the Court should not defer to a Magistrate Judge's probable cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984) and; Illinois v. Gates, 462 U.S. at 239).

### 8.   The Particularity Requirement for Search Warrants.

The Supreme Court has stated that "those searches deemed necessary should be as limited as possible." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). The Tenth Circuit has explained that "the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." Cassady v. Goering, 567 F.3d 628, 635 (10th Cir. 2009)(quoting United States v. Leary, 846 F.2d 592, 600 (10th Cir. 1988)). The particularity requirement prevents general searches and strictly limits the discretion of the officer executing the warrant. See Voss v. Bergsgaard, 774 F.2d 402, 404 (10th Cir. 1985)("The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."); United

States v. Janus Indus., 48 F.3d 1548, 1553 (10th Cir. 1995)("'As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'")(quoting Stanford v. Texas, 379 U.S. 476, 485 (1965))).   "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  United States v. Janus Indus., 48 F.3d at 1553 ("The test applied to the description of the items to be seized is a practical one.").

In Cassady v. Goering, the search warrant authorized the search of the plaintiff's entire farm, including his house, and the seizure of "[a]ny & all narcotics," "[a]ny and all illegal contraband," and various specific items mostly related to a narcotics operation, as well as the search and seizure of "all other evidence of criminal activity" and all personal property that was stolen, embezzled, or otherwise illegal.  567 F.3d at 635.  The Tenth Circuit found that the warrant violated the plaintiff's Fourth Amendment rights, because "[t]he warrant[] allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the Fourth Amendment proscribes."  567 F.3d at 635 (quoting Voss v. Bergsgaard, 774 F.2d at 405).  The Tenth Circuit in Cassady v. Goering explained that it had previously "applied a blanket suppression where officers *conducted a general search for evidence* of crimes not specifically listed in the warrant," 567 F.3d at 643 (emphasis in original)(citing United States v. Foster, 100 F.3d 846, 851-52 (10th Cir. 1996); see United States v. Medlin, 842 F.2d 1194, 1199-1200 (10th Cir. 1988)); given that line of cases, the Tenth Circuit said "it would be an odd result not to suppress *warrants that expressly authorize* a general search and seizure," Cassady v. Goering, 567 F.3d at 643 (emphasis in original).

### 9.  Body Cavity Searches.

Body cavity searches implicate the "most personal and deep-rooted expectations of privacy," and the "Fourth Amendment analysis thus require[s] a discerning inquiry into the facts

and circumstances to determine whether the intrusion[s] [are] justifiable." Winston v. Lee, 470 U.S. 753, 760 (1985).  "The Fourth Amendment neither forbids nor permits all such intrusions; rather, the Amendment's 'proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner.'"  Winston v. Lee, 470 U.S. at 760 (quoting Schmerber v. California, 384 U.S. 757, 767 (1966)).

In Winston v. Lee, the state of Virginia sought a court order forcing a suspect to undergo surgery to extract a bullet from his chest.  See 470 U.S. at 753.  Although the state "plainly" had probable cause and the bullet would serve as evidence of the suspect's involvement in an armed robbery, the Court rejected the request on Fourth Amendment grounds.  470 U.S. at 763, 767.  It explained that body searches require "a more substantial justification" than other searches.  470 U.S. at 767.  It explained the problem with the proposed search: "[T]o drug this citizen -- not yet convicted of a criminal offense -- with narcotics and barbiturates into a state of unconsciousness, and then to search beneath his skin for evidence of a crime . . . involves a virtually total divestment of respondent's ordinary control over surgical probing beneath his skin."  470 U.S. at 765 (citation and quotation marks omitted).  It then set out the three primary factors used to evaluate a body cavity search's reasonableness, including (1) "the extent to which the procedure may threaten the individual's safety or health;" (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity;" and (3) "the community's interest in fairly and accurately determining guilt or innocence."  470 U.S. at 754.

Subsequent courts have applied these factors in specific cases.  The first factor has not presented a great impediment to anal cavity searches.  See George v. Edholm, 752 F.3d 1206, 1217 (9th Cir. 2014)(Fletcher, J.)(describing the "danger to [the plaintiff's] health and safety" to be

"slight, though not nonexistent"); United States v. Gray, 669 F.3d at 564 ("Though . . . there was some risk of respiratory depression or arrest associated with the sedatives administered and risk of anal bleeding or perforation associated with the use of the proctoscope, these risks were low in the hospital setting where the proctoscopy occurred.").  Anal cavity searches "do not seem to rise to the level of the risks associated with the surgery found unreasonable in Winston [v. Lee]."  United States v. Gray, 669 F.3d at 564.  Courts consider X-rays even less invasive.  In Spencer v. Roche, 659 F.3d 142 (1st Cir. 2011)(Selya, J.), the United States Court of Appeals for the First Circuit dismissed a prisoner's concerns about an X-ray examination: "First, a diagnostic x-ray is a routine medical procedure that is brisk, painless, and generally regarded as safe.  Second, there is no evidence that the x-ray was carried out in a dangerous or otherwise inappropriate manner; to the contrary, the imaging was performed by trained professionals in a hospital setting."  659 F.3d at 147.

Second, courts have consistently emphasized body cavity searches' "intrusion upon the individual's dignitary interests in personal privacy and bodily integrity."  Winston v. Lee, 470 U.S. at 754.  Body cavity searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission."  Blackburn v. Snow, 771 F.2d 556, 564 (1st Cir. 1985)(Pettine, J.)(quotation omitted).  "In a situation thus laden with the potential for fear and anxiety, a reasonable search will include, beyond the usual procedural requirements, reasonable steps to mitigate the anxiety, discomfort, and humiliation that the suspect may suffer."  United States v. Cameron, 538 F.2d 254, 258 (9th Cir. 1976)(Kennedy, J.).  These dignity concerns impose greater requirements on government actors, because "the greater the intrusion, the greater must be the reason for conducting a search." Blackburn v. Snow, 771 F.2d at 565.  Even "a clear indication that the suspect is concealing contraband does not authorize

- 140 -

government officials to resort to any and all means at their disposal to retrieve it." United States

v. Cameron, 538 F.2d at 258.

In United States v. Cameron, then-Judge Anthony Kennedy, now an Associate Justice of

the Supreme Court, found a digital rectal examination, two enemas, and the forced administration

of a liquid laxative unreasonable.  538 F.2d 258-60.  The Fifth Circuit condemned a proctoscopy[104]

in United States v. Gray:

> [T]he proctoscopy here was a greater affront to Gray's dignitary interest
> than full-on exploratory surgery. Though sedated, Gray was conscious throughout
> the entire procedure. Moreover, the procedure targeted an area of the body that is
> highly personal and private. In our society, the thought of medical technicians,
> under the direction of police officers, involuntarily sedating and anally probing a
> conscious person is jarring. Such a procedure is degrading to the person being
> probed -- both from his perspective and society's.

669 F.3d at 564-65.  In United States v. Booker, 728 F.3d 535 (6th Cir. 2013)(Rogers, J.), the

United States Court of Appeals for the Sixth Circuit rejected a search in which the defendant was

"paralyzed, intubated, and anally probed without his consent."  728 F.3d at 547.  It noted that "[t]he

affront to personal dignity in Booker's case is categorically greater than what was not permitted in

[Winston v.] Lee."  728 F.3d at 547.  See George v. Edholm, 752 F.3d at 1218 ("Forced sedation,

anoscopy,[105] intubation,[106] and bowel evacuation are more invasive than the stomach-pumping

---

[104]A proctoscopy is a "[v]isual examination of the rectum and anus" with a specialized tool.
Proctoscopy, Stedman's Medical Dictionary (27th ed. 2000).

[105]An anoscopy is a visual examination of the anal canal and rectum with an anoscope, a
short and lighted tube.  See Diseases and Conditions: Anal Cancer, Mayo Clinic (Jul. 26, 2013),
http://www.mayoclinic.org/diseases-conditions/anal-cancer/basics/tests-diagnosis/con-20024923.

[106]In an intubation procedure, physicians insert a tube through the nose and into the
stomach or small intestine.  The tube allows them to deliver food, medication, or liquid laxatives
directly into the digestive system.  See Tests and Procedures: Home Enteral Nutrition, Mayo
Clinic (Dec. 9, 2014), http://www.mayoclinic.org/tests-procedures/home-enteral-
nutrition/basics/definition/prc-20012832.

that [Rochin v. People of California] described as 'close to the rack and screw.'"); Huguez v. United States, 406 F.2d 366, 379 (9th Cir. 1968)(Hauk, J.)(describing a forced digital rectal search as "a brutal invasion of privacy, an illegal and frightening example of unlawful law enforcement"); Tribble v. Gardner, 860 F.2d 321, 325 (9th Cir. 1988)(Hall, J.)("[D]igital rectal searches are one of the most intrusive methods of detecting contraband[.]"); Kennedy v. Los Angeles Police Dep't, 901 F.2d 702, 711 (9th Cir. 1989)(Hall, J.)("Strip searches involving the visual exploration of body cavities [are] dehumanizing and humiliating.").

Anal cavity searches may nonetheless be reasonable under certain circumstances. In the prison context, a "policy of allowing rectal searches must be considered reasonable unless contradicted by a showing of wanton conduct." Daughtery v. Harris, 476 F.2d 292, 294 (10th Cir. 1973)(Lewis, J.). Sanchez v. Pereira-Castillo, 590 F.3d 31 (1st Cir. 2009)(Lipez, J.), involved a prisoner's Fourth Amendment challenge to a digital rectal examinations for a suspected cellular phone. 590 F.3d at 37. The First Circuit approved the searches, noting that they were "conducted by medical professionals in the professional, hygienic confines of a hospital," and that there was "no abusive or otherwise unprofessional conduct on the part of the correctional officers or the doctors during the rectal exams." 590 F.3d at 43.

In Spencer v. Roche, police officers conducting a traffic stop obtained a search warrant for a suspect's "anal cavity" based on testimony from a confidential informant. 659 F.3d at 144. They then transported the suspect to a hospital, where they restrained him in handcuffs while a physician performed a two-finger digital examination. See 659 F.3d at 144. When this search failed to reveal any contraband, the physician ordered an X-ray which also captured images of the "stomach, kidneys, and other organs surrounding the anal cavity." 659 F.3d at 144-45. This broad X-ray was the only way to search the entire anal cavity. 659 F.3d at 144-45. The prisoner unsuccessfully

challenged the X-ray as an unreasonable search in violation of the Fourth Amendment. 659 F.3d at 149. The First Circuit cited the warrant and the lack of real alternatives, noting that the "digital examination searched only a portion of the anal cavity. Accordingly, the negative result did not foreclose the possibility that the appellant might be harboring drugs in his anal cavity." 659 F.3d at 148.

The third factor recognizes the community's interest in accurately determining guilt or innocence. It allows that "under certain circumstances it would be permissible to force a suspect to undergo a compelled medical procedure in order to enable the police to recover evidence of a crime." United States v. Husband, 226 F.3d 626, 633 (7th Cir. 2000)(en banc). In United States v. Crowder, 543 F.2d 312 (D.C. Cir. 1976)(Robb, J.), for example, the U.S. Court of Appeals for the District of Columbia allowed surgery to remove a bullet from a defendant's arm for use as evidence. 543 F.2d at 316. The D.C. Circuit noted:

> (1) the evidence sought was relevant, could have been obtained in no other way, and there was probable cause to believe that the operation would produce it; (2) the operation was minor, was performed by a skilled surgeon, and every possible precaution was taken to guard against any surgical complications, so that the risk of permanent injury was minimal; (3) before the operation was performed the District Court held an adversary hearing at which the defendant appeared with counsel; (4) thereafter and before the operation was performed the defendant was afforded an opportunity for appellate review by this court.

543 F.2d at 316. The community's interest includes the "strong interest in prosecuting those who are selling cocaine base," particularly if the search target "could not have been prosecuted without the evidence he had hidden in his rectum." George v. Edholm, 752 F.3d at 1220. See Rodriques v. Furtado, 950 F.2d 805, 811 (1st Cir. 1991)(Hill, J.)

> Society's interest in the prevention and punishment of drug trafficking weighs in favor of intrusive searches in certain instances. In the present case, other, less intrusive means of investigation and prosecution may have been available. However, given the circumstances as a whole, the existence of other means of

investigation and prosecution in this case does not render the vaginal search unreasonable.

Spencer v. Roche, 659 F.3d at 147 ("[T]he evidence sought in the x-ray search was indispensable to corroborate the officers' suspicion that the appellant had violated Massachusetts drug laws[.]").

The community's interest is diminished, however, if the contraband "could have been recovered through far less intrusive means," such as a relatively passive approach: administering laxatives, keeping the defendant in the hospital, and monitoring his bowel movements. 752 F.3d at 1220. See United States v. Cameron, 538 F.2d at 258 ("[L]ess intrusive means of obtaining the evidence may properly have been considered. In time, the contraband in the rectal cavity might have been eliminated naturally.").

The presence or absence of a warrant is also an important consideration. Courts are more likely to find even intrusive searches permissible where the officers involved seek and secure a warrant. See  Winston v. Lee, 470 U.S. at 760-61; George v. Edholm, 752 F.3d at 1217 (9th Cir. 2014); United States v. Cameron, 538 F.2d at 259 ("In addition to certifying that a search is reasonably justified, a warrant can also assure that it is conducted in a reasonable manner."). Searches that exceed the scope of the warrant, however, will likely violate the Fourth Amendment. In United States v. Nelson, 36 F.3d 758 (8th Cir. 1994)(Ross, J.), the government obtained a search warrant for the suspect's "person." 36 F.3d at 760. The United States Court of Appeals for the Eighth Circuit held that the warrant "was not sufficient to authorize a body cavity search." 36 F.3d at 760. The Eighth Circuit declined to determine whether "the x-rays, the administration of laxatives, two days in the hospital under restraints, and the administration of narcotic sedatives also violated [the suspect's] Fourth Amendment rights," because the searches clearly exceeded the warrant's scope. 36 F.3d at 761. In Cheek v. Cosby, No. 1:10-CV-01664-RRB, 2014 WL 7011943 (E.D. Cal. Dec. 10, 2014)(Beistline, J.), on the other hand, the police obtained a warrant to search

the "body cavities and person of Michael Cheeks." 2014 WL 7011943, at *2. The United States

District Court for the Eastern District of California held that this warrant "clearly authorized the

search of Cheek's body cavities," adding that a physician conducted the search. 2014 WL

7011943, at *2. In Spencer v. Roche, the First Circuit excused the X-ray's broad reach, which

included the suspect's stomach, by explaining that "[a]ny observation of the stomach was [] an

incidental result of the valid [] x-ray search and did not require an independent showing of probable

cause." 659 F.3d at 149.

## LAW REGARDING QUALIFIED IMMUNITY

Government officials performing "discretionary functions generally are shielded from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457

U.S. 800, 818 (1982). Qualified immunity "protects federal and state officials from liability for

discretionary functions, and from 'the unwarranted demands customarily imposed upon those

defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG,

2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500

U.S. 226, 232 (1991)).

Section 1983 creates a cause of action for a plaintiff to seek money damages from state

officials who have violated his or her constitutional or statutory rights. 42 U.S.C. § 1983. Under

Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 397 (1971), a

plaintiff may seek money damages from federal officials who have violated his or her

constitutional rights.[107] The Supreme Court, however, deems it "untenable to draw a distinction

---

[107]Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics has been extended, however, to only a handful of constitutional rights. See Davis v. Passman, 442 U.S. 228, 248

for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). Officials may assert qualified immunity to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties." Anderson v. Creighton, 483 U.S. 635, 638, (1987). See Green v. Padilla, 484 F. Supp. 1098, 1129.

If a government official has not violated a "clearly established" right, the official is shielded from personal liability. Harlow v. Fitzgerald, 575 U.S. 800, 818 (1982). Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Qualified immunity protects officers who have "reasonable, but mistaken beliefs" and operate at the sometimes "hazy border" of the laws. Saucier v. Katz, 533 U.S. 194, 205 (2001). A court

> can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011). A series of policy considerations guide the Tenth Circuit's qualified-immunity analysis:  "(1) protecting against 'unwarranted timidity on the part of public officials;' (2) ensuring 'that talented candidates are not deterred by the threat of damages

---

(1979)(finding an implied cause of action for violations of the equal protection principles enmeshed within the due process clause of the Fifth Amendment to the United States Constitution, U.S. Const. amend V); Carlson v. Green, 446 U.S. 14 (1980)(extending Bivens to allow for damages for violations of the cruel-and-unusual punishment clause of the Eighth Amendment to the United States Constitution). The Supreme Court has expressed hesitation about federal courts extending Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics into new contexts. See Hernandez v. Mesa, 140 S. Ct. 735, 750 (2020)("When evaluating whether to extend Bivens, the most important question 'is "who should decide" whether to provide for a damages remedy, Congress or the courts?' The correct 'answer most often will be Congress'" (quoting Ziglar v. Abbasi, 137 S. Ct. 1843, 1857 (2017), quoting Bush v. Lucas, 462 U.S. 367, 380 (1983))).

suits from entering public service;' and (3) guarding against employees being distracted from their duties."  Estate of Jensen by Jensen v. Clyde, 989 F.3d 848, 856 (10th Cir. 2021)(citing Richardson v. McKnight, 521 U.S. 399, 408 (1997)).

Qualified immunity therefore shields government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. at 818).  When a defendant asserts qualified immunity, it "creates a presumption that they are immune from suit," not a presumption that they are immune from liability.  Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016).  When a defendant asserts qualified immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct, such that "every reasonable officer would have understood" as much.  Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020).  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

   1.   **The Procedural Approach to Qualified Immunity.**

The Supreme Court has clarified the proper procedure for lower courts to evaluate a qualified-immunity defense.  Before the Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223 (2009), lower courts were directed to decide, first, whether the facts alleged or shown by the plaintiff make out a constitutional violation, and, if so, then decide whether the right at issue was clearly established at the time of the alleged violation.  See Saucier v. Katz, 533 U.S. 194, 200 (2001).  The Supreme Court's decision in Pearson v. Callahan, however, made the so-called "Saucier two-step" advisory rather than mandatory, noting that Saucier v. Katz's "'rigid order of

battle'" had faced criticism from lower courts on "'practical, procedural, and substantive grounds.'"   Pearson v. Callahan, 555 U.S. at 234 (quoting Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1275, 1277 (2006)).   Though the Supreme Court recognizes that the Saucier rule was "beneficial" and "often appropriate," lower courts are now permitted to exercise their "sound discretion" when deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."   Pearson v. Callahan, 555 U.S. at 236-37.

In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise."   Pearson v. Callahan, 555 U.S. at 237.   The Supreme Court explains that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."   Pearson v. Callahan, 555 U.S. at 241 (alterations omitted).   See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[108] qualified immunity's clearly established prong: when (i) the first, constitutional violation

---

[108]In Camreta v. Greene, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707.   In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), then-

question "is so fact bound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decision making," because of inadequate briefing; (vi) discussing both elements risks "bad decision making," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-707.  See Kerns v. Bader, 663 F.3d at 1181.[109]

---

Judge Gorsuch, writing for the Tenth Circuit, interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances.  See Kerns v. Bader, 663 F.3d at 1180-81 (10th Cir. 2011).  The Supreme Court, however, has not stressed the seven circumstances as mandatory.  Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018).  This language suggests that the inquiry is still discretionary, although the Court should exercise its discretion carefully.

[109]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified

immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity:  "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

> 407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief

- 150 -

—————————————

          shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[110]  See Camreta v. Greene, 563 U.S. at 707 ("In general, courts

---

the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[110]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.
        The "Saucier two-step" encourages courts to articulate the constitutional rights at issue. Before Pearson v. Callahan, 555 U.S. 223 (2009), made the "Saucier two-step" discretionary, it faced criticism from numerous Supreme Court members.  Associate Justice of the United States Supreme Court Stephen Breyer wrote, before Pearson v. Callahan, that he "would end the failed Saucier experiment now."  Morse v. Frederick, 551 U.S. 393, 432 (2007)(Breyer, J., concurring in the judgment and dissenting in part).  Joined by Associate Justices of the United States Supreme Court Ruth Bader Ginsburg and Stephen Breyer, Associate Justice of the United States Supreme Court John Paul Stevens criticized Saucier v. Katz because it was an "unwise judge-made rule under which courts must decide whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity." Bunting v. Mellon, 541 U.S. 1019, 1019 (2004).  Joined by Chief Justice of the United States William Rehnquist, Associate Justice of the United States Supreme Court Antonin Scalia wrote: "We should either make clear that constitutional determinations are *not* insulated from our review

should think hard, and then think hard again, before turning small cases into large ones."). The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong. See Kerns v. Bader, 663 F.3d at 1182. See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1028, 1082-83 (D.N.M. 2016)(Browning, J.).

## 2. **Clearly Established Rights.**

A right is "clearly established" when it was "sufficiently clear that every reasonable official employee would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. 7, 11 (2015)(quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). A clearly established right is "generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colorado Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-

---

. . . or else drop any pretense at requiring the ordering in every case." Bunting v. Mellon, 541 U.S. at 1025 (Scalia, J., dissenting from the denial of certiorari).

Judicial resources are valuable and scarce, but they should not be conserved at the expense of protecting constitutional rights. In addition to being easier in practice, Saucier v. Katz also increases the frequency and depth with which courts articulated constitutional law. See Nancy Leong, The Saucier Qualified Immunity Experiment, An Empirical Analysis, 36 Pepp. L. Rev. 667 (2009). Chief Justice Rehnquist opined that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." Wilson v. Layne, 526 U.S. 603, 609 (1999). The evidence to support Chief Justice Rehnquist's assertion, however, is mixed. See Paul W. Hughes, Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation of Constitutional Rights, 80 U. Colo. L. Rev. 401 (2009)("[T]he proof of the pudding is in the eating; levels of constitutional articulation increased dramatically following the Court's development of the Wilson-Saucier sequencing doctrine."). See also Leong, 36 Pepp. L. Rev. at 670 (finding that mandatory sequencing "leads to the articulation of more constitutional law, but not the expansion of constitutional rights"). See also Greg Sobolski & Matt Steinberg, Note, An Empirical Analysis of Section 1983 Qualified Immunity Actions and Implications of Pearson v. Callahan, 62 Stan. L. Rev. 523 (2010). The bottom line is that a trial court often -- if not frequently -- needs to decide whether the constitutional right was violated before deciding if t was clearly established.

73 (D.C. Cir. 1983)).   "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"   Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).   A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).   In other words, existing precedent must have placed the constitutional or statutory question "beyond debate."   Ashcroft v. al-Kidd, 563 U.S. at 741.

The Supreme Court requires that courts not define the constitutional right at issue "'at a high level of generality.'"   White v. Pauly, 137 S. Ct. 548, 552 (2017)(quoting Ashcroft v. al-Kidd, 563 U.S. at 742).   The Supreme Court refers to this as a "longstanding principle."   White v. Pauly, 137 S. Ct. at 552.   Nevertheless, the clearly established law must be "particularized" to the case's facts.   Anderson v. Creighton, 483 U.S. 635, 640 (1987).   If the clearly established law at issue is not sufficiently particularized, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."   Anderson v. Creighton, 483 U.S. at 639.   "[G]eneral statements of the law" are not "inherently incapable" of clearly establishing a right, because they can sometimes give "fair and clear warning" to officers.   United States v. Lanier, 520 U.S. 259, 271 (2017).   See White v. Pauly, 137 S. Ct. at 552 (reiterating this principle).   Importantly, the "unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. at 640.   See Brosseau v. Haugen, 543 U.S. 194, 199 (2004)("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body

of relevant case law.")(citing Hope v. Pelzer, 536 U.S. 730, 738 (2002)(noting in a case where the Eighth Amendment violation was "obvious" that there need not be a materially similar case for the right to be clearly established)).  A court must, therefore, "inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances." Green v. Padilla, 484 F. Supp. 3d 1098, at 1134 (citing City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019)).

In the Tenth Circuit, until recently, this rule meant that a right is clearly established only when there is a factually similar "Supreme Court or Tenth Circuit decision on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." Truman v. Orem City, 1 F. 4th 1227, __ (10th Cir. 2021)(quoting Thomas v. Kaven, 765F.3d 1183, 1194 (10th Cir. 2014))[111].  Although a plaintiff asserting a violation of a clearly established right must in most circumstances point to a case that is sufficiently factually similar, the Supreme Court has recently clarified that this is not always required.  See Taylor v. Riojas, 141 S. Ct. 52, 54 (2020)("Taylor").  The Supreme Court, in a short per curiam opinion, suggested an objective, "no reasonable correctional officer" standard when it held that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time." Taylor, 141 S. Ct. at 53.  In Taylor, corrections officers housed an inmate in "shockingly unsanitary cells." Taylor, 141 S. Ct. at 53.  One cell was covered "nearly floor to ceiling, in 'massive mounts' of feces: all over the floor, the ceiling, the window, the walls, and even 'packed inside the water faucet.'"  141 S. Ct. at 53 (quoting Taylor

---

[111]At the time the Court is writing, there is no pagination available either for the Federal Reporter or the electronic database citation format.  Citations to Truman v. Orem City, 1 F. 4th 1227 (10th Cir. 2021), therefore, lack page numbers.

v. Stevens, 946 F.3d 211, 218 (5th Cir. 2019)).  Correctional officers confined the plaintiff in this cell for four days, but the plaintiff did not eat or drink because he feared that his food and water would be contaminated.  See 141 S. Ct. at 53.  Correctional officers then moved the plaintiff to a second cell that was "frigidly cold" and was equipped with "only a clogged drain in the floor to dispose of bodily wastes."  141 S. Ct. at 53.  The plaintiff held his bladder for more than twenty-four hours before finally involuntarily relieving himself, which caused the clogged drain to overflow and "raw sewage to spill across the floor."  141 S. Ct. at 53.  Because the plaintiff was not provided a bed and was confined without clothes, the plaintiff was "left to sleep naked in sewage."  141 S. Ct. at 53.

The Fifth Circuit held that these confinement conditions violated the Eighth Amendment's ban on cruel-and-unusual punishment, but it granted the corrections officers qualified immunity because the law was not clearly established.  See Taylor, 141 S. Ct. at 53 (citing Taylor v. Stevens, 946 F.3d 211, 222 (5th Cir. 2019)).  The Fifth Circuit concluded that the corrections officials did not have "fair warning" that confining the plaintiff in these conditions would be unconstitutional. Taylor v. Stevens, 946 F.3d at 222 (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).  The Supreme Court reversed, holding that the Fifth Circuit erred when it granted qualified immunity on this basis.  See Taylor, 141 S. Ct. at 53.  Although the plaintiff could not identify a case on point, the Supreme Court noted that -- even in the absence of a case clearly establishing the law -- "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time."  Taylor, 141 S. Ct. at 53.  See Truman v. Orem City, 1 F. 4th at __ (summarizing the Supreme Court's conclusion and stating that the Supreme Court "made clear that [the plaintiff] did not have to" identify a case on point).

For decades, lower courts have tried diligently and faithfully to follow the unwritten signals

of superior courts.[112]  One such unwritten signal is that "a nigh identical case must exist for the

law to be clearly established."  Caldwell v. University of N.M. Bd. of Regents, No. 20-CIV-0003

JB/JFR, 2020 WL 7861330, at *33 n.14 (D.N.M. Dec. 31, 2020)(Browning, J.).[113]  As numerous

---

[112]As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).

[113]The Court notes, as it has elsewhere, see, e.g., Caldwell v. University of N.M. Bd. of Regents, 2020 WL 7861330, at *33 n.14, that qualified immunity is a problematic doctrine.  This is particularly true of the Supreme Court's approach before Taylor.  "Factually identical or highly similar factual cases are not . . . the way the real world works."  Caldwell v. University of N.M. Bd. of Regents, 2020 WL 7861330, at *33 n.14.
    Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?"  Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).  The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

_____

        In most circumstances, a prior plaintiff must have been subjected to almost identical treatment, and a court must have found that law to have been clearly established for a subsequent plaintiff to get around the obstacle that qualified immunity creates.  See Stephen R. Reinhardt, The Demise of Habeas Corpus and the Rise of Qualified Immunity and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences, 113 Mich. L. Rev. 1219, 1245 (2015)("[T]he Court has through qualified immunity created such powerful shields for law enforcement that people whose rights are violated, even in egregious ways, often lack any means of enforcing rights.").  See also White v. Pauly, 137 S. Ct. 548, 552 (2017)(criticizing the Tenth Circuit below, because it "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment).  In most of those situations, officials can escape liability for violating someone's statutory or constitutional rights, because a prior court has not addressed the issue.  As United States Circuit Judge for the Court of Appeals for the Fifth Circuit Don Willett notes, this creates a Catch-22.  See Zadeh v. Robinson, 902 F.3d 483, 499 (5th Cir. 2018)(Willett, J. concurring dubitante)(opinion withdrawn on rehearing).  The plaintiffs "must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because those questions are yet unanswered. Courts then rely on that judicial silence to conclude there's no equivalent case on the books." Zadeh v. Robinson, 902 F.3d at 499.  In short, "[n]o precedent = no clearly established law = no liability. An Escherian Stairwell. Heads defendants win, tails plaintiffs lose." Zadeh v. Robinson, 902 F.3d at 499.

        The Court disagrees with the Supreme Court's approach.  The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy.  As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, (U.S. Supreme Court, filed Mar. 2, 2018)("Cato Brief").  "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2.  "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2.  See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect).  Further, as Justice Clarence Thomas has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act." Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017)(Thomas, J., concurring)(internal quotation marks omitted).  "Our qualified immunity precedents instead represent precisely the sort of freewheeling policy choice[s] that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(internal quotation marks omitted).  The judiciary should be true to § 1983 as Congress wrote it.

Courts of Appeals have recently noted, however, Taylor clarifies that it is no longer the case that

an almost-identical case must exist.  See Truman v. Orem City, 1 F. 4th 1227 (10th Cir. 2021)("Just

like any reasonable corrections officer should have understood the inmate in Taylor's conditions

. . . offended the Constitution, so too should any reasonable prosecutor understand that that

providing a medical examiner fabricated evidence and then putting him on the stand to testify

based on that false information offends the Constitution."); Moderwell v. Cuyahoga County, 997

F.3d 653, 660 (6th Cir. 2021)(explaining that the Supreme Court held in Taylor that "there does

not need to be a case directly on point" when no reasonable officer could have concluded that the

challenged action was constitutional); Taylor v. Ways, 2021 WL 2217474, at * 9 (7th Cir. June 2,

2021)(noting that Taylor reaffirmed that "the Supreme Court does not demand a case directly on

---

        Moreover, in a day when police shootings and excessive force cases are in the news, there
should be a remedy when there is a constitutional violation, and jury trials are the most democratic
expression of what police action is reasonable and what action is excessive.  If the citizens of New
Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict
should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit
or Supreme Court decision.  Finally, to always decide the clearly established prong first and then
to always say that the law is not clearly established could be stunting the development of
constitutional law.  See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity,
89 S. Cal. L. Rev. 1, 6 (2015).  And while the Tenth Circuit -- with the exception of now-Justice
Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online
(2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the Supreme
Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified
immunity's clearly established prong, see, e.g, Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th
Cir. 2018); Aldaba II, 844 F.3d at 874; Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018);
Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 2017 WL 3951706, at *3; Brown v. City
of Colo. Springs, 2017 WL 4511355, at *8, and willing to reverse district court decisions should
the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889
F.3d 1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled
to qualified immunity, because a caseworker would know that "child abuse and neglect allegations
might give rise to constitutional liability under the special relationship exception"); McCoy v.
Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly
established law even though the three decisions invoked to satisfy that prong were not "factually
identical to this case," because those cases "nevertheless made it clear that the use of force on
effectively subdued individuals violates the Fourth Amendment").

point"); Roque v. Harvel, 993 F.3d 325 (5th Cir. 2021)(citing Taylor for the proposition that, "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant case law" (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004))). See also Joanna C. Schwartz, Qualified Immunity and Federalism All the Way Down, 109 Geo. L.J. 305, 351 (2020)("The Court's decision in *Taylor* sends the signal to the lower courts that they can deny qualify immunity without a prior case on point."); Lawrence Rosenthal, Defending Qualified Immunity, 72 S.C.L. Rev. 547, 593 & n.193 (2020)("More recently, however, the Court has stressed that on egregious facts, qualified immunity should be denied regardless whether there are factually similar precedents.").

There are, therefore, two possible interpretations of Taylor.  First, Taylor could simply clarify that the holding in Hope v. Pelzer, 536 U.S. at 741 -- that identifying an earlier case with "'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established," but that it is "not necessary to such a finding" -- is still good law even though it has fallen out of favor among lower courts.  This reading of Taylor would mean there is a narrow exception to the standard requirement that a plaintiff identify an earlier case on point that only applies in case with "extreme circumstances" or "particularly egregious" facts.  Second, Taylor could mean that a court must now ask whether the conduct at issue was particularly egregious such that no reasonable officer could have concluded that their actions are constitutional, and, if so, then there does not need to be a case clearly establishing the law.

Most Courts of Appeals have adopted the second interpretation.  Nonetheless, there is confusion both between and within the Courts of Appeals about Taylor's scope.  Compare Bates v. Schwarzenegger, 832 F. App'x. 509, 511 (9th Cir. 2020)(mem.)(citing Taylor for the proposition that the "Supreme Court has repeatedly, including very recently, reaffirmed and

applied the doctrine of qualified immunity"), with Rico v. Ducart, 980 F.3d 1292, 1307 (9th Cir.

2020)(Silver, J., concurring in part and dissenting in part)(explaining that, in Taylor, "the Court

held that the prisoner's rights were so obvious that 'ambiguity in the caselaw' could not create any

doubt" that the officer's conduct was unconstitutional (citing Taylor, 141 S.Ct. 52, 53, n.2)).  Since

Taylor, courts have asked not just whether the law was clearly established through a factually

similar case from that Circuit or from the Supreme Court, but also whether the conduct at issue

was "particularly egregious" such that "no reasonable officer could have concluded that" their

actions were constitutionally permissible.  Taylor, 141 S. Ct. at 53.  See Truman v. Orem City, 1

F. 4th at __.  In other words, in addition to asking whether the officer was theoretically on notice

that they were acting unlawfully,[114] the court must also ask whether the conduct at issue was

---

[114]The Court notes that one of the most basic premises of the law of qualified immunity -- that an officer is aware either actually or potentially that their conduct is unlawful because they know the holdings of both watershed constitutional decisions and the lower court decisions that apply them -- does not hold up to empirical scrutiny.  See Joanna C. Schwartz, Qualified Immunity's Boldest Lie, 88 U. Chi. L. Rev. 605, 610 (2021)(finding that although police departments do regularly inform officers about "watershed" decisions, officers are "not regularly informed about court decisions interpreting those decisions in different factual scenarios -- the very types of decisions that are necessary to clearly establish the law about the constitutionality of uses of force").  The Court has previously noted:

> It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).

"particularly egregious" -- an apparently objective question.  McCoy v. Alamu, 141 S. Ct. 1364, 1364 (mem)(2021)(vacating and remanding in light of Taylor even though the conduct at issue was likely not "particularly egregious").[115]

The United States Court of Appeals for the Third Circuit, for example, notes that Taylor did not affect whether three state legislators who took a public stand against the sale of state-owned property and then tried to pass a law divesting the State's ability to sell it were entitled to qualified immunity, because the legislators' actions were "not so outrageous that 'no reasonable . . . officer could have concluded' they were permissible under the Constitution." HIRA Educ. Servs. N. Am. v. Augustine, 991 F.3d 180, 191 n.7 (3d Cir. 2021)(quoting Taylor, 141 S. Ct. at 53).  The United States Court of Appeals for the Seventh Circuit, too, concludes that Taylor means an officer is not entitled to qualified immunity if his or her conduct was "particularly egregious." Lopez v. Sheriff of Cook Cnty., 993 F.3d 981, 991 (7th Cir. 2021).  In Lopez v. Sheriff of Cook County, the Seventh Circuit found that an off-duty correctional officer who shot and then used as a human shield a man who fired his gun into the air near a crowd after a scuffle did not act "so egregious[ly]

_____

Manzanares v. Roosevelt Cnty. Adult Detention Center, 331 F. Supp.3d 1260, 1294 n.10 (D.N.M. 2018)(Browning, J.).

[115]Professor Colin Miller of the University of South Carolina School of Law notes that there are only two likely interpretations of the Supreme Court's summary disposition of McCoy v. Alamu: (i) that the Court remanded so that the Fifth Circuit could consider whether the case involved "extreme circumstances" or "particularly egregious facts" like those in Taylor; and (ii) that the Supreme Court remanded so that the Fifth Circuit can reconsider without looking for analogous prior precedent and instead "determine whether any reasonable officer should have realized" that the conduct violated the plaintiff's constitutional rights.  Colin Miller, The End of Comparative Qualified Immunity, 99 Tex. L. Rev. Online 217, 224 (2021)("Miller, The End of Comparative Qualified Immunity").  Miller argues that this second interpretation is more likely to be correct, because it "would be difficult to characterize" the officer's conduct as "'particularly egregious' without making a similar finding about most other unconstitutional behavior by government officers who seek qualified immunity."  Miller, The End of Comparative Qualified Immunity, at 224 (no citation for quotation).

that any reasonable officer would know they [were] violating the Constitution notwithstanding the lack of an analogous decision."[116]  993 F.3d at 991.  The United States Court of Appeals for the Ninth Circuit also distinguishes Taylor on the basis of the conduct's severity.  See Rico v. Ducart, 980 F.3d 1292, 1300 n.9 (9th Cir. 2020).  In Rico v. Ducart, the Ninth Circuit held that correctional officers who performed inmate-welfare checks that, because of the design of the prison, created loud noises every forty-five minutes were entitled to qualified immunity because the facts were not "as extreme as those present in" Taylor.  980 F.3d at 1300 n.9.  Similarly, the Ninth Circuit also has decided that Taylor "only highlights the level of blatantly unconstitutional conduct necessary to satisfy the obviousness principles."  O'Doan v. Sanford, 991 F.3d 1027, 1044 (9th Cir. 2021).

---

[116]The Court does not agree with the Seventh Circuit's conclusion.  An off-duty officer using someone he had just shot multiple times as a human shield to "ward off" someone else with a gun -- the human shield had moments earlier fired a gun into the air near a crowd -- is particularly egregious such that any reasonable officer should have realized that it violates someone's constitutional rights.  Lopez v. Sherriff of Cook Cnty., 993 F.3d 992.  Even if the officer was trying to protect himself and the public, firing a gun near a crowd does not justify being used as fleshy shield to protect an off-duty officer who had shot that very shield moments earlier.  Numerous provisions of international law and the laws of war, see, e.g., Rome Statute of the International Criminal Court, art. 8(2)(b)(xxiii)(including in the definition of "war crimes" "[u]tilizing the presence of a civilian or other protected person to render certain points, areas or military forces immune from military operations")(July 17, 1998), prohibit such conduct.  A police officer need not be familiar with international law to know that such conduct is improper, nor should someone else have been used as a human shield previously and a Court of Appeals concluded that conduct to have violated clearly established law for a subsequent human shield to overcome the burden of qualified immunity.  The Seventh Circuit found that the situation was "too fast-moving, too unpredictable, and too volatile" for an officer to know that using as a human shield the person he had just shot multiple times was a violation that was "so egregious that any reasonable officer would know they are violating the Constitution notwithstanding the lack of an analogous decision."  993 F.3d at 992.  Instead, the Seventh Circuit appears to require the officer theoretically to be on notice that this conduct was a law violation because a prior officer must have done the same thing and an earlier court -- most likely the Seventh Circuit itself -- must have found that the use of human shields to violate some other clearly established law.  If human shields are banned in war, they should not be allowed on the Chicago's streets.  Any reasonable officer should know this conduct is not acceptable conduct under the Constitution.

The other Courts of Appeals have, however, characterized <u>Taylor</u> as only reaffirming an "extreme circumstances" or "obvious clarity" exception.  The Fifth Circuit, for example, has distinguished <u>Taylor</u>, noting that it "involved a factually distinct claim involving unsanitary prison conditions," so it did not apply to a case about mental healthcare in prison.  <u>Landry v. Laborde-Lahoz</u>, 2021 WL 1537455, at * 5 (5th Cir. April 19, 2021).[117]  The Fifth Circuit, however, like other Courts of Appeals, has not adopted a consistent approach to <u>Taylor</u>.  The Fifth Circuit also has noted that "it would have been 'obvious' to a reasonable officer that" several officers using their body weight to apply pressure to an unarmed man who did not resist arrest while the man was in the "maximal-restraint" position for five-and-a-half minutes so that the man stopped breathing and his lips turned blue -- while officers nearby "milled around"-- would constitute "such a severe tactic against this particular person would be constitutionally proscribed," and that the officer would "have no recourse to qualified immunity."  <u>Aguirre v. City of San Antonio</u>, 995 F.3d 395, 403-04, 424 (5th Cir. 2020)(Jolly, J., concurring).  The Fifth Circuit has further cited <u>Taylor</u> to support its assertion that "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant law.'"  <u>Roque v. Harvel</u>, 993 F.3d 325, 335 (5th Cir. 2021)(quoting <u>Brosseau v. Haugen</u>, 542 U.S. 194, 199 (2004)).  In <u>Roque v. Harvel</u>, however, the Fifth Circuit did not say what those "general standards" might be, from where they might come, or where a court might look for them, and then proceeded to characterize qualified-immunity law

---

[117]The Court does not agree with the Fifth Circuit's reasoning on this point, although it does not disagree with the case's result.  The Fifth Circuit reasons that <u>Taylor</u> did not support the plaintiff's argument that County officials acted with deliberate indifference in violation of the Eighth Amendment, because it was "factually distinct."  <u>Landry v. Laborde-Lahoz</u>, 2021 WL 1537455, at * 5.  That <u>Taylor</u> is factually distinct has no bearing on the merits of a deliberate-indifference claim but impacts its applicability to the qualified-immunity question.

as requiring a case on point in almost all circumstances.  993 F.3d at 335.[118]  More recently, however, the Fifth Circuit acknowledged that Taylor excuses a plaintiff from "their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'"  Cope v. Cogdill, 2021 WL 2767581, at *4 (5th Cir. July 2, 2021)(quoting Taylor, 141 S. Ct. at 53-54).  The Fifth Circuit stressed, however, that this is a "high standard," because the facts must be "'particularly egregious.'"  Cope v. Cogdill, 2021 WL 2767581, at *4 (quoting Taylor, 141 S. Ct. at 53-54).

Most relevant here, the Tenth Circuit also has not given Taylor consistent treatment.  For example, the Tenth Circuit treated Taylor as an example of the rule of United States v. Lanier, 520 U.S. 259 (1997), that a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in

---

[118]The Fifth Circuit's treatment of Taylor and the clearly established analysis is not consistent.  In Tucker v. City of Shreveport, 998 F.3d 165 (2021), the Fifth Circuit did not cite Taylor, but writes that

> "[q]ualified immunity is justified unless *no* reasonable officer could have acted as [the defendant officers] did here, or *every* reasonable officer faced with the same facts would *not* have [acted as the defendant officers did]."  Mason v. Faul, 929 F.3d 752, 764 (5th Cir. 2019, cert. denied, 141 S. Ct. 116, 207 (2020)(citing District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018)("The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.  Otherwise, the rule is not one that 'every reasonable official' would know.")).

998 F.3d at 176-77.  The Fifth Circuit's analysis in Tucker v. City of Shreveport confuses the reasonableness of the officers' behavior with the clarity of the precedent that clearly establishes the law.  See 998 F.3d 165.  As Taylor suggests, an officer can act particularly egregiously and not be entitled to qualified immunity even if no precedent clearly establishes the law.  See 141 S. Ct. at 54.  See Ramirez v. Guadarrama, 2 F.4th 506, __ (5th Cir. 2021)(mem.)(Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [on McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts.").

question has not previously been held unlawful," if it gives "fair and clear warning" that the conduct violates the plaintiff's constitutional rights.  United States v. Lanier, 520 U.S. at 271.  See Routt v. Howry, 835 F. App'x. 379, 382 (10th Cir. 2020).  This treatment of Taylor asks about the relationship between a "general constitutional rule *already identified* in the decisional law" and the "conduct in question," and asks whether that rule is applies with "obvious clarity."  United States v. Lanier, 520 U.S. at 271 (emphasis added).  Elsewhere, the Tenth Circuit states: "It suffices that 'the alleged unlawfulness [is] apparent in light of preexisting law.' That is, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'" Huff v. Reeves, 996 F.3d 1082, 1088 (10th Cir. 2021)(first quoting Riggins v. Goodman, 572 F.3d 1101, 1101 (10th Cir. 2009), then quoting Taylor, 141 S. Ct. at 53-54).

In Frasier v. Evans, however, the Tenth Circuit wrote that "under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful." Frasier v. Evans, 992 F.3d 1003, 1015 (10th Cir. 2021)(quoting Taylor, 141 S. Ct. at 53).  The Tenth Circuit continued by noting that the situation before them -- several police officers surrounding a man who asked one of the officers for a statement about the force the officer had just used on a "uncooperative suspect," and then one of the officers grabbing the tablet and searching it for a video of the encounter -- was "not such a rare case" as Taylor or Hope v. Pelzer, 536 U.S. 730 (2002).  Frasier v. Evans, 992 F.3d at 1021-22.  In other words, rather than having to point to an existing case with sufficiently analogous facts, a plaintiff instead can defeat a claim for qualified immunity by meeting Taylor's "extreme circumstances" or "particularly egregious" standard.  See Frasier v. Evans, 992 F.3d at 1015.

- 166 -

More recently, the Tenth Circuit held that even without a prior precedent clearly establishing the law, it was "'obvious'" that a prosecutor providing materially false information to a medical examiner that influences his expert opinion whether a homicide occurred -- and then putting that medical examiner on the stand to testify about that false information -- is "'obviously egregious.'"  Truman v. Orem City, 1 F. 4th at__  (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018), then Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004)).  The Tenth Circuit, in Truman v. Orem City, comparing the facts directly to those in Taylor, continued: "Just like any reasonable correctional officer should understand the inmate in Taylor's conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."  1 F. 4th at __.  In reaching its conclusion in Truman v. Orem City, the Tenth Circuit reiterated that its qualified-immunity analysis is "'not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law."  Truman v. Orem City, 1 F. 4th at __ (quoting Reavis v. Frost, 967 F.3d 978, 992 (10th Cir. 2020)).  Because the Tenth Circuit concluded that "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer was clearly established at the time of the prosecutor's conduct," 1 F. 4th at __, it found that the plaintiff had plausibly alleged a fabrication-of-evidence claim against the prosecutor.  1 F. 4th at __.  This treatment of Taylor does not just ask about the relationship between a "general constitutional rule already identified in the decisional law" and whether it applies with "obvious clarity" to the conduct, Routt v. Howry, 835 F. App'x at 382 (quoting United States v. Lanier, 520 U.S. at 271), but instead focuses on the objective "particularly egregious" standard, which applies even without any general constitutional principles

that courts have already promulgated, because "no reasonable officer" could have concluded the conduct to be lawful, Taylor, 141 S. Ct. at 53.

The Court does its best follow diligently and faithfully the unwritten signals of superior courts, but, here, the signals are not clear.[119] The Court will therefore proceed with both lines of analysis. An officer therefore is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established either (a) by a factually similar Supreme Court or Tenth Circuit case on point, see Thomas v. Kaven, 765 F.3d 1183, at 1194, or, in rare cases, by "general constitutional principles," Routt v. Howry, 835 F. App'x. 382 -- at the time of the alleged misconduct, or (b)because the conduct was "particularly egregious" such that "any reasonable officer should have realized" it was unlawful, Taylor, 141 S. Ct. at 54. See Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020)(quoting Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016))("'To overcome this presumption,' the plaintiffs bear the burden of 'show[ing] that (1) the

---

[119]The Court agrees with the Tenth Circuit's treatment of Taylor in Truman v. Orem City, 1 F.4th 1227, that Taylor marginally expands the standard in United States v. Lanier 520 U.S. 259 and Hope v. Pelzer, 536 U.S. 730, and stands for the proposition that an officer is not entitled to qualified immunity when their conduct is "particularly egregious" such that "any reasonable officer should have realized" that their conduct offends the Constitution. Taylor, 141 S. Ct. at 54. See also Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)("[W]hen 'no reasonable correctional officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." (quoting Taylor, 141 S. Ct. at 53)). The Court concludes this treatment to be correct, especially in light of the Supreme Court's summary disposition in McCoy v. Alamu, 141 S. Ct. 1364, 1364 (mem)(2021). See Ramirez v. Guadarrama, 2 F.4th 506, __ (Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [on McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts."); Miller, The End of Comparative Qualified Immunity, at 222-23. On the other hand, given the Court's view on qualified immunity, the Court hopes that the lower courts patch the hole in the defense's line of reasoning, since it is so wide that the nation can run a truck through it.

officers' alleged conduct violated a constitutional right, and (2) [that right] was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right.'").  See also Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009)("When a defendant asserts qualified immunity at summary judgment . . .  the plaintiff [must] . . . demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity."); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

## LAW REGARDING JUDICIAL ESTOPPEL

Judicial estoppel "'generally prohibits a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'"  New Hampshire v. Maine, 532 U.S. 742, 749 (2001)(quoting Pegram v. Herdrich, 530 U.S. 211, 227, n.8 (2000)).  Judicial estoppel doctrine's purpose is to protect the judicial process' integrity:

> [W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

Davis v. Wakelee, 156 U.S. 680, 689 (1895).  See United States v. McCaskey, 9 F.3d 368, 378 (5th Cir. 1993)(judicial estoppel prohibits "parties from deliberately changing positions according to the exigencies of the moment").  See also New Hampshire v. Maine, 532 U.S. at 750.  Parties asserting contrary positions in the same action "would most flagrantly exemplify that playing 'fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate." Scarano v. Central R. Co. of N.J., 203 F.2d 510, 513 (3d Cir. 1953)(quoting Stretch v. Wilson, 6 N.J. Super. 456, 469 (1949)).  "Because the rule is intended to prevent 'improper use of judicial machinery,' Konstantinidis v. Chen, 626 F.2d 933, 938 (D.C. Cir. 1980), judicial estoppel 'is an

equitable doctrine invoked by a court at its discretion,' <u>Russell v. Rolfs</u>, 893 F.2d 1033, 1037 (9th Cir. 1990)." <u>New Hampshire v. Maine</u>, 532 U.S. at 750 (omission of internal quotation marks and citations in original).

The circumstances under which courts may appropriately invoke judicial estoppel are "'probably not reducible to any general formulation of principle.'" <u>New Hampshire v. Maine</u>, 532 U.S. at 750 (quoting <u>Allen v. Zurich Ins. Co.</u>, 667 F.2d 1162, 1166 (4th Cir. 1982)). Nevertheless, the Supreme Court notes that "several factors typically inform the decision whether the apply the doctrine in a particular case." <u>New Hampshire v. Maine</u>, 532 U.S. at 750. First, "a party's later position must be 'clearly inconsistent' with its earlier position." <u>New Hampshire v. Maine</u>, 532 U.S. at 750 (quoting <u>United States v. Hook</u>, 195 F.3d 299, 306 (7th Cir. 1999)). Second, "courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'" <u>New Hampshire v. Maine</u>, 532 U.S. at 750 (quoting <u>Edwards v. Aetna Life Ins. Co.</u>, 690 F.2d 595 (6th Cir. 1982). The Supreme Court explains that, "[a]bsent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent determinations' . . . and thus poses little threat to judicial integrity." <u>New Hampshire v. Maine</u>, 532 U.S. at 750-51 (quoting <u>United States v. C.I.T. Constr. Inc.</u>, 944, F.2d 253, 259 (5th Cir. 1991)). Third, courts consider "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." <u>New Hampshire v. Maine</u>, 532 U.S. at 751. The Supreme Court emphasizes, however, that it does not establish "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." <u>New Hampshire</u>

v. Maine, 532 U.S. at 751.  Consequently, "[a]dditional considerations may inform the doctrine's application in specific factual contexts."  New Hampshire v. Maine, 532 U.S. at 751.

Before the Supreme Court's decision in New Hampshire v. Maine, 532 U.S. 742, the Tenth Circuit "repeatedly refused" to adopt judicial estoppel.  Johnson v. Lindon City Corp., 405 F.3d 1065, 1058 (10th Cir. 2005).  See United States v. 162 MegaMania Gambling Devicies, 231 F.3d 713, 726 (10th Cir. 2000).  See also Williams v. Stewart Title Co., 806 F. App'x 625, 631 n.8 (10th Cir. 2020)("We began applying judicial estoppel only after the Supreme Court recognized the doctrine in New Hampshire v. Maine . . . .").  Because of New Hampshire v. Maine, however, the Tenth Circuit adopted the doctrine of judicial estoppel.  See Johnson v. Lindon City Corp., 405 F.3d at 1068.  The Tenth Circuit adopts the three factors from New Hampshire v. Maine, 405  F.3d 1065, but emphasizes that the position to be estopped must be "one of fact, not one of law," BancInsure, Inc. v. F.D.I.C., 796 F.3d 1226, 1240 (10th Cir. 2015), and stresses that the "requirement that previous court has accepted the prior inconsistent position 'ensures that judicial estoppel is applies in the narrowest of circumstances,'" Johnson v. Lindon City Corp., 405 F.3d at 1068 (quoting Lowery v. Stovall, 92 F.3d 219, 224 (4th Cr. 1996)).  The Tenth Circuit applies the doctrine of judicial estoppel "both narrowly and cautiously," Hansen v. Harper Excavating, Inc., 641 F.3d 1216, 1227 (10th Cir. 2011)(quoting Bradford v. Wiggins, 516 F.3d 1189, 1194 n.3 (10th Cir. 2008)), because it is a "powerful weapon . . . and there are often lesser weapons that can keep alleged inconsistent statement in check while preserving a party's option to have its day in court," Vehicle Mkt. Rsch., Inc. v. Mitchell Int'l, Inc., 767 F.3d 987, 993 (10th Cir. 2014).

As the Court has previously explained:

Judicial estoppel "prohibits a party from maintaining inconsistent positions in legal proceedings." Gallegos v. Pueblo of Tesuque, 2002-NMSC-012, ¶ 23, 46 P.3d 668, 677. When a party takes "a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter assume a contrary position,

especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." <u>Citizens Bank v. C & H Const. & Paving Co.</u>, 1976-NMCA-063, ¶ 36, 552 P.2d 796, 802.

<u>Leon v. FedEx Ground Package Sys., Inc.</u>, No. CIV 13-1005 JB/SCY, 2016 WL 814836, at *12 (D.N.M. Feb. 21, 2016)(Browning, J.).

## ANALYSIS

First, the Court concludes that Risk Management may intervene as a matter of right, because it meets its burden to show: (i) that it has an obligation under New Mexico law to pay damages if a jury determines that the Defendants were acting within the scope of their duties; and (ii) that its interests are not adequately represented by the existing State Defendants.  Second, although Bearden might have joined the MSJ before it was filed, the Court permits Bearden to adopt by reference the arguments in the MSJ, because Bearden is entitled to incorporate by reference argument in other parties motions under D.N.M. LR-Civ. 7.1(a).  Bearden joining the MSJ also promotes judicial efficiency and prevents Bearden from having to file his own MSJ that largely would duplicate the MSJ's arguments.  The Court permits Bearden to adopt by reference the arguments in the Intervention Response for the same reasons.  Third, the Court concludes that Oritz' Second Amended Complaint does not violate rule 8's notice-pleading requirements, because, although some of the allegations are vague and conclusory, it asserts sufficient detail about Bearden's sexual advances and the other Defendants' knowledge of the advances for both the Court and the Defendants to discern a factual and legal basis for Ortiz' claims. Fourth, the Court dismisses Ortiz' due process, equal protection, and Fourth Amendment claims, because allegations of rape and sexual abuse in prison are properly analyzed under the Eighth Amendment. Fifth, a reasonable jury could find that Nunez, Gonzales, and Bearden acted with deliberate indifference in violation of Ortiz's Eighth Amendment Rights, because Ortiz presents evidence

that Ortiz and Bearden's sexual relationship was not consensual that does not blatantly contradict the record.  Sixth, because there is no evidence Perez, Baca, and Trujillo knew of, or were deliberately indifferent to, the relationship between Ortiz and Bearden before Nunez and Gonzales told them on the same day they approached Bearden, the Court concludes that no reasonable jury could find Perez, Baca, and Trujillo violated Ortiz' constitutional rights. Seventh, because (i) the Tenth Circuit has long held that it is clearly established that sexual assault in prison violates the Eighth Amendment; and (ii) prison rape is particularly egregious such that no reasonable officer could conclude it is lawful, the Court concludes that Nunez, Gonzales, and Bearden are not entitled to qualified immunity.  Eighth, the Court concludes that Bearden is judicially estopped from arguing that the sexual relationship he had with Ortiz was consensual, because the argument is plainly inconsistent with the Bearden plea.

I.     **RISK MANAGEMENT MAY INTERVENE AS A MATTER OF RIGHT, BECAUSE ITS OBLIGATION UNDER NEW MEXICO LAW TO PAY DAMAGES DEPENDS ON WHETHER THE DEFENDDANTS WERE ACTING WITHIN THE SCOPE OF THEIR DUTY.**

Rule 24(a)(2) entitles a movant to intervene as a matter of right if: (i) the motion is timely; (ii) the movant claims an interest relating to the property or transaction which is the subject of the action; (iii) the movant's interest relating to the property may be impaired or impeded; and (iv) existing parties do not represent adequately the movant's interest.  See WildEarth Guardians v. National Park Serv., 604 F.3d at 1198.  Risk Management has carried its burden to show that it has an interest relating to the transaction that is the subject of the action, and that disposing of the action may impair or impede its ability to protect its interest.  Risk Management may intervene, because it has shown that it meets its burden of satisfying rule 24(a)'s requirements, and because its obligation under New Mexico law to pay damages depends on whether Bearden was acting within the scope of duty.

First, the Motion to Intervene is timely.  In the Intervention Response, Ortiz argues that Risk Management's intervention is not timely, because a court has not yet determined that Bearden was acting within the scope of his duties.  Intervention Response at 2.  Risk Management counters that the Motion to Intervene is timely, because this is an at "early stage of litigation," and that there has not yet been any discovery in this case. Intervention Reply at 5.  Timeliness is determined "in light of all the circumstances."  Okla. ex rel. Edmonson v. Tyson Foods, Inc., 629 F.3d at 1232. Three non-exhaustive factors are particularly important to determine timeliness: (i) the length of time since the movant knew of their interests in the case; (ii) prejudice to the existing parties; and (iii) prejudice to the movants.  See Okla. ex rel. Edmonson v. Tyson Foods, Inc., 629 F.3d at 1232.

Risk Management filed the Motion to Intervene on November 6, 2018.  See Motion to Intervene at 1.  The MSJ was filed December 7, 2018.  See MSJ at 1.  Ortiz' argument that the Motion to Intervene is not timely "until such a time that a court determines if at all, that" Bearden was acting within the scope of his duty, Intervention Response at 2, raises a question of fact that does not bear on whether intervention is timely under rule 24(a), see Morgan v. Carrejo, 2013 WL 12330025, at *4 (concluding that Risk Management's "obligation to pay damages in this lawsuit is directly related to whether" the defendant "was acting in the scope of duty," so Risk Management "clearly has an interest in seeking an answer to the question of whether it has a duty to defend and indemnify" the defendant "should the jury find that the alleged facts occurred"). Risk Management states that it wishes to intervene, so that it can argue that Bearden's "violent rapes . . . were outside the course and scope of his employment and outside the scope of his duties." Motion to Intervene at 4.  Were Risk Management not permitted to intervene until after the scope-of-duty question is answered, Risk Management's interests in the case already would be determined, because Risk Management is obligated under New Mexico law to cover liability for

torts and civil rights violations that public employees "acting within the scope of" their duty

commit.  N.M.S.A. §§ 41-4-4.  Because this "case is still in the early stages of discovery and no

depositions have been taken," Morgan v. Carrejo, 2013 WL 12330025, at * 2, there is no indication

of a significant delay between when Risk Management was "on notice that its interests may not be

protected by a party already in the case" and when Risk Management asked the Court to intervene.

Okla. ex rel. Edmonson v. Tyson Foods, 619 F.3d at 1233.  Because Risk Management filed the

Motion to Intervene relatively early in the litigation -- seven days after the Second Amended

Complaint was filed, and over a year before the MSJ -- there will be no prejudice to the existing

parties if Risk Management intervenes.  Accordingly, the Court concludes that the Motion to

Intervene is timely.

Second, Risk Management demonstrates that it has an interest in the subject of this lawsuit.

Determining whether a party has "an interest sufficient to warrant intervention as a matter of right

is a highly fact-specific determination."  Western Energy All. v. Zinke, 877 F.3d at 1165 (quoting

Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of Interior, 100 F.3d 837, 841).

Although the Tenth Circuit notes that interest must be "'direct, substantial, and legally

protectable,'" Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1251 (quoting In re Kaiser Steel Corp.,

998 F.2d at 791), it stresses that this standard "must yield to pragmatic concerns," San Juan Cnty.,

Utah v. United States, 503 F.3d at 1196.  A party, therefore, has a protectable interest if it "would

be 'impeded by the disposition of the action.'" San Juan Cnty., Utah v. United States, 503 F.3d at

1203 (quoting Allard v. Frizzell, 563 F.2d 1332, 1334 (10th Cir. 1976)(per curiam)).  The parties

agree that, because New Mexico law obligates Risk Management to pay any settlement or final

judgment against the Defendants in this case if a jury finds they were acting within the scope of

their duty, N.M.S.A. §§ 41-4-4, it has an interest related to the subject of this action.  See Motion

to Intervene at 5; Intervention Response at 2.  See also Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d at 1115 ("The threat of economic injury from the outcome of litigation undoubtedly gives a petitioner the requisite interest.").

Third, Risk Management's interest may be impaired or impeded if a jury finds that either Bearden, Nunez, or Gonzales acted within the scope of his duties.  An interest may be impaired or impeded if "it is 'possible' that" the party's interest will be impaired.  Western Energy All. v. Zinke, 877 F.3d at 1167 (quoting WildEarth Guardians v. National Park Serv., 604 F.3d at 1199).  This standard presents a "minimal burden" for a party seeking to intervene to overcome.  WildEarth Guardians v. National Park Serv., 604 F.3d at 1199.  Ortiz argues that Risk Management's interests will not be impeded, because there is "no plausible doubt that John Bearden was acting in the scope and course of his employment when he gained access to Plaintiff as a prisoner in the New Mexico correction department."  Intervention Response at 3.  Ortiz asks the Court to, in effect, foreclose the argument that Risk Management asks to make if it intervenes by making a factual determination about the scope of Bearden's duty.  The scope of Bearden's employment is a question for the jury, and the one that Risk Management wants to address by intervening.  See Motion to Intervene at 4.  Ortiz' contention that this action's outcome will not impede Risk Management's interest therefore does not persuade the Court. Risk Management has shown that it is "'possible'" their interest will be impaired.  Western Energy All. v. Zinke, 877 F.3d at 1167 (quoting WildEarth Guardians v. National Park Serv., 604 F.3d at 1199).

Fourth, even though Mr. Dickman represents both Risk Management and the non-Bearden Defendants, Risk Management's interests are not represented adequately, because the parties have different interests.  Risk Management bears the burden of showing that "no existing party adequately represents its interest."  Coal. Of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't

of Interior, 100 F.3d at 844.  Ortiz asserts that Risk Management's interest are already protected adequately because Mr. Dickman represents all the remaining Defendants except Bearden.  See Intervention Response at 2.  Risk Management counters that, because Ortiz has sued Bearden in his individual capacity, without Risk Management, "there is no one to argue the scope-of-duty issue."  Intervention Reply at 6.  Rule 24(a) does not state that existing parties adequately represent the interests of other parties if those parties share an attorney.  See Fed. R. Civ. P. 24(a).  Rather, the focus is on the parties' interests.  See Fed. R. Civ. P. 24(a).  The Tenth Circuit notes that courts should not assume that a party can represent simultaneously the public's interest and the interests of a particular member of the public.  Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1255-56 ("[R]epresentation of the public interest generally cannot be assumed to be identical to the individual parochial interest of a particular member of the public merely because both entities occupy the same posture in the litigation.").  Moreover, following the Tenth Circuit in Western Energy All. v. Zinke, the Court does "not assume that the government agency's position will stay 'static or unaffected by unanticipated policy shifts.'"  877 F.3d at 1186 (quoting Utah Ass'n of Cntys. v. Clinton, 355 F.3d at 1256).

Risk Management has satisfied rule 24(a)'s requirements for intervention as a matter of right in similar circumstances.  See Morgan v. Carrejo, 2013 WL 12330025, at *4; Soto v. Galvan, 2007 WL 9734042, at *2.  In Morgan v. Carrejo, Risk Management satisfied rule 24(a)'s requirements for intervention of right in circumstances similar to those of this case.  2013 WL 12330025.  In Morgan v. Carrejo, the plaintiff asserted a claim for excessive force under the Eighth Amendment, because a sexual assaulted the plaintiff while the plaintiff was an inmate.  2007 WL 9734042, at *1.  The Honorable William P. Johnson, United States District Judge for the District of New Mexico, explained that the existing parties did not have an interest in arguing the same

"scope of duty" position that Risk Management sought to argue.  2007 WL 9734042, at 4.  "In fact, both parties have an interest in arguing just the opposite -- that the alleged sexual assaults were carried out within the scope of the [defendant's] duty."  2007 WL 9734042, at *4.  There, the defendant looked to Risk Management "to provide a defense and to pay any future settlement or judgment, and Plaintiff has an interest in having a future judgment paid out of state coffers rather than risk having to contend with Defendant's discharge in bankruptcy."  2007 WL 9734042, at *4 (citing Healey v. Scovone, 188 F.3d 518 (10th Cir. 1999)).

The existing parties intend to argue that the Bearden's and the other Defendants' actions were within the scope of their duties.  See Intervention Response at 3-6; Bearden Interv. Resp. Joinder at 1.  Risk Management states that it intends to argue the opposite.  See Motion to Intervene at 4.  To meet the adequate-representation requirements of rule 24(a), the divergence of interest between the movant and a party "need not be 'great' to satisfy [the] minimal burden."  Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d at 1117 (quoting Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n, 578 F.2d 1341, 1346 (10th Cir. 1978)).  The Court concludes, therefore, that Risk Management meets its burden to show that existing parties do not adequately protected its interest, even though Mr. Dickman represents both Risk Management and some of the existing Defendants.  The reality is that Mr. Gardner has an ethical obligation to represent Bearden and his interests.  It is not in Bearden's interest to lose his insurance coverage.  Risk Management has its own interests, and Mr. Dickman acts like any other coverage attorney -- arguing Risk Management's position that there is no coverage.  Mr. Gardner and Mr. Dickman do not have the same interests or ethical obligations.  The Court should allow Risk Management and Mr. Dickman to intervene to argue Risk Management does have to cover Bearden, which is not

Bearden's position.  It is also in Ortiz' interest argue that Bearden acted within the scope of his duties.  The Court, therefore, grants the Motion to Intervene.

## II.     BEARDEN IS ENTITLED TO ADOPT BY REFERENCE THE ARGUMENTS IN THE INTERVENTION RESPONSE AND THE MSJ, BECAUSE D.N.M. LR-CIV. 7.1(A) PERMITS IT.

Bearden asks to join both the Intervention Response, see Bearden Interv. Resp. Joinder at 1, and the MSJ, see Bearden Joinder at 1.  In the Bearden Interv. Resp. Joinder, Bearden provides notice to the Court that he "adopts by reference and incorporates herein the arguments, points and authorities" of the Intervention Response.  Bearden Interv. Resp. Joinder at 1.  Similarly, in the Bearden Joinder, Bearden provides notice to the Court that he "adopts by reference and incorporates herein the arguments, exhibits, points and authorities of the" MSJ "insofar as they apply to Bearden."  Bearden Joinder at 1.  Specifically, Bearden "joins" the MSJ in "seeking the dismissal of counts 1-4" in the Second Amended Complaint.  Bearden Joinder at 1.  Both the Bearden Interv. Resp. Joinder and the Bearden Joinder state that they are seeking to join "pursuant to" rule 10(c) of the Federal Rules of Civil Procedure.  Bearden Interv. Resp. Joinder at 1; Bearden Joinder at 1.

The processes that rule 10 and D.N.M. LR-Civ. 7.1(a) address cover adoption by reference, often referred to as "incorporation."  See Young v. Addison, 490 F. App'x 960, 964 (10th Cir. 2012)(noting that "Federal Rule of Civil Procedure 10(c) allows incorporation by reference in pleadings").  These rules do not discuss "joinder."  Rules 18, 19, 20, and 21 of the Federal Rules of Civil Procedure govern "joinder," the process of joining parties or claims to consolidate litigation.  As the Supreme Court has explained, the philosophy of the joinder provisions is "toward entertaining the broadest possible scope of action consistent with fairness to the parties."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966).  For that reason, "joinder of claims,

parties and remedies is strongly encouraged." United Mine Workers of Am. v. Gibbs, 383 U.S. at

724. The federal judiciary has "an obvious interest in every litigation in having the whole case

tried at one time." Hargrave v. Oki Nursery, Inc., 646 F.2d 716, 720 (2d Cir. 1980).

Incorporation by reference is a different doctrine. It "takes several forms, depending on

whether the primary document -- the document that incorporates the secondary document by

reference -- is a patent, contract, will, pleading, or motion." Macias v. N.M. Dep't of Labor, 300

F.R.D at 561. Rule 10(c) allows a "statement in a pleading" to be "adopted by reference elsewhere

in the same pleading or in any other pleading or motion." Fed. R. Civ. P. 10(c). Documents that

are "pleadings" are defined in rule 7(a) of the Federal Rules of Civil Procedure, which states that

the pleadings enumerated are the "only" ones "allowed." Fed. R. Civ. P. 7(a). Under rule 7,

Pleadings are limited to: "(1) a complaint; (2) an answer to a complaint; (3) an answer to a

counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party

complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an

answer." Fed. R. Civ. P. 7(a). See Sec. Ins. Co. of Hartford v. Clovis Ins. Center, Inc., No. CIV

04-1246 JB/ACT, 2006 WL 8444163, at *4 (D.N.M. May 10, 2006)(Browning, J.)(noting that

pleadings "typically include complaints, answers, replies to counterclaims, third-party complaints,

and third[-]party answers"). Motions are not included in the list of "pleadings." See Fed. R. Civ.

P. 7(a); Fed. R. Civ. P. 7(b) (discussing motions separately from pleadings). Under rule 10(c),

statements in motions typically may not be incorporated by reference. See Wright & Miller supra

§ 1326 ("Rule 10(c) does not contemplate the incorporation of statements from prior motions (only

statements 'in a pleading' may be adopted by reference elsewhere).").

Although the rule Bearden cites -- rule 10(c) -- does not permit him to do what he requests,

Bearden is entitled to adopt by reference the arguments both from the Motion to Intervene and the

MSJ.  D.N.M. LR-Civ. 7.1(a) permits parties to "adopt by reference another party's motion." D.N.M. LR-Civ. 7.1(a).  Incorporation or adoption by reference through D.N.M. LR-Civ. 7.1(a) is not appropriate when: (i) a party "purport[s] to incorporate *its* [own] response to a separate motion" and tries to make "an end run around page limits"; (ii) a purported incorporation "violates the local rules for summary judgment briefing" by not allowing the non-movant to "see the entire field of facts on which the movant depends"; and (iii) it requires the Court to draw inferences that "make[] no sense" "in the summary judgment context" because the  Court would have to make inferences in favor of the movant.  Herrera v. Santa Fe Pub. Schs., 41 F. Supp. 3d 1188, 1239 n. 75.  (D.N.M. 2014)(Browning, J.)(emphasis in original).

None of these considerations applies here.  Neither the Bearden Interv. Resp. Joinder nor the Bearden Joinder attempts to make an end-run around page limits or affects how Ortiz responds to the MSJ or how the Court analyzes the MSJ.  D.N.M. LR-Civ. 7.1(a)'s purpose is to "promote judicial efficiency and economy by precluding the unnecessary filing of motions, responses, and orders."  Hooten v. Ikard Servi Gas, 525 F. App'x 663, 667 (10th Cir. 2013).  By filing the Bearden Interv. Resp. Joinder and the Bearden Joinder, Bearden does not have to file either a duplicative response to the Motion to Intervene or a duplicative motion for summary judgment.  Although the rule that Bearden invokes, rule 10(c), does not allow Bearden to do what he asks, D.N.M. LR-Civ. 7.1(a) permits parties to adopt by reference arguments in motions.  The Court concludes, therefore, that, although Bearden cites the wrong rule, he is entitled to adopt by reference the arguments in both the Intervention Response and the MSJ.

**III.     THE COURT DISMISSES THE DUE PROCESS, EQUAL PROTECTION, AND FOURTH AMENDMENT CLAIMS, BECAUSE ALLEGATIONS OF RAPE AND SEXUAL ASSAULT IN PRISON ARE ANALYZED UNDER THE EIGHTH <u>AMENDMENT</u>.**

The MSJ includes arguments under rule 12(b)(6).  See MSJ at 2.  The MSJ states that "Defendants have chosen to file a single motion asserting and combining all of the grounds for dismissal and/or summary judgment."  MSJ at 2.[120] The Defendants argue that Ortiz' complaint

> breaches a cardinal rule of pleading under rule 8: he has sued all six individual defendants in their individual capacities . . . for their alleged violation of his constitutional rights, but he consistently uses the general, collective term "Defendants" or else refers to all of them in an undifferentiated manner.

MSJ at 18.  Thus, the MSJ states, Ortiz "fails to specify 'exactly *who* is alleged to have done *what* to *whom*' and fails to give each defendant 'fair notice as to the basis of the claims against him or her, as distinguished from collective allegations."  MSJ at 18 (quoting Robbins v. Oklahoma, 519 F.3d 1242, 1250 (10th Cir. 2008)(italics in Robbins v. Oklahoma).  In addition, the Bearden MSJ Reply states that Ortiz has not provided sufficient allegations to state separate causes of action under the Fourth Amendment, Fourteenth Amendment, and Eighth Amendment, because "even though an inmate's safety and bodily integrity concerns could implicate the Fourteenth Amendment's substantive due process clause," as well as Fourth Amendment protections against invasive searches, "such claims are to be analyzed under the standards that govern Eighth Amendment claims."  Bearden MSJ Reply at 4.

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has

---

[120]The Court notes that combining a motion under rule 12(b)(6) with a summary judgment motion is unusual, but not prohibited.  See Mann v. Hutchinson Pub. Schs., 202 F.3d 282 (table), at *1-2 (10th Cir. 1999)("A Rule 12(b) motion to dismiss may be 'made in any pleading . . ., or by motion for judgment on the pleadings, or at the trial on the merits.'"); Weatherhead v. Globe Int'l, Inc., 832 F.2d 1226, 1228 (10th Cir. 1987)("In other words, a defense of dismissal is waived only when presented after trial.").

facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). This standard requires "'more than a sheer possibility that a defendant has acted unlawfully.'" Nowell v. Medtronic Inc., 372 F. Supp. 3d 1166, 1245 (D.N.M. 2019)(Browning, J.)(quoting Ashcroft v. Iqbal, 556 U.S. at 678).

The Court concludes that, even though Ortiz' complaint does not violate rule 8's notice-pleading requirements, claims of excessive force arising out of rape or sexual assault in prison are properly analyzed under the Eighth Amendment. See Graham v. Connor, 490 U.S. 386, 394-95 (1989). The Court will, therefore, dismiss the due process, equal protection, and Fourth Amendment claims, because any protection these provisions "afford[] convicted prisoners against excessive force is . . . at best redundant of that provided by the Eighth Amendment." Graham v. Connor, 490 U.S. at 395 n.10. Accordingly, because -- other than what gives rights to an Eighth Amendment claim -- all of Ortiz' allegations that any of the Defendants violated Ortiz' due process, equal protection, or Fourth Amendment rights are conclusory, the Court dismisses Counts 1, 2, and 4 with respect to all Defendants -- including Bearden.

## A.   ORTIZ' COMPLAINT DOES NOT VIOLATE RULE 8'S NOTICE-PLEADING REQUIREMENTS.

The MSJ contends that the Second Amended Complaint violates rule 8's pleading requirements, see Fed. R. Civ. P. 8(a), because it does not put the Defendants on notice regarding "'*exactly* who is alleged to have done *what* to *whom*,'" MSJ at 18 (quoting Robbins v. Oklahoma, 519 F.3d at 1250)(italics in Robbins v. Oklahoma). The MSJ Response does not respond to this allegation. See MSJ Response. To state a claim for relief, a complaint must contain: "(1) a short and plain statement of the grounds for the court's jurisdiction . . . ; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought . .

. .” Fed. R. Civ. P. 8(a).  Allegations in a complaint must "be enough to raise a right to relief above

the speculative level on the assumption that all of the complaint's allegations are true."  Bell Atl.

Corp. v. Twombly, 550 U.S. at 545.  See Ashcroft v. Iqbal, 556 U.S. at 679-80.  The United States

Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in
> a complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the
> line from conceivable to plausible."   The allegations must be enough that, if
> assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for
> relief.

Robbins v. Oklahoma, 519 F.3d at 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550

U.S. at 570).  "By complying with these requirements, a complaint will provide notice to the

opposing party of the basis of the claims against them and will also permit the court to determine

whether the allegations, if proven, will entitle the plaintiff to relief."  Richeson v. United States,

2021 WL 868485, at *2.  The Court concludes that the Second Amended Complaint satisfies rule

8, because it "provides allegations which are clear enough so that the opposing party and the court

can discern a factual and legal basis for" the claims.  Richeson v. United States, 2021 WL 868485,

at *2.

Many of the allegations in the Second Amended Complaint are conclusory.  The Second

Amended Complaint states that the "training the State of New Mexico, the New Mexico

Corrections Department, WNMCF, the Warden, Deputy Warden, and other supervisors provided

Bearden and other personnel did not fulfill the duty required by the PREA and other applicable

state or federal laws," which "created a dangerous condition on the property," including a

"significant risk of harm from sexual assault to all the inmates."  Second Amended Complaint ¶

24, at 7.  The Second Amended Complaint, however, does not contain details of the training or

specify why it is insufficient.  See Second Amended Complaint at 1-16.  Ortiz also alleges that

"Defendants Warden, Deputy Warden, Jason Baca, Gary Trujillo, STIU Officer Damien Nunez, STIU Officer Carlos Gonzales, and other officers" both knew Bearden was making sexual advances, "yet did not act to stop it by adopting or enforcing appropriate policies, training, discipline, or investigation procedures," and "perpetuated lax inmate protections and a culture that allowed" the sexual abuse to continue.  Second Amended Complaint ¶¶ 25-26, at 8.  Ortiz does not, however, supply any details about what policies, training, discipline, or investigation procedures might have been sufficient, or whether the Defendants considered any of changes. Moreover, Ortiz does not specify how the inmate protections were "lax" or how the culture at Western NM allowed sexual abuse to happen.  Second Amended Complaint ¶¶ 25-26, at 8

Ortiz' allegations in the Second Amended Complaint nevertheless set forth sufficient facts to "state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. at 1974.   The Second Amended Complaint states that "Bearden became intensely interested in Mr. Ortiz shortly after Mr. Ortiz began his detention at WNMCF toward the end of September 2015."  Second Amended Complaint ¶ 14, at 4. Ortiz alleges that "Bearden's criminal conduct," including his "interest in having a sexual relationship with Mr. Ortiz," was "in full view of Jason Baca, Gary Trujillo, the Warden and Deputy Warden, their employees, and/or agents, other corrections officers, and inmates."  Second Amended Complaint ¶ 17, at 5.  Ortiz notes that, over a period of two weeks beginning late-September, 2015, "Bearden's behavior toward Mr. Ortiz became predatory," and included "flirting and unwanted kissing, and quickly came to include unwanted touching and groping Mr. Ortiz's body, including his buttocks and genitalia."  Second Amended Complaint ¶ 18, at 5.  Ortiz asserts that other inmates noticed this behavior, which caused them "to classify Mr. Ortiz as 'Officer Bearden's favorite.''  Second Amended Complaint ¶ 19, at 6.  Ortiz alleges that "Bearden violently raped Mr. Ortiz" on two occasions during this two-week

period.  Second Amended Complaint ¶ 23, at 7.  During the first rape, Bearden "became angry when Mr. Ortiz did not respond"; during the second, "Mr. Ortiz resorted to desperate actions to stop the rape, but only after Bearden had completed the rape and digital penetration."  Second Amended Complaint ¶ 23, at 7.  According to the Second Amended Complaint, Bearden again raped Ortiz on October 18, 2015, between 2:00 a.m. and 3:30 a.m. by "forcefully remov[ing]" him to the H-Unit[121] stairway, where Bearden "ordered Mr. Ortiz to remove his shirt, pants, and underwear," handcuffed Ortiz, and "maneuvered himself to trap Mr. Ortiz into a corner of the stairwell."  Second Amended Complaint ¶¶ 28-30, at 5-6.

The Second Amended Complaint also alleges sufficiently specific allegations against the other Defendants. Ortiz alleges that before the rape, "the State of New Mexico, New Mexico Department of Corrections, STIU Officer D. Nunez, STIU Officer Carlos Gonzales, and WNMCF officials, including the Warden, Deputy Warden, Jason Baca, and Gary Trujillo, were informed by another inmate that Mr. Ortiz was selling drugs," so they began to monitor Oritz' telephone calls and "discovered some of the letters from Bearden."  Second Amended Complaint ¶ 35, at 10-11. The Second Amended Complaint states that monitoring and discovery is when these Defendants "learned of the inappropriate sexual attraction that" Bearden had for Ortiz.  Second Amended Complaint ¶ 35, at 11.  Ortiz' alleges that, though the Defendants knew of Bearden's sexual advances, they "chose to use Mr. Ortiz as bate to catch Bearden in the act of bringing drugs into the facility."  Second Amended Complaint ¶ 35, at 11.

In Richeson v. United States, 2021 WL 868485, the Tenth Circuit concluded that a complaint did not meet rule 8's requirements, because the plaintiff did "not have all the facts and

---

[121]The "H-Unit" is the "Housing Unit #2, Upper Level," a section of Western NM.  Second Amended Complaint ¶ 9, at 3.

details of his case," could not provide "an exacting account of his injury," and the eighty-four pages of attachments to the complaint could only "provide a few pieces of the puzzle as to what happened."  2021 WL 868485, at *2.  The complaint contained a "general allegation of wrongdoing." 2021 WL 868485, at *2.  Similarly, in Robbins v. Oklahoma, 519 F.3d 1242, the Tenth Circuit noted that a complaint that "contains almost no allegations that are neither conclusory nor vacuous," 519 F.3d at 1252, and "fails to differentiate among individual defendants and specify which defendants are alleged to have taken which particular actions," does not meet rule 8's requirements.  519 F.3d at 1253.  Ortiz alleges that Bearden raped him, and that the other Defendants knew about it but failed to intervene.  The Court concludes, therefore, that, although some of the allegations could be more specific, the Second Amended Complaint satisfies rule 8's requirements, because Ortiz "does not need to provide exact details to state a claim for relied under Rule 8."  Richeson v. United States, 2021 WL 868485, at *2.

   **B.   THE COURT DISMISSES THE DUE PROCESS, EQUAL PROTECTION, AND FOURTH AMENDMENT CLAIMS, BECAUSE THE TENTH CIRCUIT CONSISTENTLY ANALYZES RAPE AND SEXUAL ASSAULT IN PRISON UNDER THE EIGHTH AMENDMENT'S BAN ON CRUEL-AND-UNUSUAL PUNISHMENT.**

   Pursuant to § 1983, Ortiz alleges violations of the Eighth Amendment, Due Process and Equal Protection clauses of the Fourteenth Amendment, the Fourth Amendment.  See Second Amended Complaint ¶¶42-65, at 12-15.  In the MSJ, the Defendants state that they "could have raised some of the grounds asserted herein pursuant to" rule 12(b)(6), but instead they chose "to file a single motion asserting and combining all of the grounds for dismissal and/or summary judgment."  MSJ at 2.  The Court agrees that Ortiz' due process, equal protection, and Fourth Amendment claims should be dismissed.   These various constitutional provisions do not independently and concurrently give rise to liability.  See Graham v. Connor, 490 U.S. at 395.  See

also Ullery v. Raemisch, No. 18-CIV-0839-STV, 2019 WL 529570, at * 11 (D. Colo. Feb. 9. 2019)(Varholak, M.J.)(explaining that the Plaintiff was incorrect that the "'Eighth Amendment and the substantive due process clause of the Fourteenth Amendment are distinct bases for state liability" because the "Tenth Circuit has consistently evaluated the violation of a prisoner's right to 'bodily integrity' resulting from sexual assault under the Eighth Amendment (quoting the plaintiff's response to the defendant's motion to dismiss)).

       The "right to be secure in one's bodily integrity includes the right to be free from sexual abuse."   Smith v. Cochran, 339 F.3d 1205, 1212 (10th Cir. 2003).   The Tenth Circuit has consistently analyzed, however, violations of a prisoner's right to bodily integrity that result from sexual assault under the Eighth Amendment, not the Fourth Amendment or the Fourteenth Amendment's due process clause.   See Smith v. Cochran, 339 F.3d at 1212 ("Sexual abuse is repugnant to contemporary standards of decency and allegations of sexual abuse can satisfy the objective component of an Eighth Amendment excessive force claim."); Barney v. Pulsipher, 143 F.3d 1299, 1310 (10th Cir. 1998)("[P]laintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment.").   In addition, the Supreme Court explains that rights that are protected by specific constitutional provisions should be analyzed under those provisions and not others.   See Graham v. Connor, 490 U.S. at 395 ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.")(no citation for quotation); Berry v. City of Muskogee, Okla., 900 F.2d 1494 ("[C]laims for excessive force against convicted prisoners should be analyzed under the Eighth and not the Fourteenth Amendment.").

Dismissing Counts 1, 2, and 4 does not change the level of constitutional protection afforded the right to bodily integrity that rape and sexual assault in prison offends, because "the legal standards under" the Eighth Amendment and substantive due process rights are "identical." Berry v. City of Muskogee, Okla., 900 F.2d at 1496 n.6. Similarly, the Supreme Court explains that "[a]ny protection that 'substantive due process affords convicted prisoners against excessive force is, we have held, at best redundant of that provided by the Eighth Amendment.'" Graham v. Connor, 490 U.S. at 395 n.10. Although this analysis applies specifically to the comparison between the Eighth Amendment and substantive due process, the Court concludes that it also extends to the protections under procedural due process and the Fourth Amendment, because the Eighth Amendment "provides an explicit textual source of constitutional protection against" rape and sexual assault in prison. See Graham v. Sheriff of Logan Cnty., 741 F.3d at 1123; Berry v. City of Muskogee, Okla., 900 F.2d at 1494. Accordingly, the Court dismisses Counts 1, 2, and 4 of Ortiz' Second Amended Complaint.

## IV.   A REASONABLE JURY COULD FIND THAT BEARDEN, NUNEZ, AND GONZALES BEARDEN ACTED WITH DELIBERATE INDIFFERENCE IN VIOLATION OF ORTIZ' EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL-AND-UNUSUAL PUNISHMENT.

Accepting Ortiz' allegations as plausibly true and viewing them in the light most favorable to him, they establish the elements of an Eighth Amendment excessive-force claim against Nunez, Gonzales, and Bearden. The Court concludes that there is sufficient evidence for a reasonable jury to find that Nunez, Gonzales, and Bearden acted with deliberate indifference in violation of the Eighth Amendment. Further, because it was clearly established that sexual assault of inmates by correctional officers violates the Eighth Amendment, and because prison rape is a particularly egregious violation such that no reasonable officer could conclude they are acting lawfully, neither

Nunez, Gonzales, nor Bearden is entitled to qualified immunity. Accordingly, the Court denies the MSJ with respect to Nunez, Gonzales, and Bearden for Count 3.

As a threshold matter, "review of summary judgment in the qualified immunity context differs from that applicable to review of other summary judgment decisions." Thomson v. Salt Lake Cnty., 584 F.3d at 1312. "In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to the plaintiff as the nonmoving party." Thomson v. Salt Lake Cnty., 584 F.3d at 1312. The plaintiff "'must demonstrate *on the facts alleged* both that the defendant violated his constitutional or statutory rights, and that the right was clearly established.'" Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (quoting Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009)(emphasis added in Thomson v. Salt Lake Cnty.). A plaintiff's version of the facts, however, "must find support in the record." Thomson v. Salt Lake Cnty., 584 F.3d at 1312. Just with any motion for summary judgment, "'[w]hen opposing parties tell two different stories, one is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott v. Harris 550 U.S. at 280). See Thomson v. Salt Lake Cnty., 584 F.3d at 1312.

"At the summary-judgment phase, a federal court's factual analysis relative to the qualified-immunity question is distinct." Cox v. Glanz, 800 F.3d 1231, 1243 (10th Cir. 2015).

> "[T]he objective is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury. Instead, the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court."

Cox v. Glanz, 800 F.3d at 1243 (quoting Thomson v. Salt Lake Cnty., 584 F.3d at 1232 (Holmes, J., concurring)). See Tolan v. Cotton, 572 U.S. 650, 655-56 (2014)("In resolving questions of

qualified immunity at summary judgment, courts engage in a two-pronged inquiry.  The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'")(alterations in original)(quoting <u>Saucier v. Katz</u>, 533 U.S. at 201).  When a defendant asserts qualified immunity at the summary-judgment stage, therefore, the burden shifts to the plaintiff to show that: (i) a reasonable jury could find the defendant violated a constitutional or statutory right and (ii) the constitutional right was clearly established at the time in question.  <u>See</u> <u>Estate of Jensen by Jensen v. Clyde</u>, 989 F.3d 848, 854 (10th Cir. 2021)(citing <u>Ullrey v. Bradley</u>, 949 F.3d 1282, 1289 (10th Cir. 2020)).

A prison official "may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  <u>Farmer v. Brennan</u>, 511 U.S. at 847.  "The prisoner must show 'the alleged injury or deprivation [is] sufficiently serious' and 'the prison official must have a sufficiently capable state of mind to violate the constitutional standard.'"  <u>Lobozzo v. Colorado Dep't of Corr.</u>, 429 F. App'x at 710 (quoting <u>Farmer v. Brennan</u>, 511 U.S. at 832).  A prison official "cannot be found liable under the Eighth Amendment for denying an inmate human conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety."  <u>Farmer v. Brennan</u>, 511 U.S. at 837.

Vicarious liability does not apply in the § 1983 context, so Ortiz must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution."  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 676.  <u>See</u> <u>Rombach v. Culpepper</u>, 2021 WL 2944809, at *5 n.7 (5th Cir. 2021)("An officer-by-officer analysis is necessary when determining whether any officer acted with deliberate indifference to a prisoner's serious medical needs.").  The Defendants must "both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. at

837. "To state a claim for cruel-and-unusual punishment, a plaintiff must assert (i) the deprivation

was objectively serious; and (ii) the officer exhibited deliberate indifference – knowledge

pertaining to a substantial risk of serious harm and inaction to remedy the harm -- to an inmate's

health and safety." Davitt v. Doe, 429 F.Supp. 3d 947, 983 (D.N.M. 2019)(Browning, J.)(citing

Adkins v. Rodriguez, 59 F.3d 1034, 1037 (10th Cir. 1995)). See Graham v. Sheriff of Logan

Cnty., 742 F.3d at 1123 ("'Ordinarily, an excessive force claim involves two prongs: (1) an

objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a

constitutional violation, and (2) a subjective prong under which the plaintiff must show that the

official acted with a sufficiently culpable state of mind.'")(quoting Giron v. Corr. Corp. of

America, 191 F.3d 1281, 1298 (10th Cir. 1999).   The deliberate-indifference test has three

requirements.  See Perry v. Durborow, 892 F.3d 1116, 1122 (10th Cir. 2018).  A plaintiff must

show (i) that a defendant was aware of facts from which the inference could be drawn that a

substantial risk of serious harm existed; (ii) that the defendant actually drew that inference; and

(iii) that the defendant was aware of and failed to take reasonable steps to alleviate the risk.  See

Perry v. Durborow, 892 F.3d at 1122; Keith v. Koerner, 843 F.3d 944, 848 (10th Cir. 2016).

Because Nunez and Gonzales were aware that, on multiple occasions, Ortiz told his mother he was

"playing the part" in his relationship with Bearden, and that Ortiz and Bearden's relationship

violated prison policy and New Mexico criminal law -- both of which state that inmates are

incapable of giving consent -- a reasonable jury could conclude that they actually drew the

inference that Bearden was sexually assaulting Ortiz, and that they therefore acted with deliberate

indifference in violation of Ortiz' Eighth Amendment rights.  See MSJ ¶ 19, at 13.  Ortiz also has

provided sufficient facts for a reasonable jury to conclude that Bearden "forced sex" on him.

Graham v. Sheriff of Logan Cnty., 741 F.3d at 1123.  In addition, because (i) that prison officials'
deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment was
clearly established; and (ii) prison rape and deliberate indifference to prison rape are particularly
egregious violations such that no reasonable officer could conclude that he or she was acting
lawfully, Gonzales, Nunez, and Bearden are not entitled to qualified immunity.  See Keith v.
Koerner, 843 F.3d 833, 849-50 (10th Cir. 2016); Taylor, 141 S. Ct. at 52.

## A.   ORTIZ' ALLEGATIONS SATISFY THE ELEMENTS OF AN EIGHTH AMENDMENT CLAIM ONLY AGAINST GONZALES, NUNEZ, AND BEARDEN.

First, it is "undisputed that sexual assault satisfies this objective component of an Eighth
Amendment claim."  Poore v. Glanz, F. App'x 635, 639 (10th Cir. 2018).  See Hovater v.
Robinson, 1 F.3d 1063, 1068 (10th Cir. 1993)("[A]n inmate has a constitutional right to be secure
in her bodily integrity and free from attack by prison guards.").  "Sexual abuse of an inmate by an
officer violates the Eighth Amendment."  Graham v. Sheriff of Logan Cnty., 741 F.3d 1118, 1122
(10th Cir. 2013).  The Tenth Circuit states: "'Like the rape of an inmate by another inmate, sexual
abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is simply
not part of the penalty that criminal offenders pay for their offenses against society.'"  Graham v.
Sherriff of Logan Cnty., 741 F.3d at 1122-23 (quoting Giron v. Corr. Corp. of America, 191 F.3d
at 1290)(internal citation and quotation omissions in Graham v. Sherriff of Logan Cnty.).  Because
Ortiz alleges that Bearden sexually assaulted him, see Second Amended Complaint ¶ 28, at 5, and
raped him twice, see Second Amended Complaint ¶23, at 7, and the other Defendants knew about
it or knowingly allowed it to happen, see Second Amended Complaint ¶¶ 54-59, at 14, the Court
concludes that Ortiz satisfies the first, objective element of an Eighth Amendment claim.  See
Smith v. Cochran, 339 F.3d at 1212 ("Sexual abuse is repugnant to contemporary standards of

decency and allegations of sexual abuse can satisfy the objective component of an Eighth Amendment excessive force claim."); Barney v. Pulsipher, 143 F.3d at 1310 ("[P]laintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment.").

Second, Ortiz alleges sufficient facts for a reasonable jury to conclude only that Nunez, Gonzales, and Bearden were deliberately indifferent to his health and safety.  Even in a light most favorable to Ortiz, no reasonable jury could conclude that Perez, Baca, or Trujillo were "aware of facts from which the inference could be drawn that" Bearden was raping or sexually assaulting Ortiz.  Perry v. Durborow, 892 F.3d at 1122.  The parties do not dispute that, when STIU received the anonymous tip that Ortiz was getting illicit drugs from his mother and smuggling them into Western NM, only Gonzales, Nunez, Fawley, and Scott either were monitoring Ortiz' phone calls or were aware the monitoring was happening.  See MSJ ¶ 8, at 9 (asserting this fact)(citing Gonzales Aff. ¶ 5, at 2-3; Nunez Aff. ¶ 5, at 1-2).  Fawley and Scott are not named as Defendants in this suit, however.  Ortiz does not offer any evidence that officials at Western NM learned about the relationship between Ortiz and Bearden other than through Ortiz' telephone calls or the handwritten letters. The parties do not dispute that it was the STIU officers who searched Ortiz' cell, where they discovered the first handwritten letter.  See MSJ ¶ 14, at 11 (asserting this fact)(citing Gonzales Aff. ¶ 9, at 4).  When the second letter was found in the parking lot in October, 2015, there is no evidence anyone other than the STIU officers saw it.  See MSJ ¶ 16, at 12 (asserting this fact)(citing Gonzales Aff. ¶ 11, at 4-5).  Ortiz offers no evidence which suggests that the STIU officers were convinced only that Ortiz and Bearden were collaborating to smuggle drugs into the prison, and that they had an "inappropriate relationship" on October 22 or 23, 2015. See MSJ ¶ 18, at 12-13 (asserting this fact)(citing Gonzales Aff. ¶ 13, at 5; Nunez Aff. ¶ 6, at 2).

There is no dispute that the earliest Perez and Baca learned of Ortiz and Bearden's relationship was October 23, 2015, when STIU officers Scott and Cavasos -- neither of whom is named as a defendant -- met with them to update them on the investigation.  See MSJ ¶ 21, at 13 (asserting this fact)(citing Gonzales Aff. ¶ 14, at 5).  Bearden was intercepted before beginning his shift and interviewed that same day.  See MSJ ¶ 21, at 13-14 (asserting this fact)(citing Gonzales Aff. ¶ 14, at 6).  Ortiz does not dispute that, when Perez and Baca learned about Ortiz and Bearden's relationship, they responded the same day.  See MSJ ¶ 21, at 13-14 (asserting this fact)(citing Gonzales Aff. ¶ 14, at 6).  Prison officials who "actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Farmer v. Brennan, 511 U.S. at 844-45.  See Howard v. Waide, 534 F.3d 1227, 1239 (10th Cir. 2008).  Even though "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," Farmer v. Brennan, 511 U.S. at 842, Ortiz has not produced any evidence that Perez, Baca, or Trujillo were aware of the STIU investigation before October 23, 2015, or learned about Ortiz and Bearden's relationship some other way.  There is, therefore, no basis for a jury reasonably to infer that Perez, Baca, or Trujillo were deliberately indifferent to Ortiz' safety.

### B.   ORTIZ HAS PROVIDED SUFFICIENT FACTS FOR A REASONABLE JURY TO CONCLUDE GONZALES, NUNEZ, AND BEARDEN WERE DELIBERATELY INDIFFERENT.

The Court concludes that Ortiz has, however, provided sufficient facts for a reasonable jury to conclude that Gonzales, Nunez, and Bearden were indifferent deliberately to his well being, because: (i) Ortiz' argument that his relationship with Bearden was not consensual is not blatantly contradicted by the record; (ii) a reasonable jury could find that Gonzales and Nunez drew the inference that Bearden was raping or sexually assaulting Ortiz; and (iii) a reasonable jury could

find that Bearden forced sex on Ortiz.  Ortiz has, therefore, supplied  "'factual allegations . . .

sufficiently grounded in the record,'" <u>Cox v. Glanz</u>, 800 F.3d at 1243 (quoting <u>Thomson v. Salt

Lake Cnty.</u>, 584 F.3d at 1326 (Holmes, J., concurring)), for a reasonable jury to conclude that

Gonzales, Nunez, and Bearden deliberately were  indifferent to his well-being -- the first element

he that must meet to survive the MSJ.  <u>See</u> <u>Estate of Jensen by Jensen v. Clyde</u>, 989 F.3d 848, 854

(10th Cir. 2021)("[W]hen a defendant raises a qualified immunity defense on summary judgment,

a plaintiff must respond with evidence tending to show that: (1) the defendant violated a

constitutional or statutory right and (2) the right was clearly established at the time in question.").

### 1.    <u>Ortiz' Argument That His Relationship With Bearden Was Not Consensual Does Not Blatantly Contradict The Record</u>.

First, the Defendants argue that "the undisputed facts demonstrate that the sexual

relationship between" Ortiz and Bearden "was consensual.  MSJ at 22.  In the Tenth Circuit,

"consent is a defense to a constitutional claim for sexual abuse." <u>Brown v. Flowers</u>, 974 F.3d at

1186 (citing <u>Graham v. Sheriff of Logan Cnty.</u>, 741 F.3d at 1125-26).  The Defendants suggest,

therefore, that Ortiz and Bearden "professed their love for one another, repeatedly, and sometimes

(especially by Plaintiff) in the most graphic, explicit terms."  MSJ at 22.  The Ortiz Aff. disputes

that the relationship was consensual.  <u>See</u> Ortiz Aff. ¶¶ 10-38, at 3-7.  In the Ortiz Aff., Ortiz states:

"The sexual encounters that occurred with John Bearden were not consensual," Ortiz Aff. ¶ 33, at

6, "I did not consent to him fondling me or touching my genitals," Ortiz Aff. ¶ 34, at 6, and "I did

not consent to him performing oral sex on me."  Ortiz Aff. ¶ 35, at 7.  In his affidavit, Ortiz asserts:

"I did not consent to him anally penetrating me.," Ortiz Aff. ¶ 36, at 7, and "I felt trapped."  Ortiz

Aff. ¶ 18, at 4.  Bearden acknowledges that, "ordinarily," this contradiction creates a genuine

dispute of fact that would preclude granting the MSJ.  Bearden MSJ Reply at 2.  Bearden contends,

however, that "this is not your ordinary case."  Bearden MSJ Reply at 2.  The Defendants,

including Bearden, contend that, because Ortiz does not dispute the authenticity of the letters that

he sent to Bearden or of the recorded telephone conversations, there is no genuine dispute about

consent, because the contents of these exhibits "'blatantly contradict[]'" the Ortiz Aff.  MSJ Reply

at 4; Bearden MSJ Reply at 2 (quoting Scott v. Harris, 550 U.S. at 380-81).  These letters, however,

establish neither that the relationship was consensual, nor that Bearden did not rape Ortiz.

  "When opposing parties tell two different stories, one of which is blatantly contradicted by

the record, so that no reasonable jury could believe it, a court should not adopt that version of the

facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. at 380.

See Simon v. Taylor, 252  F. Supp. 3d 1196, 1128-29 (D.N.M. 2017)(Browning, J.).  In the MSJ

Reply, the Defendants call the Ortiz Aff. a "self-serving fiction" because it attempts to manufacture

a factual dispute.  MSJ Reply at 4.  The Defendants, in the MSJ, MSJ Reply, and Bearden MSJ

Reply, all argue that the Court should, therefore, disregard Ortiz' allegations about the lack of

consent, because the letters and telephone calls demonstrate that Ortiz reciprocated Bearden's

affection, which in turn makes all their alleged sexual encounters consensual.  See MSJ at 22; MSJ

Reply at 4-7; Bearden MSJ Reply at 2, 10-13.

  The Court disagrees with the Defendants' argument for two reasons.  First, the Defendants

misunderstand the scope of Scott v. Harris, 550 U.S. 372.  The Tenth Circuit "has generally limited

the application of [the blatant-contradiction] exception to cases involving objective documentary

evidence, such as video recording or photographs."  Vette v. K-9 Unit Deputy Sanders, 989 F.3d

1154, 1164 (10th Cir. 2021)(collecting cases).  See, e.g., Ross v. Burlington N. and Santa Fe Ry.

Co., 528 F. App'x 960, 964 (10th Cir. 2013)("When parties present conflicting evidence at the

summary judgment stage, a court may rely on video footage to grant summary judgment if the

recording 'utterly discredit[s]' the opposing party's version of the facts." (quoting Scott v. Harris,

550 U.S. at 380)); Thomas v. Durastanti, 607 F.3d 655, 659 (10th Cir. 2010)("While a court considering a summary judgment motion based upon qualified immunity 'usually' must 'adopt[] . . . the plaintiff's version of the facts,' that is not true to the extent that there is clear contrary video evidence of the incident at issue." (quoting Scott v. Harris, 550 U.S. at 378-80));  In addition, the blatant-contradiction exception also applies when a witness "directly contradict[s] her [own] deposition testimony."  Koch v. City of Del City, 660 F.3d 1228, 1240 (10th Cir. 2011).  There is no sound reason to depart from the Tenth Circuit's treatment of the blatant-contradiction exception.

Second, the Defendants and Bearden characterize incorrectly the letters and telephone calls.  At best, the letters and telephone calls show that Ortiz reciprocated Bearden's affections or that Ortiz was exploiting Bearden's affections to get drugs.  Even if the Defendants' interpretation of the letters and telephone calls is correct, it has no bearing on whether Ortiz consented to sexual relations with Bearden.  In other words, even if Ortiz reciprocated Bearden's affections, Bearden could still have raped Ortiz.  Having affection for someone or exploiting someone else's affections for personal benefit does not equate to consent to sex.  See United States v. Velarde, 2021 WL 2472349, at *5 (10th Cir. June 17, 2021)(unpublished)(explaining that even if two pretrial statements showed a close relationship between an alleged rapist and his victim, "the statements would not have significantly affected the jury's analysis of the central issue: what happened in the room when [the defendant] raped [the victim]").  Moreover, the prison context makes determining consent in this case even more challenging.  The Tenth Circuit has noted: "'The power dynamics between prisoners and guards make it difficult to discern consent from coercion.'"  Graham v. Sheriff of Logan Cnty., 741 F.3d at 1126 (quoting Wood v. Beauclair, 692 F.3d 1041, 1047 (9th Cir. 2012)).  As the Ninth Circuit explains in Wood v. Beauclair, 692 F.3d 1041 (9th Cir. 2012),

numerous other Courts of Appeals have recognized that prisoners are incapable of consenting to

sexual relations with a prison official.  See 692 F.3d at 1046.  The Ninth Circuit explains:

> The rationale underpinning these decisions rests primarily on the pronounced dichotomy of control between prison guards and prisoners. Prisoners have no control over most aspects of their daily lives. They cannot choose what or when to eat, whether to turn the lights on or off, where to go, and what to do. They depend on prison employees for basic necessities, contact with their children, health care, and protection from other inmates. See Carrigan [v. Davis], 70 F. Supp. 2d [448,] 458-59 (D. Del. 1999); see also Human Rights Watch Women's Rights Project, All Too Familiar: Sexual Abuse of Women in U.S. State Prisons 5 (1996) . . . (documenting the sexual abuse of prisoners and finding that "[i]n prison, correctional employees have nearly absolute power over the well-being of prisoners."). The power disparity between prisoners and prison guards is similar to that of an adult over a child or a teacher over a student.  At least one commentator likens the relationship to that of an owner over a slave.  See Brenda V. Smith, Sexual Abuse of Women in United States Prisons: A Modern Corollary of Slavery, 33 Fordham Urb. L.J. 571 (2006) (concluding that parallels exist between the prisoner-guard and owner-slave relationships). Just as power inequities between adults and minors, teachers and students, and owners and slaves foster opportunities for sexual abuse, so too does the prisoner-guard relationship. Indeed, sexual abuse in prison is prolific. Id. (noting that sexual harassment in prison "is so much a part of the power structure that it is almost invisible."); Carrigan, 70 F. Supp. 2d at 458-61; Cash [v. Cnty. of Erie], No. 4-CV-0182, 2009 WL 3199558 at *2 (W.D.N.Y., Sep. 30, 2009)(Curtin, J.)];  see also  All Too Familiar, 407 n. 13 [(1996)](recognizing that prisoners "cannot meaningfully consent to sexual relations with staff" and quoting the superintendent of the Bedford Hills Correctional Facility who said: "Where you have power over a person, [sex] cannot be consensual . . . .  You cannot be in the position of an inmate and make that kind of decision . . . . Eventually, [sexual relations between an inmate and a staff person] makes other people feel unsafe."); Laurie A. Hanson, Comment, Women Prisoners: Freedom from Sexual Harassment -- A Constitutional Analysis, 13 Golden Gate U.L.Rev. 667, 667 (1983) . . .("Sexual relationships between inmates and guards are the product of sexual exploitation and cannot be defined as voluntary.").

Wood v. Beauclair, 692 F.3d at 1047.  Even if, therefore, "the prisoner concedes that the sexual

relationship is 'voluntary,' because sex is often traded for favors (more phone privileges or

increased contact with children) or 'luxuries' (shampoo, gum, cigarettes), it is difficult to

characterize sexual relationships in prison as truly the product of free choice."  Wood v. Beauclair,

692 F.3d 1041, 1047 (9th Cir. 2012)(citing, All Too Familiar supra, at 102, 420 (describing an

environment where prisoners engage in sexual acts with staff in exchange for favorable treatment or coveted items such as gum, cigarettes, and drugs and quoting one prisoner who commented: "The women here will [perform sexual acts] for gum.")).

At the September 13, 2019 hearing, Bearden directed the Court's attention to Joint Technology, Inc. v. Weaver, 567 F. App'x 585 (10th Cir. 2014). See Sept. Hearing Tr. at 16:4-5 (Gardner). In Joint Technology, Inc. v. Weaver, the Tenth Circuit concluded that summary judgment was warranted, because an affidavit was "largely uncorroborated, conclusory, and contradicted, in parts, by a two-hour recording of a conference call." 567 F. App'x at 588 n.3. Bearden argues that Joint Technology., Inc. v. Weaver controls here, because it demonstrates that the Tenth Circuit has extended Scott v. Harris' blatant-contradiction exception beyond video evidence. See Hearing Tr. at 16:7-18 (Gardner). Bearden correctly notes that the Tenth Circuit, in Joint Technology, Inc. v. Weaver, extends the blatant-contradiction exception beyond video evidence. 567 F. App'x at 588, n.3. In Joint Technology, Inc. v. Weaver, the relevant question was whether the defendant was the plaintiff's bona fide employee for purposes of the Medicare Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b)(2)(A). The district court had concluded that "no rational jury could find that [the plaintiff] was a bona fide employee," because the record "could only support a conclusion that [the plaintiff] was an independent contractor." 567 F. App'x at 588. The plaintiff argued that it "provided ample evidence that Mr. Weaver was its bona fide employee." 567 F. App'x at 588. To support its assertion, the plaintiff relied on the text of the agreement that it had with the defendant, as well as on an affidavit from the plaintiff-corporation's founder and president. 567 F. App'x at 588. The Tenth Circuit noted, however, that, because the affidavit was "largely uncorroborated, conclusory, and contradicted, in parts, by a two-hour

recording of a conference call with" the defendant and others, it fell into the blatant-contradiction exception.  567 F. App'x at 588 n.3.

Joint Technology, Inc. v. Weaver, 567 F. App'x 585, does not control here.  For the Tenth Circuit in Joint Technology, Inc. v. Weaver to conclude that the plaintiff was not a bona fide employee, it had only to observe that the relevant affidavit's contents blatantly contradicted the contents of the conference call.  567 F. App'x at 588 n.3.  It did not also have to assume that the contents of the conference call were true and accurate despite disparate power dynamics that often cause company presidents or other participants on company conference calls to behave in ways they otherwise would not.  In short, the company was not a prison.  In addition, the court did not have to make a logical leap like the one that the Defendants and Bearden ask the Court to make -- that statements of affection in letters and on telephone calls constitute consent to sex acts.

The Court concludes, therefore, that, because: (i) the power dynamics in prisons makes consent extraordinarily difficult to discern with certainty; and (ii) love and affection do not amount to consent to sex acts, these letters and telephone calls do not establish that Ortiz was consenting to sexual relations with Bearden.  Although the Defendants contend that these letters unequivocally demonstrate that Ortiz consented, it is also possible the letters and statements contained in the telephone calls are the product either of forced coercion or of false consent the guard-inmate relationship power imbalance induced.  See Dennehy-Fay Aff. ¶¶ 9-16, at 5-11.  The Court, therefore, concludes that the record does not blatantly contradict the Ortiz Aff.'s statements that dispute the issue of consent.

**2.    A Reasonable Jury Could Conclude that Gonzalez and Nunez Subjectively Drew the Inference that Ortiz and Bearden's Relationship Was Not Consensual.**

- 201 -

Second, the Defendants argue that, even if the relationship between Ortiz and Bearden was not consensual, they are not liable, because they did not "subjectively draw the inference that" Ortiz "was being raped." MSJ at 22. Ortiz must demonstrate that Gonzales and Nunez personally violated his constitutional rights. See Perry v. Durborow, 892 F.3d at 1121. Ortiz must, therefore, "establish '(1) personal involvement; (2) causation, and (3) state of mind.'" Perry v. Durborow, 892 F.3d at 1121 (quoting Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767 (10th Cir. 2013)(quoting Dodds v. Richardson, 614 F.3d 1185, 1195 (10th Cir. 2010)). To satisfy the state-of-mind requirement, Ortiz must show that Gonzalez and Nunez acted with deliberate indifference. See Perry v. Durborow, 892 F.3d at 1122. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that [the defendant] disregarded a known or obvious consequence of his action." Bd. of Cnty. Com'rs v. Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 410 (1997)(no citation for quotation). In the Tenth Circuit, "deliberate indifferent is equivalent to recklessness" in the Eighth Amendment context. Smith v. Cummings, 445 F.3d at 1258. To satisfy this standard, Ortiz must produce "'evidence showing that the defendant knowingly created a substantial risk of constitutional injury.'" Keith v. Koerner, 848 F.3d at 848 (quoting Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 769 (10th Cir. 2013)).[122]

---

[122]Ortiz notes that this standard opens the door for an "'empty-head' response," meaning the Defendants and Bearden can assert ignorance -- that they are not liable, because they failed to draw an inference. MSJ Response ¶ 40, at 19. See Perry v. Durborow, 892 F.3d at 1122 (noting that the second requirement of the deliberate-indifference standard is that the defendant actually drew the inference). The Court agrees that the deliberate-indifference standard leaves open the possibility that a prison official can escape liability by being oblivious to the PREA, prison dynamics, or even the world around them.

The Court notes that the Tenth Circuit's standards for prison sexual-assault excessive-force claims is higher than for other species of excessive-force claims. The Tenth Circuit is clear that "it is proper to treat sexual abuse of prisoners as a species of excessive-force claim, requiring as least some form of coercion (not necessarily physical) by the prisoner's custodians." Graham v. Sheriff of Logan Cnty., 741 F.3d at 1126. "'Ordinarily, an excessive force claim involves two

prongs: (1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the official acted with sufficiently capable state of mind.'" Graham v. Sheriff of Logan Cnty., 741 F.3d at 1123 (quoting Giron v. Corrs. Corp. of Am., 191 F.3d at, 1289). The state-of-mind-requirement is established by showing the officer acted with deliberate indifference, which in turn has three requirements: (i) that the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; (ii) that the officer actually drew that inference; and (iii) that the officer was aware of and failed to take reasonable steps to alleviate the risk. See Perry v. Durborow, 892 FF.3d at 1122.

In the Tenth Circuit, therefore, to show that an officer violated a prisoner's constitutional rights the prisoner must show that the officer actually drew the relevant inference. See Perry v. Durborow, 892 FF.3d at 1122. A prison official "may not be held liable if they prove that they were unaware of even an obvious risk or if they responded reasonably to a known risk, even if the harm ultimately was not averted." Farmer v. Brennan, 511 U.S. at 826.

By contrast, for excessive-force cases arising under the Fourteenth Amendment's due process clause, see Kingsley v. Hendrickson, 576 U.S. 389, 400-01 (2015), courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," Graham v. Connor, 490 U.S. at 397 (no citation for quotation). The test is "an objective one." Graham v. Connor, 490 U.S. at 397. "A court (judge or jury) cannot apply this standard mechanically." Kingsley v. Hendrickson, 576 U.S. at 397. A Fourteenth Amendment excessive-force inquiry "requires careful attention to the facts and circumstances of each particular case." Graham v. Connor, 490 U.S. at 396. The relevant circumstances include:

> the relationship between the need for the use of excessive force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Kingsley v. Hendrickson, 576 U.S. at 397. Further, the Supreme Court has recently stressed that evidence relevant to these factors must be analyzed closely and cannot be dismissed quickly as "insignificant." Lombardo v. City of St. Louis, 141 S.Ct. 2239, 2241 (2021).

The Supreme Court observed this apparent inconsistency in Kinglsey v. Hendrickson, writing: "We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners." 576 U.S. at 402. Because the Supreme Court in Kingsley v. Hendrickson was "not confronted with such a claim," however, it did "not address that issue." 576 U.S. at 402.

Were the Court writing on a clean slate, it would not impose the requirement that victims of prison rape alleging excessive force also demonstrate that prison officials were not willfully ignorant -- and, similarly, that prison officials can escape liability for being "unaware of an even obvious risk," Farmer v. Brennan, 511 U.S. at 826 -- when in other contexts, police brutality, for example, a victim must only show that the officer's actions are not "objectively reasonable,"

There is no dispute that, by October 22 or 23, 2015, Gonzales and Nunez believed Ortiz and Bearden were collaborating to smuggle drugs into Western NM, and that they had an "inappropriate relationship."  MSJ ¶ 18, at 12-13.  The Court concludes, therefore, that, adopting all reasonable inferences in Ortiz' favor, that Gonzales and Nunez were both personally involved in the investigation and, by not intervening earlier,[123] caused Bearden to violate Ortiz' constitutional rights, thus satisfying the first two "affirmative link" requirements.  Perry v. Durborow, 892 F.3d at 1121.

With respect to the deliberate-indifference requirement, even though they maintain that they believed Ortiz and Bearden's relationship to be consensual, the Defendants acknowledge that they knew it was "prohibited by New Mexico criminal statutes and prison policy."  MSJ ¶ 19, at 13.  The New Mexico Corrections Department policy states: "[U]nder NM law; subjecting another person who is incapable of giving consent by reason of their custodial status, physical or mental state to sexual contact; or rape, sexual molestation, prostitution or other form of sexual exploitation."   N.M. Corr. Dep't Policy No. 150100, Definitions 2 (2020), available at https://cd.nm.gov/wp-content/uploads/2020/08/150100.pdf.   In New Mexico, second-degree

---

Graham v. Connor, 490 U.S. at 397.  Inmates should not have a higher burden to demonstrate sexual abuse by staff, particularly in light of the courts' recognition of the disparate power dynamic between prison staff and inmates.  See, e.g., Graham v. Sheriff of Logan Cnty., 741 F.3d 1118; Wood v. Beauclair, 592 F.3d 1041.  The Court would prefer an excessive-force standard that allows prison officials to be liable when their actions are objectively unreasonable.  See Graham v. Connor 490 U.S. 386, 397 (1989).

[123]It is not clear exactly when Bearden is alleged to have raped Ortiz for the first time, and whether the STIU investigation had begun at that point.  STIU received an anonymous tip "sometime around mid[-]October of 2015," MSJ ¶ 8, at 9, but STIU had already begun monitoring Oritz' telephone calls by October 12, 2015.  See MSJ ¶ 9, at 9.  The Ortiz Aff. does not state when Bearden is alleged to have raped and assaulted Ortiz.  See Ortiz Aff.  Adopting all reasonable inferences in Ortiz' favor, the Court assumes that Bearden was assaulting Ortiz while the STIU investigation was ongoing.

criminal sexual penetration includes "all criminal sexual penetration perpetrated . . . on an inmate confined in a correctional facility or jail when the perpetrator is in a position of authority over the inmate . . . ."  N.M.S.A. § 30-9-11(E).  Finally, "as a matter of law, an inmate victim of sexual assault by a corrections officer cannot give consent."  State of N.M v. Enock Arvizo, No. 37,389, mem. op. at ¶ 22 (N.M. Ct. App. May 11, 2021 (non-precedential); See Spurlock v. Townes, 2016-NMSC-014, 368 P.3d 1213, 1218 ("The essential elements of [N.M.S.A. § 30-9-11(E)(2)[124]] are a legislative acknowledgment of the disparity between an inmate and corrections officer and a recognition that this disparity not only facilitates sexual assault of the vulnerable party but makes meaningful voluntary consent to sexual intercourse an unrealistic inquiry.").  Although it is not strictly New Mexico law, under the PREA, any sexual contact between an inmate and a prison staff member constitutes sexual abuse "with or without consent of the inmate."  28 C.F.R. § 115.6. The New Mexico Corrections Department states that it is "committed to PREA compliance," N.M.

---

[124]N.M.S.A. § 30-9-11(E)(2) states:

E.      Criminal sexual penetration in the second degree consists of all criminal sexual penetration perpetrated:

(1)      by the use of force or coercion on a child thirteen to eighteen years of age;

(2)      on an inmate confined in a correctional facility or jail when the perpetrator is in a position of authority over the inmate;

(3)      by the use of force or coercion that results in personal injury to the victim;

(4)      by the use of force or coercion when the perpetrator is aided or abetted by one or more persons;

(5)      in the commission of any other felony; or

(6)      when the perpetrator is armed with a deadly weapon.

Corr. Dep't, Annual PREA Report 2 (2020)(https://cd.nm.gov/wp-content/uploads/2021/05/2020-PREA-Annual-report_.pdf), and the team that conducted the 2015 Western NM audit was "impressed by how knowledgeable the correctional officers and other staff were about PREA, offender rights regarding PREA, first response, and evidence collection,"  Bureau of Justice Assistance, National PREA Resource Center, WNMCF Audit 2015, 3, filed February 5, 2019 (Doc. 61-5)("Western NM PREA Audit").

Further, Gonzales and Nunez twice heard Ortiz tell his mother that he was "playing the part."  MSJ ¶ 9, at 9; id. ¶12, at 11.  In light of the circumstances, there are two plausible interpretations of Ortiz' statement. First, Ortiz could have been telling his mother that he was "playing the part" to leverage Bearden's affection for him to get drugs.  Second, he could have been telling his mother that he was pretending to reciprocate Bearden's affection, because he felt pressure from both other inmates and from Bearden himself. Considering (i) the "'power dynamics between prisoners and guards make it difficult to discern consent from coercion,'" Graham v. Sheriff of Logan Cnty., 741 F.3d at 1126 (citing Wood v. Beauclair, 692 F.3d at 1047); (ii) that Ortiz asserts that he was under obvious pressure from other inmates to succumb to Bearden's advances, see Ortiz Aff. ¶ 12, at 3; and (iii) that Ortiz says that he was "under constant pressure from John Bearden to given [sic] him sexual gratification which I did not want to do," Ortiz Aff. ¶ 24, at 24, this second interpretation of Ortiz' statement is not unreasonable.  Moreover, in light of Gonzales and Nunez' assertion that they believed the relationship to be consensual yet "prohibited by New Mexico criminal statutes and prison policy," MSJ ¶ 19, at 13, but that New Mexico criminal statues as well as prison policy suggest that inmates can rarely if ever consent, the Court, drawing all reasonable inferences in Ortiz' favor, must assume that Gonzales and Nunez knew about both the pressure on Ortiz from other inmates and that the relationship was not

consensual as a matter of law.  The Court concludes, therefore, that a reasonable jury could find

that Gonzales and Nunez were deliberately indifferent to Ortiz' constitutional right to be free from

sexual assault in prison.  See Estate of Jensen by Jensen v. Clyde, 989 F.3d at 854.

### 3.  A Reasonable Jury Could Conclude that Bearden "Forced Sex" on Ortiz.

Bearden argues similarly that he "never drew the inference that his relationship with" Ortiz

was "anything other than a private matter between consenting adults," because Ortiz "went to great

pains to have *Mr. Bearden believe* he reciprocated Mr. Bearden's affections and enthusiastically

welcomed his sexual advances."  Bearden MSJ Reply at 9-10 (emphasis in original).  A reasonable

jury could conclude, however, that Bearden was deliberately indifferent.  Because Ortiz alleges

that a prison guard committed sexual abuse, the analysis for Bearden is distinct.  See Graham v.

Sheriff of Logan Cnty., 741 F.3d at 1123.  The Tenth Circuit states:

> The subjective prong turns on whether the officer acted maliciously and sadistically. Particularly relevant to this case, "[w]here no legitimate penological purpose can be inferred from a prison employee's alleged conduct, including but not limited to sexual abuse or rape, the conduct itself constitutes sufficient evidence that force was used 'maliciously and sadistically for the very purpose of causing harm.'" Giron v. Corr. Corp. of Am., 191 F.3d at 1290 (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)). Thus, when a prisoner alleges rape by a prison guard, the prisoner need prove only that the guard forced sex in order to show an Eighth Amendment violation.

Graham v. Sheriff of Logan Cnty., 741 F.3d at 1123.  Unlike with Gonzales and Nunez, where

Ortiz must show that a reasonable jury could find that that Gonzales and Nunez were deliberately

indifferent to Bearden's conduct, to satisfy his burden of showing that a reasonable jury could find

Bearden violated his constitutional rights, to satisfy the subjective prong with respect to Bearden,

Ortiz need only show, therefore, that Bearden "forced sex."  Graham v. Sheriff of Logan Cnty.,

741 F.3d at 1123.[125]   Ortiz meets this burden.   Viewing the evidence in a light most favorable to Ortiz and drawing all reasonable inferences in his favor, a reasonable jury could conclude that Bearden raped or sexually assaulted Ortiz.

Bearden argues that he "did not have anal intercourse or perform oral sex on" Ortiz "at any time during our brief relationship."   Bearden Aff. ¶ 44, at 7.   Bearden states that his "physical contact" with Ortiz "was limited to kisses and hugs and light caressing of his face."   Bearden Aff. ¶ 45, at 7.   Although Ortiz contends that "Bearden was out of control and his physical sexual abuses included raping me anally," Ortiz Aff. ¶ 28, at 6, that he "did not want to have any sexual encounters with him," Ortiz Aff. ¶ 27, at 6, and that the "sexual encounters that occurred with John Bearden were not consensual," Ortiz Aff. ¶ 33, at 6, Bearden argues that he "would not have known the feelings he professed to have for me were anything other than genuine and freely given," Bearden Aff. ¶ 50, at 8.   Bearden asserts that, "to the extent that" Ortiz felt "coerced to establish an intimate relationship with" him "due to pressure, intimidation or threats of outright violence from other inmates, he never reported this to" Bearden.   Bearden Aff. ¶ 49, at 8.

The MSJ concedes, however, that Ortiz and Bearden's relationship was sexual.   See MSJ ¶ 26, at 17.   The MSJ states that Bearden received a relatively lenient sentence for his plea, because it was the "prosecutor's conclusion based on the evidence that the sexual relationship between" Ortiz and Bearden "was consensual in nature."   MSJ ¶ 26, at 17 (citing Bearden Plea).   In the

---

[125]Because Ortiz is not a pretrial detainee, he still must meet the subjective element to show an Eighth Amendment excessive-force claim.   See Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015)("[T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one.");   Brown v. Flowers, 974 F.3d at 1182-83("[A]fter Kingsley, a pretrial detainee bringing [sexual-abuse claims against prison officials] is not required to meet the 'subjective element' required of Eighth Amendment excessive-force claims.")(citing Colbruno v. Kessler, 928 F.3d 1155, 1163 (2019).

Bearden Joinder, Bearden adopts this argument, see Bearden Joinder at 1, but nevertheless argues in the Bearden Aff. that the relationship was limited to kisses, hugs, and facial caressing.  See Bearden Aff. ¶ 45, at 7.  Bearden maintains this position even though he plead to two counts of Criminal Sexual Contact in the Fourth Degree Resulting in Personal Injury.  N.M.S.A. § 30-9-12(C).

Ortiz's argument that he was raped, however, is supported by other portions of the record. When the New Mexico Corrections Department investigated the alleged incident, it determined that Ortiz' allegations were "substantiated." State of New Mexico Corrections Department Memorandum from Jillian Shane to Raymond Ortiz, December 4, 2015, filed December 5, 2019 (Doc. 61-4)("NM Corrections Memo").  Further, Ortiz' psychological evaluation also finds that Ortiz is "suffering from a chronic and severe posttraumatic stress disorder" that "is the result of the repetitive, sexual exploitation by a corrections officer when Mr. Ortiz was incarcerated at" Western NM.  Ortiz Psych. At 2.  Specifically, the psychologist states:

> Using his position of authority and power, the Officer forced Mr. Ortiz to submit to a series of increasingly inappropriate and humiliating sexual assaults. The Officer also used Mr. Ortiz' incarcerated state to put Mr. Ortiz in an obligated position toward the Officer. This included the Officer gifting Mr. Ortiz cigarettes, marijuana, and bringing illicit, powerful drugs into the facility for Mr. Ortiz. The Officer also offered Mr. Ortiz the prospect of being able to stay at the home of the Officer's mother, after Mr. Ortiz was paroled.
>  . . . .
> The sexual approaches began by the Officer telling Mr. Ortiz that the Officer was a homosexual and interested in a sexual encounter with Mr. Ortiz. It proceeded to physical assaults that involved genital and anal fondling by the Officer and progressed to more intense sexual assaults. He subjected Mr. Ortiz *to* forced anal penetration, without a condom, and fellated Mr. Ortiz.  The Officer chided Mr. Ortiz for not being able to ejaculate in the Officer's mouth but told Mr. Ortiz that he would "make him cum" in the Officer's mouth, on the next occasion.  The Officer tried to force Mr. Ortiz to fellate the Officer but Mr. Ortiz was able to resist. Mr. Ortiz' sexual orientation was heterosexual.

Ortiz Psych. R. at 2.  Additionally, Bearden pled guilty to two counts of fourth-degree criminal sexual contact for his relationship with Ortiz.  See Bearden Plea at 1.  The Bearden Plea alone does not establish that Bearden sexually assault Ortiz.  Viewed in the context of Ortiz' allegations, the NM Corrections Memo., the Ortiz Psych., the MSJ, and the Bearden Joinder, however, the Court concludes that a reasonable jury could determine that Bearden "forced sex," Graham v. Sherriff of Logan Cnty., 741 F.3d at 1123, on Ortiz.

Based on the NM Corrections Memo., the Ortiz Psch. R., and the Bearden Plea, the Court reaches the conclusion that, because the record does not blatantly contradict Ortiz' allegations, see Scott v. Harris, 550 U.S. at 280, Ortiz' "factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts," Cox v. Glanz, 800 F.3d at 1243 (quoting Thomson v. Salt Lake Cnty., 584 F.3d at 1232 (Holmes, J., concurring), that make up his excessive-force claim against Bearden. The Court concludes, therefore, that whether Ortiz consented to a sexual relationship with Bearden is disputed.  Consequently, (i) because consent is a defense to an Eighth Amendment excessive-force claim, see Graham v. Sheriff of Logan Cnty., 741 F.3d at 1125-26; (ii) because sexual abuse and rape have no "legitimate penological purpose," Giron v. Corr. Corp. of Am., 191 F.3d at 1290; and; (iii) because Ortiz need only demonstrate that Bearden "forced sex" on him to meet the subjective element, Graham v. Sheriff of Logan Cnty., 741 F..3d at 1125-26; see Giron v. Corr. Corp. of Am., 191 F.3d at 1290, the Court concludes that Ortiz has met his burden of showing that a reasonable jury could find that Bearden sexually assaulted him, in violation of the Eighth Amendment.  See Brown v. Flowers, 974 F.3d at 1184 (holding that the questions of consent and coercion in the context of sexual assault in prison are questions for the jury and preclude granting summary judgment).

C.     **NUNEZ, GONZALES, AND BEARDEN ARE NOT ENTITLED TO QUALIFIED IMMUNITY, BECAUSE NONCONSENSUAL SEX BETWEEN A JAILER AND AN INMATE -- OR DELIBERATE INDIFFERENCE TO IT -- WAS CLEARLY ESTABLISHED, AND PRISON RAPE IS PARTICULARLY EGREGIOUS.**

The Defendants assert qualified immunity in the MSJ, but do not address the second prong of the qualified-immunity analysis, whether the right was "clearly established" at the time of the alleged conduct.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  See MSJ at 5, 18-22.  Ortiz counters by asserting that each of the rights that he alleged the Defendants violated was clearly established.  See MSJ Response ¶¶ 11-24, at 6-12.  Bearden, in the Bearden MSJ Reply does not address the clearly established prong.  See Bearden MSJ Reply, at 3-14.  The other Defendants, in their MSJ Reply, however, argue that Ortiz does not meet his burden of identifying that his rights that were allegedly violated were clearly established at the time, because he

> has failed to point to any governing case holding that a prison official who mistakenly believes that the relationship between another guard and an inmate is consensual (based on the official's review of the inmate phone conversations and intercepted correspondence between the guard and the inmate), and who therefore fails to intervene immediately (while waiting for a drug drop from the guard to the inmate to occur, in order to arrest them) can be subjected to § 1983 liability for damages.

MSJ Reply at 11.  The Defendants also assert that the "Defendants have located no such case, either, and, on information and belief, no such case exists."  MSJ Reply at 12.  To overcome qualified immunity, a party usually must point to prior Supreme Court or Tenth Circuit decision that clearly establishes a right, and it must be "'sufficiently clear that every reasonable official would have understood that what he is doing violates that right,'" Mullenix v. Luna, 577 U.S. at 11 (quoting Reichle v. Howards, 566 U.S. at 664).  Cf. Taylor v. Riojas, 141 S. Ct. 52.  Courts must not "'define clearly established law at a high level of generality.'"  Mullenix v. Luna, 577 U.S. at 12 (quoting Ashcroft v. al-Kidd, 563 U.S. at 742).

Perez, Baca, and Trujillo are entitled to qualified immunity, because there is no evidence they were deliberately indifferent to Ortiz' constitutional rights.[126]  See Thomson v. Salt Lake Cnty., 584 F.3d at 1318 ("For qualified immunity purposes, the presumed factual dispute arising from the officers' testimony is irrelevant.  In determining whether a plaintiff's constitutional rights were violated we ordinarily, as here, adopt plaintiff's version of the facts, insofar as it is supported by the record.").  Nunez, Gonzales, and Bearden, however, are not entitled to qualified immunity, because (i) the Tenth Circuit has held that it is clearly established that sexual abuse by prison employees -- or other prison officials' deliberate indifference to that abuse -- violates the Eighth Amendment, see Keith v. Koerner, 707 F.3d at 1189 ("As an initial matter, it is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment.); and (ii) rape and sexual assault in prison by a prison guard is particularly egregious such that no reasonable officer would conclude that it was constitutional, see Taylor v. Riojas, 141 S.Ct. at 53.  An officer is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) either (a) that the right was clearly established -- either by a factually similar Supreme Court or Tenth Circuit case on point, see Thomas v. Kaven, 765 F.3d 1183, at 1194, or by "general constitutional principles," Routt v. Howry, 835 F. App'x. 382 -- at the time of the alleged misconduct, or (b) the conduct was "particularly egregious" such that "any reasonable officer should have realized" it was unlawful, Taylor, 141 S. Ct. at 54.  See Estate of Smart by Smart v.

---

[126]The Court addresses whether any of the Defendants is entitled to qualified immunity, because the Defendants assert qualified immunity as a defense with respect to every Defendant. Because the Court concludes that no reasonable jury could find that Perez, Baca, or Trujillo violated Ortiz' constitutional rights, however, the fact that the right is clearly established does not impact their liability.

City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020).  See also Riggins v. Goodman, 572 F.3d

1101, 1107 (10th Cir. 2009); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079

(D.N.M. 2016)(Browning, J.).

> **1.     Nunez, Gonzales, and Bearden Are Not Entitled to Qualified Immunity, Because the Tenth Circuit Has Held That it is Clearly Established that Sexual Abuse by Prison Guards -- or Deliberate Indifference to it -- Violates the Eighth Amendment.**

The Defendants argue that this case is too factually distinct from others for the law to have

been clearly established.  See MSJ Reply at 11.  The Defendants misunderstand the Supreme Court

and Tenth Circuit precedent, as well as "the facts as [the Court] must construe them."  Brown v.

Flowers, 974 F.3d at 1185.  To determine whether a right is clearly established, the Tenth Circuit

looks "to see if existing precedent placed the statutory or constitutional question beyond debate."

Routt v. Howry, 835 F. App'x 379, 381 (10th Cir. 2020)(quoting Estate of Reat v. Rodriguez, 824

F.3d 960, 965 (10th Cir. 2016)).  Because the Tenth Circuit has placed the question of sexual abuse

by prison guards -- or deliberate indifference to it -- beyond debate, the Court concludes that the

right to be free from sexual assault in prison is clearly established.

The Tenth Circuit recently clarified the scope of clearly established law in the context of

sexual abuse of detainees.  See Brown v. Flowers, 974 F.3d at 1184.  In Brown v. Flowers, a

pretrial detainee brought a § 1983 suit against her jailer, alleging that he raped her.  See 974 F.3d

at 1180.  The jailer could see the residents over video and communicate with them over an intercom

system.  See 974 F.3d at 1180.  The jailer asked the detainee to come see him in the control tower,

telling her to "hurry up."  974 F.3d at 1180.  Because the detainee felt that she "had to comply

with" the jailers orders because "she was in jail and 'ha[d] to do what [she was] told," she went to

the tower.  974 F.3d at 1180 (quoting record).  The jailer said to the detainee, "'let me see your

titties'" and he lifted up her shirt.  974 F.3d at 1180 (quoting record).  The jailer then began having

sex with the detainee, but when she began to cry, he turned her around "so that he could penetrate her from behind." 974 F.3d at 1181 (quoting record). The detainee did not resist, because the jailer "was 'a guard and [she was] an inmate' and so if she used physical force to resist [the jailer], that resistance could result in charges against her." 974 F.3d at 1181 (quoting record).

First, the Tenth Circuit "affirm[ed] the district court's conclusion that a reasonable jury could find," 974 F.3d at 1184, "that the sex was coerced and nonconsensual," 974 F.3d at 1183, because Courts of Appeal lack jurisdiction to reconsider a district court's factual findings, See 974 F.3d at 1184. Second, the Tenth Circuit concluded that the jailer violated clearly established law, because "[w]e have long held that nonconsensual, coerced sex between a jailer and an inmate violates the Constitution". 974 F.3d at 1187. The jailer sought to draw a factual distinction between forceful rape, and "'not necessarily physical[ly] coercive' sexual relations between inmates and jailers." 974 F.3d at 1186 (quoting record). The Tenth Circuit rejected this distinction, explaining that "our existing caselaw on sexual abuse of inmates is relevant and defines the contours of" the detainee's rights. 974 F.3d at 1186. The Tenth Circuit rejected the jailor's argument that there was no on point case law, and explained:

> Given the context of this case and the facts as we must construe them in this interlocutory appeal -- the inherently coercive nature of prisons, [the jailor] giving [the detainee] cigarettes, and [the detainee's] testimony, including the fact that she was crying during the sex -- existing caselaw made it "clear to a reasonable officer that" [the jailor's] "conduct was unlawful." Brosseau v. Haugen, 543 U.S. 194, 199 (2004)(quoting Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009)). And considering the nature of the constitutional violation -- where [the jailor's] use of force was in no way related to his duties as a jailer, as opposed to being at the "hazy border between excessive and acceptable force" -- a case involving the same type of coercion and evidence of lack of consent is unnecessary to place the unconstitutionality of [the jailor's] conduct "beyond debate." Mullenix[ v. Luna], 136 S. Ct. at 308, 312 . . . . We therefore conclude that Flowers violated a clearly established right . . . .

Brown v. Flowers, 974 F.3d at 1187.

The Defendants ask the Court to draw a distinction between, on the one hand, prison guards who, by listening to telephone conversations and reading letters, mistakenly believe a relationship between an inmate and prison guard is consensual, yet prohibited by prison policy and state law, and, as a result, fail to intervene immediately because they are waiting to intercept a drug drop, and, on the other, all other forms of sexual abuse in prison.  See MSJ Reply at 11-12.  This distinction has no basis in the Tenth Circuit's caselaw.  The Court is not free to depart from the Tenth Circuit's conclusion in Brown v. Flowers that "existing caselaw on sexual abuse of inmates is relevant and defines the contours of" a detainee's rights.  974 F.3d at 1186.

The Tenth Circuit long has held that it is clearly established that sexual abuse of prisoners by prison guards violates the Eighth Amendment.  See Smith v. Cochran, 339 F.3d 1205, 1215 (10th Cir. 2003)("It is clearly established that prison guards employed by the state can be liable under the Eighth Amendment for using excessive force against prisoners in the form of sexual abuse.")  It is clearly established today.  See Brown v. Flowers, 974 F.3d at 1186 ("We conclude that Flowers violated a clearly established right. We have long held that nonconsensual, coerced sex between a jailer and an inmate violates the Constitution.").  It was clearly established in 2015, when Bearden allegedly raped Ortiz.  See Ullery v. Bradley, 949 F.3d 1282, 1291 (10th Cir. 2020)("[T]he clearly established weight of persuasive authority in our sister circuits as of August 11, 2015, would have put any reasonable corrections officer in Defendant's position on notice . . . [that sexually assaulting, sexually abusing, and sexually harassing an inmate] would violate the Eighth Amendment.").  It was clearly established in 2015 that "a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment."  Keith v. Koerner, 707 F.3d at 1188.  Moreover, in 2016, the Tenth Circuit stated:

> As we stated in our previous decision in this case, "it is clearly established that a
> prison official's deliberate indifference to sexual abuse by prison employees

violates the Eighth Amendment." Keith v. Koerner (Keith I), 707 F.3d 1185, 1188
(10th Cir. 2013). We have further concluded "an inmate has a constitutional right
to be secure in her bodily integrity and free from attack by prison guards," and "a
prison official's failure to protect an inmate from a known harm may constitute a
constitutional violation." Hovater v. Robinson, 1 F.3d 1063, 1068 (10th Cir. 1993).
In other words, "prison officials . . . must 'take reasonable measures to guarantee
the safety of inmates.'" Farmer v. Brennan, 511 U.S. at 832 (quoting Hudson v.
Palmer, 468 U.S. 517, 526-27). And we have held that such "reasonable measures"
include "serious investigation and response" when a prison official becomes aware
of a risk to inmates, including sexual misconduct by prison employees. See Tafoya
v. Salazar, 516 F.3d 912, 920 (10th Cir. 2008).

Keith v. Koerner, 843 F.3d 833, 849–50 (10th Cir. 2016).

The Tenth Circuit has stressed, however, that courts must tether their clearly established

analysis to the case's particularized facts.  See Perry v. Durborow, 892 F.3d at 1124.  In Perry v.

Durborow, an inmate who alleged she was been raped sued the county sheriff under a theory of

supervisory liability.  See 892 F.3d at 1118.  The Tenth Circuit noted that it was not clearly

established what kind of "'supervisory conduct' must suffice to violate the Eighth or Fourteenth

Amendments."  Perry v. Durborow, 892 F.3d at 1125 (quoting Cox v. Glanz, 800 F.3d at 1247).

Earlier cases did not clearly establish the law because, in those earlier cases, "the defendants were

aware that those known risks had, in fact, *already previously materialized*."  Perry v. Durborow,

892 F.3d at 1126 (emphasis in Perry v. Durborow).  The Tenth Circuit concluded that, "in the

absence of a finding that [the sheriff] was aware of any previous incidents of sexual assault at the

Jail," none of the cases that the plaintiff identified placed the constitutional question beyond

debate.  Perry v. Durborow, 892 F.3d at 1126.

Here, however, a reasonable jury could conclude that Nunez, Gonzales, and Bearden knew

that sexual assaults had already previously materialized in Western NM.  Western NM passed its

PREA Audit in 2015.  See Western NM PREA Audit at 2-3.  Nunez, Gonzales, and Bearden knew

prison policy and New Mexico criminal law prohibited sexual relationships.  See MSJ ¶ 19, at 13.

The Court concludes, therefore, that, because the Tenth Circuit has "long held that nonconsensual, coerced sex between a jailer and an inmate violates the Constitution," Brown v. Flowers, 974 F.3d at 1186, Ortiz' "asserted right to be free from sexual abuse was clearly established at the relevant time," Ullery v. Bradley, 949 F.3d at 1291.  Nunez, Gonzales, and Bearden are, therefore, not entitled to qualified immunity.

> ### 2. Nunez, Gonzales, and Bearden Are Not Entitled to Qualified Immunity Because Prison Rape and Deliberate Indifference to Prison Rape is Particularly Egregious Such That No Reasonable Officer Would Believe He or She Was Acting Lawfully.

This is an "'obvious case' of a constitutional violation." Truman v. Orem City, 1 F. 4th 1227, ___ (10th Cir. 2021).  Even if there is no case clearly establishing the constitutional right at issue, an officer is not entitled to qualified immunity if the facts are "particularly egregious" and "no reasonable . . . officer could have concluded that" he or she not offending the Constitution. Taylor, 141 S. Ct. at 54.  See Truman v. Orem City, 1 F. 4th at __ ("The inmate in Taylor could not identify a case in which a court held that an inmate confined to extremely unsanitary cells for six days offends the Constitution. But the Supreme Court made clear that he did not have to.").  A "general constitutional rule already identified in the decisional law may apply with obvious clarify to the specific conduct in question." Hope v. Pelzer, 536 U.S. at 741.  As the Fifth Circuit has recently stated, plaintiffs are "excused of their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'" Cope v. Cogdill, 2021 WL 2767851, at *4 (5th Cir. July 2, 2021).

This proposition applies here.  "'Like the rape of an inmate by another inmate, sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society.'" Graham v. Sherriff of Logan Cnty., 741 F.3d at 1122-23 (quoting Giron v. Corr. Corp. of America, 191 F.3d at

1290)(internal citation and quotation omissions in <u>Graham v. Sherriff of Logan Cnty.</u>).   The Tenth

Circuit has "long held that nonconsensual, coerced sex between a jailer and an inmate violates the

Constitution," <u>Brown v. Flowers</u>, 974 F.3d at 1186.   Inmates have a "constitutional right to be

secure in [their] bodily integrity and free from attack by prison guards." <u>Hovater v. Robinson</u>, 1

F.3d at 1068.  The Supreme Court has stated that being "violently assaulted in prison is simply not

'part of the penalty that criminal offenders pay for their offenses against society." <u>Farmer v.</u>

<u>Brennan</u>, 511 U.S. at 834 (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981)).

This is not a case where the reasonableness of the officers' behavior is in question.  The

reasonableness of an officer's use of force "'must embody allowance for the fact that police

officers are often forced to make split-second judgments -- in circumstances that are tense,

uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular

situation.'" <u>Kisela v. Hughes</u>, 138 S. Ct. at 1152 (quoting <u>Graham v. Connor</u>, 490 U.S. at 396-

97).  Nunez and Gonzales were not asked to make any split-second decisions.  Nine days passed

between when Nunez and Gonzales first heard Ortiz tell his mother that he was "playing the part"

in his relationship with Bearden and when they intercepted Bearden when he arrived at Western

NM.  <u>See</u> MSJ ¶ 9, at 9; 15, at 12.  Just like "any reasonable correctional officer should understand

the inmate in <u>Taylor</u>'s condition of confinement offended the Constitution, so too should any

reasonable" correctional officer understand that either sexually assaulting an inmate, or knowingly

allowing it to happen despite being aware that it was prohibited by State law and prison policy --

both of which define sexual assault to include purportedly consensual acts between prisoners and

guards -- "offends the Constitution." <u>Truman v. Orem City</u>, 1 F. 4th at __.  The Court concludes,

therefore, that Nunez, Gonzales, and Bearden's behavior was "particularly egregious" such that

any reasonable officer would believe they were offending the Constitution.  Taylor, 141 S. Ct. at

54.  Nunez, Gonzales, and Bearden are not entitled to qualified immunity.

## V.       BEARDEN IS JUDICIALLY ESTOPPED FROM ARGUING THAT HIS RELATIONSHIP WITH ORTIZ WAS CONSENSUAL AND ONLY INVOLVED KISSING, BECAUSE IT IS PLAINLY INCONSISTENT WITH THE BEARDEN PLEA.

Ortiz argues that Bearden is judicially estopped from "disputing his prior plea that his

contact with Mr. Ortiz was without consent."  MSJ Response ¶ 45, at 21. Bearden counters that he

is not estopped from arguing consent, because he "specifically did not plead guilty to criminal

sexual penetration [i.e., rape] or to furnishing drugs to an inmate."  Bearden MSJ Reply 13

(brackets in original).  Bearden argues that: (i)  he "did not plead guilty to the type of coercion or

quid pro quo that would violate the Eight[h] Amendment"; (ii) he was sentenced according to a

conditional discharge under New Mexico law, so he is "neither 'adjudicated guilty' nor

'convicted,'"  United States v. Saiz, 797 F.3d 853, 865 (10th Cir. 2015)(quoting State v.

Herbstman, 1999-NMCA-014, ¶ 21, 974 P.2d 177, 183); and (iii) the "State agreed to the plea to

lesser charges because the evidence indicated the relationship was consensual."  Bearden MSJ

Reply at 13-14 (emphasis in original).  The Court concludes that Bearden is judicially estopped

from arguing that his relationship with Ortiz was consensual and not sexual, because it is plainly

inconsistent with the Bearden Plea.

"The doctrine of judicial estoppel is designed 'to protect the integrity of the judicial process

by prohibiting parties from deliberately changing positions according to the exigencies of the

moment.'"  BancInsure, Inc. v. F.D.I.C., 796 F.3d 1226, 1239 (10th Cir. 2015)(quoting New

Hampshire v. Maine, 532 U.S. 742, 749-50 (2001)).  Although the circumstances in which judicial

estoppel applies are "not reducible to any general formulation of principle," the Supreme Court,

nevertheless, has identified three relevant factors: (i) whether a party's later position is "'clearly

inconsistent'" with its former position; (ii)  "whether the party 'succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled'"; and (iii) "'whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'"  BancInsure, Inc. v. F.D.I.C., 796 F.3d at 1239 (quoting New Hampshire v. Maine, 532 U.S. at 750-51).

The Tenth Circuit applies the doctrine of judicial estoppel "both narrowly and cautiously," Hansen v. Harper Excavating, Inc., 641 F.3d 1216, 1227 (10th Cir. 2011)(quoting Bradford v. Wiggins, 516 F.3d 1189, 1194 n.3 (10th Cir. 2008)), because "judicial estoppel is a powerful weapon . . . and there are often lesser weapons that can keep alleged inconsistent statements in check while preserving a party's option to have its day in court," Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc., 767 F.3d 987, 993 (10th Cir. 2014).  See Asarco, LLC v. Noranda Mining, Inc., 844 F.3d 1201, 1207 (10th Cir. 2017)(stating that the moving party faces a "difficult task" given the court's "reluctance to impose the harsh remedy" of judicial estoppel); Wright & Miller supra § 4477 n.16 ("Although the Tenth Circuit has come to recognize judicial estoppel, it has not come to love it.").  Moreover, judicial estoppel "only applies when the position to be estopped is one of fact, not one of law."  BancInsure, Inc. v. F.D.I.C., 796 F.3d at 1239 (citing United States v. Vilagrana-Flores, 467 F,3d 1269, 1279 (10th Cir. 2006).

The Court will invoke judicial estoppel to prevent Bearden from arguing his relationship with Ortiz was consensual and not did not involve touching "intimate parts," N.M.S.A. § 30-9-12(E).  On November 17, 2016, Bearden pled guilty to two counts of Criminal Sexual Contact in the Fourth Degree Resulting in Personal Injury, N.M.S.A. § 30-9-12(C), for his conduct at Western NM.  See Bearden Plea at 1.  In relevant part, N.M.S.A. § 30-9-12(C) states: "Criminal sexual

contact in the fourth degree consists of all criminal sexual contact perpetrated . . . by the use of force or coercion that results in personal injury to the victim."  "Criminal sexual contact" means the "unlawful and intentional touching of or application of force, without consent, to the unclothes intimate parts of another who has reaches his eighteenth birthday, or intentionally causing another who has reached his eighteenth birthday to touch one's intimate parts."  N.M.S.A. § 30-9-12(A).  "Intimate parts" means "the primary genital area, groin, buttocks, anus or breast."  N.M.S.A. § 30-9-12(E).

First, Bearden's position that his relationship with Ortiz was consensual is "'clearly inconsistent'" with his plea.  BancInsure, Inc. v. F.D.I.C., 796 F.3d at 1239 (quoting New Hampshire v. Maine, 532 U.S. at 750).  Bearden argues that he is not estopped, because he did not plead guilty to the "type of coercion or *quid pro quo* that would violate the Eight[h] Amendment," because he "did not plead guilty to criminal sexual penetration" or "to furnishing drugs to an inmate."  Bearden MSJ Reply at 13.  It does not matter, however, that Bearden did not plead guilty to criminal sexual penetration or to furnishing drugs to an inmate, because judicial estoppel "only applies when the position to be estopped is one of fact, not one of law."  BancInsure, Inc. v. F.D.I.C., 796 F.3d at 1239.  See Pueblo of Jemez v. United States, 430 F. Supp.3d 943, 1203-06 (D.N.M. 2019)(Browning, J.)(same).  Bearden is correct that he would not be estopped from arguing consent if his earlier position had been that he had violated the Eighth Amendment, because that is a position of law, and not of fact.  See United States v. Villagrana-Flores, 467 F. 3d 1269, 1279 (10th Cir. 2006)("Even if we to were to agree that the government took two clearly inconsistent positions, . . . the existence of a Fourth Amendment violation is a legal position, not a factual one, and therefore the first judicial estoppel factor has not been satisfied.").  Whether Ortiz and Bearden's relationship was consensual is, however, a question of fact.  Under

New Mexico law, Criminal Sexual Contact in the Fourth Degree Resulting in Personal Injury requires a showing that the conduct was not consensual.  See N.M.S.A. § 30-9-12(C); State v. Jackson, 2020-NMCA-034, ¶ 46, 468 P.3d 901, 018 ("The [criminal sexual contact] statute, as well as the jury instructions, require proof that Defendant touched or applied force to Victim's unclothed vagina without her consent . . . .").[127]  Bearden, therefore, pled guilty to two counts of a violation which requires a showing that, without consent, he touched Ortiz' "primary genital area, groin, buttocks, anus or breast."  N.M.S.A. § 30-9-12(E).  He now seeks to argue that (i) his contact with Ortiz was "limited to kisses and hugs and light caressing of his face"; and (ii) the relationship was consensual.  Those two positions are clearly inconsistent with the Bearden Plea.

Second, the Honorable Cindy M. Mercer, District Judge for the Thirteenth Judicial District Court of New Mexico signed the Bearden Plea.  See Bearden Plea, at 8.  Judge Mercer's acceptance of Bearden's plea weighs in favor of judicial estoppel, because it demonstrates that Bearden "'succeeded in persuading a court to accept" his "earlier position" BancInsure, Inc. v. F.D.I.C., 796 F.3d at 1239 (quoting New Hampshire v. Maine, 532 U.S. at 750).  Were Bearden to argue that his relationship with Ortiz was consensual and did not involve touching "intimate parts," N.M.S.A. § 30-9-12(E), it "would create a perception" that either Judge Mercer or the Court was "misled."  BancInsure, Inc. v. F.D.I.C., 796 F.3d at 1239 (quoting New Hampshire v. Maine, 532 U.S. at 750).  Moreover, for judicial-estoppel purposes, it does not matter that Bearden was sentenced to conditional discharge, nor that the Tenth Circuit treats those granted conditional

---

[127]The Court predicts that the New Mexico Supreme Court would agree with the New Mexico Court of Appeals' decision in State v. Jackson, 2020-NMCA-034, 468 P.3d 901, 018, because the New Mexico Court of Appeals largely tracked the language of N.M.S.A. § 30-9-12(A), and the New Mexico Supreme Court previously has not taken issue with this requirement.  See State v. Sena, 2020-NMSC-011, ¶ 52, 470 P.3d 227.

discharge as "neither 'adjudicated guilty' nor 'convicted,'" United States v. Saiz, 797 F.3d 853, 865 (10th Cir. 2015)(quoting State v. Herbstman, 1999-NMCA-014, ¶ 21, 974 P.2d 177, 183). The thrust of the second judicial-estoppel factor is on a court's acceptance of a party's position, not on the consequences a party receives from taking that position.  See Pueblo of Jemez v. United States, 430 F. Supp.3d at 1205 (concluding that a party was not judicially estopped because "Magistrate Judge Lynch decline[d] to adopt" the party's earlier legal position").

Bearden argues similarly that he is not estopped from arguing consent because "the State agreed to the plea to lesser charges because the evidence indicated the relationship was consensual."  Bearden MSJ Reply at 14.  Bearden cites the Pederson Aff. which states:

> One reason for the State's decision to accept a relatively lenient sentence from Mr. Bearden (supervised probation rather than incarceration, and the possibility of receiving a conditional discharge), was my conclusion based on the evidence that the sexual relationship between inmate Raymond Ortiz and Correctional Officer John Bearden, although prohibited by statute, was consensual in nature.

Pederson Aff. ¶ 5, at 2.  Contrary to Bearden's assertion, the State's decision to offer Bearden a more lenient plea because it believed the relationship to be consensual favors invoking judicial estoppel.  If Bearden were able to rely on his assertion that the relationship was sexual but consensual to obtain a more favorable plea -- yet still plead to two counts of a crime that requires proof of a nonconsensual sexual relationship -- and assert it as a defense to and Eighth Amendment claim,  he would be deriving an "'unfair advantage'" or imposing an "'unfair detriment'" on Ortiz if not estopped.  BancInsure, Inc. v. F.D.I.C., 796 F.3d at 1239 (quoting New Hampshire v. Maine, 532 U.S. at 751).  The judicial-estoppel factors, therefore, cut in favor of the Court invoking judicial estoppel to preclude Bearden from arguing both that his relationship with Ortiz was consensual and that it was "limited to kisses and hugs and light caressing of his face."  Bearden Aff. ¶ 45, at 7.  See Beem v. McKune, 317 F.3d 1175, 1187 (10th Cir. 2003)(O'Brien, J.,

concurring)("[W]hen a defendant prevails upon a stated position and later attempts to take unfair advantage by inconsistently arguing against that prior successful position, '[s]uch an arbitrary about-face cannot be countenanced'")(quoting United States v. Velez Carrero, 140 F.3d 327, 330 (1st Cir. 1998)).

Other District Judges in the District of New Mexico have invoked judicial estoppel under similar circumstances. See Doe v. Chee, No. CIV 16-1148 RB/CG, 2021 WL 218037, at *3 (D.N.M. Jan. 21, 2021)(Brack, J.). In Doe v. Chee, an inmate -- who was also incarcerated at Western NM -- alleged that a correctional officer "illegally coerced her into having sexual intercourse and/or oral sex with him on four occasions." 2021 WL 218037, at *1. The correctional officer pled guilty to Criminal Sexual Penetration in the Third Degree (Force or Coercion), in violation of N.M.S.A. § 30-9-11(F).[128] The inmate argued that his case was similar to Spurlock v. Townes, No. CIV 09-0768 WJ./DJS, 2010 WL 11470391 (D.N.M. May 26, 2010)(Johnson, J.), where the corrections officer who pled guilty to four counts of criminal sexual penetration by one in a position of authority, in violation of N.M.S.A. § 30-9-11(E)(2), and four counts of false imprisonment, in violation of N.M.S.A. § 30-4-03, for his assaults on inmates was judicially estopped from "contesting the facts to which he specifically admitted under oath at the plea hearing," including consent and that he had restrained the inmate. 2010 WL 11470391, at *6. The correctional officer, however, urged the Court to follow Sandoval v. Romero, No. CIV 09-1028 WJ/ACT, 2011 WL 13291259 (D.N.M. Mar. 3, 2011)(Johnson, J.), where a correctional officer was not estopped from arguing consent even though he also had pled guilty to N.M.S.A. § 30-9-

---

[128]N.M.S.A. § 30-9-11(F) states: "Criminal sexual penetration in the third degree consists of all criminal sexual penetration perpetrated through the use of force or coercion not otherwise specified in this section."

11(E)(2), because the correctional officer had not admitted to using force.  See 2011 WL 13291259, at *3.  In Doe v. Chee, the Honorable Robert C. Brack, United States District Judge for the United State District Court for the District of New Mexico, sided with the inmate, concluding that the officer was judicially estopped from contesting consent because N.M.S.A. § 30-9-11(F), unlike N.M.S.A. § 30-9-11(E)(2) requires "force or coercion."  2010 WL 11470391, at *4.

None of these cases is directly applicable here, because Bearden pled to a different statute, N.M.S.A.. § 30-9-12(C).  As stated above, however, N.M.S.A. § 30-9-12(C) requires that the conduct occur "without consent" and involve the "intentional touching or application of force" to "intimate parts."  Allowing Bearden to argue that his relationship with Ortiz was consensual, and only involved "kisses and hugs and light caressing of his face," Bearden Aff. ¶ 45, at 7, would afford Bearden an "unfair advantage" and "would impose an unfair detriment" on Ortiz. BancInsure, Inc. v. F.D.I.C., 796 F.3d at 1239 (quoting New Hampshire v. Maine, 532 U.S. at 751).  See Pueblo of Jemez v. United States, 430 F. Supp. 3d at 1203.  Because all three factors counsel in favor of invoking judicial estoppel, the Court determines that Bearden is judicially estopped from arguing that: (i) his relationship with Ortiz was consensual; and (2) his relationship with Ortiz was not sexual.

**IT IS ORDERED** that (i) New Mexico Risk Management's Opposed Motion to Intervene, filed November 6, 2018 (Doc. 36), is granted; (ii) Defendants Pete Perez, Gary Trujillo, Damien Nunez, and Carlos Gonzales Motion for Summary Judgment as to Second Amended Complaint Based on Qualified Immunity, filed December 18, 2018 (Doc. 53), is granted with respect to Pete Perez, and Gary Trujillo, and denied with respect to Damien Nunez, Carlos Gonzales, and John Bearden.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Elias Barela
Lauren L. Zabicki
Elias Barela Attorney at Law, L.L.C.
Los Lunas, New Mexico

    *Attorneys for the Plaintiff*

Michael Dickman
Law Office of Michael Dickman
Santa Fe, New Mexico

    *Attorney for Defendants Lucero-Ortega, Perez, Baca, Trujillo, Nunez, and Gonzales*
    *Attorney for Intervenor*

Douglas Gardner
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

    *Attorney for Defendant John Bearden*